1  William C. Rooklidge (SBN 134483)
   Ben M. Davidson (SBN 181464)
2  Gregory S. Cordrey (SBN 190144)
   Jesse D. Mulholland (SBN 222393)
3  HOWREY LLP
   2020 Main  Street
4  Irvine, California 92614
   949-721-6900
5  949-721-6910
   E-mail:  rooklidgew@howrey.com
6  E-mail:  davidsonb@howrey.com
   E-mail:  cordreyg@howrey.com
7  E-mail:  mulhollandj@howrey.com

8  Mark D. Wegener (*admitted pro hac vice*)
   HOWREY LLP
9  1299 Pennsylvania Ave, NW
   Washington, DC 20004
10 Telephone:  202-783-0800
   Facsimile:  202-383-6610
11 E-mail:  wegenerm@howrey.com

12 Attorneys for Plaintiff
   The Procter & Gamble Company

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17

18 THE PROCTER & GAMBLE COMPANY,      )   Case No.: C07-04413 PJH
                                      )
19              Plaintiff,            )   **Honorable Phyllis J. Hamilton**
                                      )
20 v.                                 )   **PLAINTIFF THE PROCTER & GAMBLE**
                                      )   **COMPANY'S NOTICE OF MOTION AND**
21 KRAFT FOODS GLOBAL, INC.,          )   **MOTION FOR A PRELIMINARY**
                                      )   **INJUNCTION; MEMORANDUM OF**
22              Defendant.            )   **POINTS & AUTHORITIES IN SUPPORT**
                                      )   **OF SAME.**
23                                    )
                                      )   **Date:   October 24, 2007**
24                                    )   **Time:   9:00 a.m.**
                                      )   **Court:  Courtroom 3, 17th Floor**
25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.     SUMMARY OF ARGUMENT ............................................................................. 1

II.    STATEMENT OF ISSUES TO BE DECIDED.................................................... 2

III.   STATEMENT OF RELEVANT FACTS ............................................................ 3

IV.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT
       KRAFT FROM INFLICTING FURTHER IRREPARABLE HARM TO
       P&G.................................................................................................................... 7

       A.   Legal Standards For Granting Preliminary Injunctions In Patent
            Cases ........................................................................................................ 7

       B.   P&G Is Likely To Succeed On The Merits Of Its Infringement
            Claim ........................................................................................................ 7

       C.   Kraft Is Unlikely To Succeed On The Merits Of Its Invalidity
            Claim ...................................................................................................... 13

       D.   P&G Will Be Irreparably Harmed Unless Kraft Is Enjoined......................... 15

            1.   Irreparable Harm Is Presumed From P&G's Strong
                 Showing Of Infringement And Validity ............................................. 15

            2.   P&G Has Also Made An Affirmative Showing Of
                 Irreparable Harm ............................................................................. 16

                 a.   Irreparable Harm From Erosion of P&G's Superior
                      Market Share ........................................................................ 18

                 b.   Irreparable Harm From Kraft's Ability As A Free-
                      Rider To Sell Infringing Products At Lower Prices.................. 19

                 c.   Irreparable Harm From Loss Of Customer Loyalty.................. 19

                 d.   Irreparable Harm From Lost Goodwill .................................. 20

                 e.   Irreparable Harm From Lost Sales Of Specialty
                      Products ............................................................................... 21

                 f.   Irreparable Harm From Kraft's Trading On P&G's
                      Investment ............................................................................ 22

       E.   The Balance of The Hardships Favors Granting An Injunction. ................... 22

       F.   The Public Interest Favors Enjoining Kraft's Infringement.......................... 24

HOWREY LLP

Page(s)

V.    CONCLUSION ................................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWREY LLP

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

4

5

### CASES

6  *02 Micro Int'l Ltd. v. Beyond Innovation Tech., Co.,*
       No. 2-04-CV-32 (TJW), 2007 U.S. Dist. LEXIS 25948, at **7-8 (E.D.
7     Tex. Mar. 21, 2007)............................................................................................................ 17

8  *3M Innovative Props. Co. v. Avery Dennison Corp.,*
       No. 01-1781 (JRT/FLN), 2006 U.S. Dist. LEXIS 70263, at *6 (D. Minn.
9     Sept. 25, 2006) ................................................................................................................. 25

10  *3M Unitek Corp. v. Ormco Co.,*
       96 F. Supp. 2d 1042  (C.D. Cal. 2000)............................................................................. 25
11

12  *800 Adept, Inc. v. Murex Sec., Ltd.,*
       No. 6:02-CV-1354-Orl-28 DAB, 2007 U.S. Dist. LEXIS 27051 at *24
13     (M.D. Fla. Apr. 12, 2007) ............................................................................................ 17, 21

14  *A.K. Stamping Co. v. Instrument Specialties Co.,*
       106 F. Supp. 2d 627 (D.N.J. 2000) .................................................................................. 23
15

16  *Amhil Enters. v. Wawa, Inc.,*
       81 F.3d 1554 (Fed. Cir. 1996)........................................................................................... 15
17

18  *Basicomputer Corp. v. Scott,*
       973 F.2d 507 (6th Cir. 1992).............................................................................................. 21

19  *Brooktrout, Inc. v. Eicon Networks Corp.,*
       No. 2:03-CV-59, 2007 U.S. Dist. LEXIS 43107 at **3-4 (E.D. Tex. June
20     14, 2007) ........................................................................................................................... 16

21  *Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech, Inc.,*
       492 F. Supp. 2d 600 (E.D. Tex. 2007)............................................................................. 19
22

23  *CVI/Beta Ventures v. Custom Optical Frames,*
       893 F. Supp. 508 (D. Md. 1995) ....................................................................................... 15
24

25  *Dippin' Dots v. Mosey,*
       No. 3:96-CV-1959-X, 1997 U.S. Dist. LEXIS 20896, *22 (N.D. Tex. Mar.
26     31, 1997) ........................................................................................................................... 24

27  *E. I. Du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,*
       706 F. Supp. 1135 (D. Del. 1989)..................................................................................... 15
28

  *E.I. Du Pont de Nemours & Co. v. Cetus Corp.,*

HOWREY LLP

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

No. C-89-2860 MHP, 1990 U.S. Dist LEXIS 18414, at **8-10 (N.D. Cal.
Dec. 3, 1990) .......................................................................................................... 15

*Ethicon, Inc. v. Quigg,*
849 F.2d 1422 (Fed. Cir. 1988) ............................................................................ 14

*Gillette Co. v. Energizer Holdings, Inc.,*
405 F.3d 1367 (Fed. Cir. 2005) .............................................................................. 7

*H.H. Robertson, Co. v. United Steel Deck, Inc.,*
820 F.2d 384 (Fed. Cir. 1987) ................................................................................ 7

*Hybritech, Inc. v. Abbott Labs.,*
849 F.2d 1446 (Fed. Cir. 1988) .............................................................................. 7

*In re Seagate Tech.,*
No. 830, 2007 U.S. App. LEXIS 19768, at *12 (Fed. Cir. Aug. 20, 2007) ............... 22

*Jacobsen v. Cox Paving,*
No. 89-1786 PHX PGR, 1991 U.S. Dist. LEXIS 17787, *4 (D. Ariz. May
16, 1991) (same), *aff'd,* 949 F.2d 404 (Fed. Cir. 1991) .......................................... 17, 23

*Johnston v. IVAC Corp.,*
885 F.2d 1574 (Fed. Cir. 1989) .............................................................................. 8

*Keith v. Superior Ct.,*
26 Cal. App. 3d 521, 103 Cal. Rptr. 314 (2d Dist. 1972) ...................................... 23

*Kristar Enters., Inc. v. Revel Envtl. Mktg., Inc.,*
No. C98-3094 CRB, 1998 U.S. Dist LEXIS 19914, at **14-16 n. 9 (N.D.
Cal. Dec. 16, 1998) ............................................................................................... 18

*Lubrizol Corp. v. Exxon Corp.,*
696 F. Supp. 302 (N.D. Ohio 1988) ...................................................................... 24

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) ................................................................................. 8

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC,*
No. H-05-1634, 2007 U.S. Dist. LEXIS 30536 at *49 (S.D. Tex. Apr. 25,
2007) ...................................................................................................................... 25

*MPT, Inc. v. Marathon Labels, Inc.,*
No. 1:04-cv-2357, 2007 U.S. Dist. LEXIS 3992, at *49 (N.D. Ohio Jan.
19, 2007 .................................................................................................................. 21

*Novozymes A/S v. Genencor Int'l, Inc.,*

HOWREY LLP

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

474 F. Supp. 2d 592 (D. Del. 2007) .......................................................................... 17

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005), *cert. denied*, 547 U.S. 1055 (2006) ........................................ 13

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003)................................................................................ 13, 15, 18

*Oscar Mayer Foods Corp. v. Sara Lee Corp.*,
743 F. Supp. 1326 (W.D. Wis. 1990).......................................................................... 23

*Paice LLC v. Toyota Motor Corp.*,
No. 2:04-CV-211-DF, 2006 U.S. Dist. LEXIS 61600, at **15-16 (E.D.
Tex. Aug. 16, 2006) ............................................................................................... 24

*Pfizer, Inc. v. Teva Pharms, USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005)................................................................................ 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................................... 8

*Pittway v. Black & Decker*,
667 F. Supp. 585 (D. Ill. 1987) ............................................................................... 21

*Polymer Techs. v. Bridwell*,
103 F.3d 970 (Fed. Cir. 1996)........................................................................... 17, 18, 20

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
75 F.3d 1558 (Fed. Cir. 1996)................................................................................. 17

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
237 F.3d 1359 (Fed. Cir. 2001)............................................................................... 17

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995).................................................................................. 22

*Roper Corp. v. Litton Sys., Inc.*,
757 F.2d 1266 (Fed. Cir. 1985).............................................................................. 8, 17

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*,
836 F. Supp. 1247 (W.D. Va. 1993) .......................................................................... 24

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*,
No. 83-2198, 1983 U.S. Dist. LEXIS 13684, *20 (D. Kan. Sept. 16, 1983) .............................. 22

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368, 1383 (Fed. Cir. 2006).......................................................................... 23

HOWREY LLP

1

## TABLE OF AUTHORITIES (cont.)

2

**Page(s)**

3  *Sinclair Int'l v. FMC Corp.,*
   No. C97-01885 CAL, 1997 U.S. Dist. LEXIS 14963, at *6 (N.D. Cal.
4  Sept. 10, 1997) ................................................................................................................. 18

5  *Smith Int'l Inc. v. Hughes Tool Co.,*
   718 F.2d 1573 (Fed. Cir. 1983)......................................................................................... 23
6

7  *Thermal Eng'g Corp. v. Clean Air Sys.,*
   706 F. Supp. 436 (W.D.N.C. 1987) ................................................................................... 15
8

9  *TiVo Inc. v. EchoStar Commc'n Corp.,*
   446 F. Supp. 2d 664 (E.D. Tex. 2006) .............................................................................. 20

10  Unique Concepts, Inc. v. Manuel,
    No. 85 C 4181, 186 U.S. Dist. LEXIS 22765, at *28 (N.D. Ill. July 15,
11  1986) .................................................................................................................................... 8

12  **STATUTES**

13  35 U.S.C. § 282 .................................................................................................................... 13

14  35 U.S.C. § 315(c)................................................................................................................ 15

15  35 U.S.C. §§ 271, 283 ........................................................................................................... 7
16

17  **REGULATIONS**

18  37 CFR § 1.555(b)(2)(ii)....................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

1        PLEASE TAKE NOTICE that on October 24, 2007 at 9:00 a.m., or as soon thereafter as the

2   counsel can be heard, in the Courtroom of the Honorable Phyllis J. Hamilton, United States District

3   Court Judge, Plaintiff, The Procter & Gamble Company's ("P&G"), will and hereby does move for an

4   order granting a preliminary injunction to prevent Defendant Kraft Global Foods, Inc. ("Kraft") from

5   continuing to infringe U.S. Patent No. 7,169,418 ("the P&G Patent").

6   **I.      SUMMARY OF ARGUMENT**

7        This case involves Kraft's failed attempt to invalidate a P&G patent in a U.S. Patent &

8   Trademark Office ("USPTO") reexamination proceeding, its decision to nevertheless infringe the

9   patent, and the irreparable harm that Kraft will cause to P&G unless it is enjoined.

10       P&G and Kraft are direct competitors in the market for ground, roast coffee. P&G sells Folgers

11  brand coffee and Kraft sells Maxwell House coffee. For many decades, both companies packed and

12  sold their coffee in cylindrical metal cans. Beginning in the late 1990s, P&G developed a

13  breakthrough new container technology that radically changed its product. P&G replaced its

14  traditional metal can with an innovative new plastic container. To bring this new plastic container to

15  market, P&G's engineers had to overcome many technical challenges in a research-and-development

16  project that lasted several years and cost several million dollars. P&G's efforts resulted in an award-

17  winning, easy-to-use, plastic container branded AromaSeal® because of its ability to keep coffee

18  smelling fresher longer. In 2003, when P&G boldly introduced its new packaging technology, over the

19  skepticism of its competitors, including Kraft, consumers rewarded P&G's innovations by giving

20  Folgers a commanding lead in the market for ground, roast coffee. In January 2007, the USPTO

21  awarded P&G's inventors U.S. Patent No. 7,169,418, giving P&G the exclusive right to use the

22  technology that continues to make P&G the market leader today.

23       P&G is entitled to a preliminary injunction because (1) it is likely to succeed on the merits of

24  its infringement claim; (2) it would suffer irreparable harm from continued infringement; (3) the

25  balance of hardships weighs in its favor; and (4) the public interest favors granting an injunction.

26       P&G's likelihood of succeeding on the merits is clear. A comparison of P&G's patent claims

27  with Maxwell House's plastic container shows that Kraft is infringing not only the broader claims, but

28

-1-      **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH**

1    also many narrower claims. P&G is just as likely to succeed against Kraft's invalidity arguments. The

2    P&G patent carries a statutory presumption of validity, and that presumption is more difficult to

3    overcome now that the USPTO has rejected Kraft's invalidity arguments in a recent reexamination.

4         Irreparable harm from Kraft's infringement is presumed from P&G's strong showing of

5    infringement and validity. P&G need not rely, however, solely on that presumption. Kraft's continued

6    infringement would injure P&G in ways that could not be remedied by an award of money damages.

7    Offering consumers the innovative plastic container P&G developed will allow Kraft to (1) diminish

8    P&G's hard-earned market share and position as market leader; (2) erode the price that consumers

9    have been willing to pay for P&G's innovations; (3) reduce P&G's ability to draw consumers to

10   Folgers brand coffee and develop consumer loyalty; (4) diminish the goodwill that P&G has earned as

11   the exclusive source of a superior technology; (5) decrease P&G's sales of specialty products that P&G

12   promotes using its plastic containers; and (6) exploit P&G's years of research and development.

13        The balance of the hardships also favors granting an injunction. If Kraft suffers any loss to its

14   business from an injunction, it has only itself to blame. Kraft chose to introduce a new product that

15   infringes P&G's patent, even after the USPTO, at Kraft's request, confirmed the validity of P&G's

16   patent claims over Kraft's invalidity arguments. And Kraft's self-inflicted harm will be minimal:

17   Kraft can continue selling Maxwell House coffee using its non-infringing metal cans.

18        Finally, public policy, which favors protecting the rights secured by valid patents, favors

19   protecting P&G's rights in this case. Kraft is selling coffee, not a pharmaceutical or another critical

20   product that might justify denying a preliminary injunction.

21        Because each of the four factors weighs heavily in favor of P&G, the Court should enter the

22   requested preliminary injunction and prevent Kraft's continued infringement.

23   **II.    STATEMENT OF ISSUES TO BE DECIDED**

24        P&G's motion requires the Court to decide five issues:

25        (1) whether P&G is likely to succeed on the merits by proving that Kraft is infringing by

26   making, selling, and offering for sale Kraft's 39-ounce plastic container of Maxwell House ground,

27   roast coffee and by preventing Kraft from showing invalidity of its asserted patent claims by clear and

28

-2-    **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1  convincing evidence;

2       (2) whether P&G faces irreparable harm from Kraft's continued infringement;

3       (3) whether the balance of the hardships favors granting a preliminary injunction;

4       (4) whether the public interest favors granting a preliminary injunction; and

5       (5) whether Kraft should be enjoined from making, using, selling, offering for sale, or

6  importing ground, roast coffee in its 39-ounce plastic containers.

7  **III.    STATEMENT OF RELEVANT FACTS**

8       P&G's Folgers, a 153-year old brand of ground, roast coffee, is the most popular brand of

9  ground, roast coffee in the United States today.  Declaration of Jason Gemeiner In Support of P&G's

10  Motion For A Preliminary Injunction ("Gemeiner Decl.") ¶4.  Folgers' current market share is

11  estimated as between 32% and 33% while Kraft's Maxwell House accounts for an estimated 19%

12  share of the market.  Gemeiner Decl. ¶4.

13       Fresh ground, roast coffee gives off substantial amounts of oils and gases, including carbon

14  dioxide gas.  Declaration of David Dalton In Support of P&G's Motion For A Preliminary Injunction

15  ("Dalton Decl.") ¶ 6.  Although these oils and gases create a pleasant aroma, the emitted gases generate

16  high pressures inside the container.  *Id.*  To deal with this problem, coffee manufacturers historically

17  have tried to eliminate the emitted gases by storing the ground coffee in bins before packing it into

18  containers.  *Id.*, ¶ 7.  In addition, for decades, manufacturers packed coffee in vacuum-packed metal

19  cans.  *Id.*  Although these metal cans are sturdy and can withstand high pressures, they have a number

20  of disadvantages, including that they tend to be heavy, difficult and unwieldy for consumers to use,

21  cannot be easily opened and require a tool (e.g., a can opener), cannot easily be molded into various

22  shapes, and are subject to permanent deformation, or denting.  *Id.*

23       As early as in 1997, P&G began looking at packaging forms as an alternative to the traditional

24  metal can, including using plastic coffee containers.  Dalton Decl., ¶ 5.  In 1999, a team of P&G

25  engineers conducted consumer focus groups to identify features that coffee consumers wanted.  *Id.*

26  P&G found that consumers preferred several features that the conventional metal cans lacked,

27  including easy-to-hold, easy-to-store, easy-to-open (without a can opener), and keeping the coffee

28

HOWREY LLP

-3-    **MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION CASE NO. C07-04413 PJH H**

1    fresh long after opening the container. *Id.* This led to features such as molding the container with

2    particular plastic materials to keep the container lightweight and provide design flexibility to promote

3    coffee freshness, molding a handle into the container, sealing the container with a laminated foil, and

4    incorporating a Tupperware-style lid. *Id.* Designing an improved container required P&G's engineers

5    to solve a number of technical problems. *Id.*, ¶ 8. For example, while plastics offered a lighter way to

6    store coffee, they could deform under pressure from the emitted gases and changes in altitude during

7    shipping. *Id.* Another problem was that plastic coffee containers are not inherently as strong as metal

8    containers and must be designed to withstand the weight of the containers stacked above them (i.e., as

9    in a pallet) during shipping. *Id.* Yet another problem was that the high pressure caused by the emitted

10   gases inside the container could unseal the flexible seal placed on the coffee container. *Id.*

11       To solve the problems posed by the use of plastic containers while taking advantage of plastic's

12   advantageous properties, P&G's engineers developed and incorporated a number of different

13   technologies to achieve an innovative new design:

14   • a multi-layered plastic structure, coupled with structural design elements to: (1)
         provide an internal layer to absorb coffee odors and oils so that the container itself

15      would give consumers a pleasant coffee aroma; (2) provide a middle, barrier layer to
        block outside gases (chiefly oxygen) from entering the container and making the

16      coffee smell bad or becoming stale; and (3) to provide rigid support to the container.
        Dalton Decl. ¶ 9.

17

18   • flexible regions called "regions of deflection," that control how the container deforms
       in response to internal or external pressures to help prevent it from becoming dented or
       otherwise distorted. *Id.*

19

20   • a ridge on top of the container at its opening to attach an easy-to-peel flexible foil seal
       to keep the coffee fresh before it was sold. *Id.*

21   • a one-way valve on the seal to allow the emitted gases to escape without letting air
       back into the container so as to prevent the emitted coffee gases from damaging the

22      container. *Id.*

23   • a handle molded into the container. *Id.*

24   • a flexible "overcap" on top of the container with an airtight seal reminiscent of
       Tupperware. *Id.*

25

    On May 24, 2002, after about five years and $5 million in research and development, P&G

26

27

28

-4-    **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

DM_US:20690368_1

1  filed a patent application on its new container technology with the USPTO.[1]  *See* Declaration of Greg

2  Huntington In Support of P&G's Motion For A Preliminary Injunction I ("Huntington Decl.") ¶3;

3  Davidson Ex. 1. The application described and claimed the inventive packaging system that allowed

4  P&G to replace traditional metal coffee cans with lightweight and durable plastic containers that would

5  appeal to consumers, keep coffee fresh, and address the challenges of storing and shipping roast,

6  ground coffee. *See* Ex. 1.[2]  The USPTO examined P&G's application for four and a half years. *Id.* In

7  doing so, USPTO Examiners considered an extensive body of over 150 patents and other documents

8  demonstrating the state of the prior art. *Id.* at 1-3.

9      In 2003, while the USPTO was examining P&G's patent application, P&G converted its entire

10  line of roast, ground coffee production to its new plastic container design, incurring millions of dollars

11  to retool its manufacturing facility in New Orleans. Mills Decl. ¶7. This changeover to the new design

12  cost P&G at least $30 million. Huntington Decl., ¶30. P&G advertised its technology under the

13  trademark "AromaSeal," emphasizing the benefits of the revolutionary container design, including the

14  improved aroma and freshness of the coffee, its peel-off seal, flavor-protecting air valve, tight-fitting

15  lid, and easy-to-grip handle. Mills Decl. ¶6. Recognizing the threat posed by P&G's innovative

16  technology, Kraft immediately engaged in a negative advertising campaign against the plastic

17  container. Declaration of Edward Bello In Support of P&G's Motion For A Preliminary Injunction

18  ("Bello Decl.") ¶4. Using its ads, Kraft tried to convince consumers that only traditional metal cans

19  could keep coffee fresh:

20      Have you seen that new plastic coffee container? Did you know it actually absorbs
        aroma from the coffee? At Maxwell House, we think the aroma should stay where it
21      belongs: in the coffee, not the container! Our steel can won't absorb OUR rich coffee
        aroma and, unlike plastic, it's a perfect barrier against coffee's worst enemies, moisture
22      and oxygen. So, choose Maxwell House with the fresh seal steel can and make every day
        good to the last drop. Bello Decl. ¶4.
23
24      Despite Kraft's negative ads, consumers reacted as P&G's extensive research had predicted,

25  ───────────────

26  [1] P&G based its May 24, 2002 patent application on a provisional application filed on June 4, 2001.

27  [2] Unless otherwise stated, all exhibits are to the Declaration of Ben M. Davidson In Support of P&G's
    Motion For A Preliminary Injunction ("Davidson Decl.").

28

overwhelmingly preferring P&G's plastic containers over traditional metal coffee cans, including Kraft's. Declaration of Rudy Schmeller In Support of P&G's Motion For A Preliminary Injunction ("Schmeller Decl.") ¶3; Bello Decl. ¶¶4, 5, 12; Roe Decl. ¶4. Consumers were readily willing to pay 25 to 40 cents more for coffee sold in the patented plastic container because of the advantages it provided over metal cans, including Kraft's. Schmeller Decl. ¶8; Gemeiner Decl. ¶8. Simultaneously, P&G was able to achieve significant increases in market share while strengthening customer loyalty among a significant percentage of consumers—coffee drinkers who switch to Folgers brand coffee and then make this brand their long-term coffee of choice. Gemeiner Decl. ¶8. Coffee consumers' widespread approval of P&G's new and innovative design was echoed by consumer groups and other organizations. The Arthritis Foundation awarded P&G's design its "Ease of Use Commendation." Huntington Decl. ¶5. Dupont awarded P&G the Dupont Award for Innovation in Packaging. *Id*. Food and Drug Packaging magazine named P&G's design the "Package of the Year." *Id*. The Institute of Packaging Professionals gave P&G its "Ameristar Award," recognizing that P&G's technology was "as dramatic a move" in the industry as when "glass was replaced by plastic 20 years ago." *Id.*

The USPTO also recognized the inventive contributions of P&G's engineers. On January 30, 2007, it granted P&G U.S. Patent No. 7,169,418. Ex. 1. The very next day, Kraft challenged the validity of P&G's patent by initiating an *inter partes* reexamination proceeding in the USPTO. Ex. 2, p. 71. Kraft had four years to prepare its challenge because the USPTO had published P&G's patent application on January 16, 2003.[3] Ex. 1. On June 7, 2007, after considering all of Kraft's arguments and prior art documents, the USPTO confirmed the validity of all 55 claims of P&G's patent by issuing an Action Closing Prosecution. Ex. 2, pp. 5-22. Just two months later, although it had failed to invalidate P&G's patent, Kraft proceeded to introduce an infringing plastic 39-ounce coffee container with an integral handle, one-way valve on the flexible seal, regions of deflection formed into the container, and other features of P&G's patented packaging system such as particular tensile strength,

---

[3] On January 21, 2005, Kraft also submitted P&G's published patent application to the USPTO during the prosecution of two of its design patents for plastic coffee containers, D520,371 and D518,735.

1  load capacity, and plastic material.[4]  *See* Huntington Decl. ¶4.  Meanwhile, Kraft continues to

2  advertise and sell its ground, roast coffee in metal cans.  Davidson Decl. ¶5, Ex. 4.

3  **IV.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT KRAFT FROM**

4  **INFLICTING FURTHER IRREPARABLE HARM TO P&G**

5        The patent laws give a patent owner the right to preclude others from infringing its patent by

6  making, using, selling, offering for sale or importing the patented invention.  35 U.S.C. §§ 271, 283.

7  To protect that right, Congress has authorized district courts to grant preliminary injunctive relief "in

8  accordance with the principles of equity to prevent the violation of any right secured by patent, on such

9  terms as the court deems reasonable." *Id*. at § 283.

10       **A.    Legal Standards For Granting Preliminary Injunctions In Patent Cases**

11        P&G is entitled to a preliminary injunction if it shows that the equities favor the grant of an

12  injunction under a four-factor test, considering: (1) the likelihood that P&G will prevail on the merits;

13  (2) whether P&G will be irreparably harmed in the absence of an injunction; (3) whether the threatened

14  injury to P&G outweighs the harm a preliminary injunction would cause Kraft; and (4) whether the

15  preliminary injunction will serve the public interest. *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d

16  1331, 1333 (Fed. Cir. 2006); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir.

17  2005).  None of these four factors can by itself determine whether the Court should issue a preliminary

18  injunction.  The Court must instead weigh and measure each factor against the other factors and

19  against the form and magnitude of the relief requested. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446,

20  1451 (Fed. Cir. 1988).  As demonstrated below, each of the factors in this case weighs in favor of

21  enjoining Kraft's continued infringement.

22       **B.    P&G Is Likely To Succeed On The Merits Of Its Infringement Claim**

23        A grant of preliminary injunctive relief does not require proof of infringement beyond all

24  question. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987),

25  _____

26  [4] The exact timing of Kraft's introduction of the product is unclear.  P&G first became aware of
    Kraft's new container in August 2007 and is not aware of any announcements made by Kraft before it

27  introduced its infringing product.  Huntington Decl. ¶5.

28

-7-    **MEMORANDUM IN SUPPORT OF THE MOTION**
**FOR A PRELIMINARY INJUNCTION**
**CASE NO. C07-04413 PJH H**

1    *overruled by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (on other grounds).

2    P&G just needs to show a reasonable likelihood of success at trial on any one of its patent claims. *Id.*

3    To make this showing, P&G may submit the claims and the structure of the accused product and

4    identify how those claims cover the accused product. *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266,

5    1271 (Fed. Cir. 1985). In the context of a preliminary injunction, "[a] clear showing of infringement

6    is, for example, a literal reading of the claims on the accused device. . . ." *Unique Concepts, Inc. v.*

7    *Manuel*, No. 85 C 4181, 186 U.S. Dist. LEXIS 22765, at *28 (N.D. Ill. July 15, 1986) (citing *Atlas*

8    *Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)). An accused product infringes

9    a claim when each limitation of the claim can be found in the product, either exactly or by a substantial

10   equivalent. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989). As explained in the table

11   below, because each and every limitation in at least claims 1, 11, 12, 13, 15, 21, 33, 37, and 43 of the

12   '418 patent is at least literally present in Kraft's plastic 39-ounce Maxwell House coffee containers,

13   Kraft infringes at least these claims.[5]

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| 1. A packaging system comprising: | The Maxwell House container is a packaging system in that it provides a package for holding 39 ounces of custom roast, ground coffee. Zeik Decl. ¶ 4. |
| a container having a longitudinal axis and comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said | As shown below, the Maxwell House container has a longitudinal axis with a closed bottom, an open top (covered in the photograph by the gold lid) and a body having an enclosed perimeter between the bottom and top. |

[5] For the purposes of this motion, P&G identifies nine claims that demonstrate the clear and literal infringement of Kraft's plastic container. P&G reserves the right to assert additional claims and, to the extent that Kraft tries to escape a finding of infringement based on any alleged substantial differences between the claims and its product, P&G reserves the right to rely on the doctrine of equivalents.

[6] Because the meaning of the claim terms is clear, they do not require construction and have been given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (*en banc*) ("[T]he words of a claim 'are generally given their ordinary and customary meaning,'" and "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." "In some cases, [as here,] the ordinary meaning of patent claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.")

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| top; [element a] | *Id.*, ¶ 5. *See also,* Kraft's U.S. Patent Application US 2007/0187420 at [00042-43] (Davidson Ex. 3) (describing a container nearly identical to the Maxwell House container as having a base, four sides extending upward from base and top connected to the sides so that the container defines a main interior volume to hold particulate coffee).<br><br><br>Longitudinal axis |
| wherein said bottom, top, and body together define an interior volume; [element b] | The bottom, top and body of Maxwell House container define an interior volume that holds 39 ounces of roast ground coffee. *Id.*, ¶ 6; Davidson Ex. 3 at [00042-43]. |
| wherein said body comprises at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection; [element c] | The body of the Maxwell House container has at least two regions of deflection. *Id.*, ¶ 7.<br><br>region of deflection<br><br><br>The region of deflection allows the body to flex and has less resistance to flexing than the curved body portions of the container next to the regions of deflection. *Id.*, ¶ 8; Davidson Ex. 3 at [0059] (describing vertical and horizontal ribs next to the side panels [regions of deflection] "to prevent side panel warping and distortion.") |

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| a protuberance continuously disposed around the perimeter of said body proximate to said top wherein said protuberance forms a ridge external to said body; [element d]<br><br>The P&G patent explains that the protuberance can provide a surface with which to removably attach the flexible closure. *See* Col. 5, line 55-59 ("Additionally, container 11 can have a protuberance 17 in the form of a rim like structure disposed at the open end of container 11. Protuberance 17 can provide a surface with which to removably attach closure 18 and provide a locking surface for skirt portion 32 of overcap 30."). | The Maxwell House container has a protuberance (or ridge) continuously disposed around the perimeter of the body at the top. The protuberance forms a ridge external to the body in that it extends upward and away from the body. *Id.*, ¶ 9. The protuberance on the Maxwell House container provides a surface on which to attach the flexible closure. *Id*; Davidson Ex. 3 at [0043] (describing a circular rim at the top of the container)<br><br> |
| a handle disposed on said body; [element e] and | The Maxwell House container has a handle disposed on the body of the container. *Id.*, ¶ 5; Davidson Ex. 3 at [0051] (describing container as having a handle). |
| a flexible closure removably attached and sealed to said protuberance; [element f] | The Maxwell House container has a flexible metallic foil closure that is removably attached and sealed to the protuberance. As shown below, the flexible closure is visible when the cover is removed. *Id.*, ¶ 10; Davidson Ex. 3 at [0045] (describing that the container opening is covered by a "peelable sheet (including foil, plastic or layere foil/plastic).")<br><br>flexible closure<br> |
| wherein said bottom and said body are constructed from a material having a tensile modulus number ranging from at | The bottom and body of the Maxwell House container are made of a material having a tensile modulus at least about 35,000 pounds per square inch to at least about 650,000 |

HOWREY LLP

DM_US:20690368_1

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (44,230 atm); [element g] | pounds per square inch. *Id.,* ¶ 12. P&G's testing shows that the Maxwell House container has a tensile strength of about 107,000 psi to 111,000 psi. *Id.* |
| wherein said container has a top load capacity of at least about 16 pounds (7.3 kg); [element h] | The Maxwell House container has a top load capacity of at least 16 pounds. *Id.,* ¶ 13. More specifically, the Maxwell House container has a top load capacity of about 180 pounds. *Id.;* Davidson Ex. 3 at [0047] (describing container as having a top load capacity of 350 pounds). |
| and wherein said closure has a one-way valve disposed thereon. [element i] | The Maxwell House container has a one-way valve on the foil seal. *Id.,* ¶ 11; Davidson Ex. 3 at [0045] (describing the "peelable sheet" of foil as having a one-way valve).<br><br>One-way valve<br> |
| 11. The packaging system as claimed in claim 1 wherein said material is a multi-layered structure. | P&G's testing shows that the Maxwell House container has a multi-layered material including an interior layer of HDPE material, a middle, barrier layer of EVOH material, and an outer layer of HDPE material. *Id.,* ¶ 14; Davidson Ex. 3 at [0041] (describing container material as being multi-layered). |
| 12. The packaging system as claimed in claim 11 wherein said multi-layered structure further comprises a polyolefin layer proximate to said interior volume and at least one layer that is an oxygen barrier. | P&G's testing shows that the Maxwell House container has a multi-layered material consisting of an interior layer of HDPE, a middle, barrier layer of EVOH, and an outer layer of HDPE. *Id.,* ¶ 14. The interior layer of HDPE is a polyolefin. *Id. See also* '418 patent, col. 4, lines 28-35 (HDPE is a polyolefin). The middle layer of EVOH is an oxygen barrier. *Id. See also* '418 patent, col. 8, lines 15-25 (EVOH can provide an excellent oxygen barrier); Davidson Ex. 3 at [0041] (describing the multi-layered container material as being HDPE and including an $O_2$ barrier layer). |
| 13. The packaging system as claimed in claim 12 wherein said polyolefin is selected from the group consisting of low density polyethylene, high density | P&G's testing shows that the Maxwell House container has a multi-layered material consisting of an interior layer of high density polyethylene (HDPE), a middle, barrier layer of EVOH, and an outer layer of HDPE. *Id.,* ¶ 14; |

**MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION CASE NO. C07-04413 PJH H**

HOWREY LLP

DM_US:20690368_1

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| polyethylene, polypropylene, co-polymers thereof, and combinations thereof. | Davidson Ex. 3 at [0041] (describing the multi-layered container material as being HDPE). |
| 15. The packaging system as claimed in claim 1 wherein said handle is substantially parallel to said longitudinal axis of said container. | The Maxwell House container has a handle that is substantially parallel to the longitudinal axis of the container. *Id.,* ¶ 5; Davidson Ex. 3 at [0051] (describing the handle as having a generally vertical segment). |
| 21. The packaging system as claimed in claim 20 wherein said tensile modulus number ranges from at least about 90,000 pounds per square inch (6,124 atm) to at least about 150,000 pounds per square inch (10,207 atm).[7] | The bottom and body of the Maxwell House container are made of a material having a tensile modulus at least about 90,000 pounds per square inch to at least about 150,000 pounds per square inch. *Id.,* ¶ 12.  P&G's testing shows that the Maxwell House container has a tensile strength of about 107,000 psi to 111,000 psi.  *Id.* |
| 33.  An article of manufacture comprising: | The Maxwell House container is an article of manufacture. |
| a closed bottom; an open top; a body forming an enclosed perimeter between said bottom and top; | See claim 1, element a. |
| wherein said bottom, top, and body together define an interior volume; | See claim 1, element b. |
| wherein said body comprises at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection; | See claim 1, element c. |
| wherein said body includes a protuberance continuously disposed around the perimeter of said body proximate to said top; and, | See claim 1, element d. |
| wherein said bottom and body are constructed from a polyolefin; | See claim 12. |
| a flexible closure having a one-way valve disposed thereon, the closure removable attached to said protuberance wherein said closure forms a seal with said protuberance; | See claim 1, elements f and i. |
| roast and ground coffee contained within said interior volume; and, | The Maxwell House container contains roast and ground coffee. *Id.,* ¶ 4. |

[7] Claim 20 depends from claim 1 and reads: "[t]he packaging system as claimed in claim 1 wherein said tensile modulus number ranges from at least about 40,000 pounds per square inch (2,721 atm) to at least about 260,000 pounds per square inch (17,692 atm)."  '418 patent, col. 17, lines 64-67.

-12-    **MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION CASE NO. C07-04413 PJH H**

| Claim[6] | Maxwell House 39-ounce coffee container |
|---|---|
| wherein said article of manufacturer has an overall coffee aroma value of at least about 5.5. | The Maxwell House container has an overall coffee aroma value of at least about 5.5. Floyd Decl., ¶¶ 3-9. P&G's testing shows that the Maxwell House container has an overall coffee aroma value of 6.23. *Id.*, ¶ 9, |
| 43. The packaging system of claim 37 wherein said container contains roast and ground coffee therein. | The Maxwell House container label (shown below) says that it contains roast and ground coffee. *Id.*, ¶ 4. Claim 43 depends from claim 37, which is identical to claim 1, except that it does not require a one-way valve. For the reasons given with claim 1, the Maxwell House container infringes claim 37. |



## C.   Kraft Is Unlikely To Succeed On The Merits Of Its Invalidity Claim

P&G's patent is entitled to a statutory presumption of validity. 35 U.S.C. § 282. Kraft bears the burden of establishing invalidity of each patent claim by clear and convincing evidence. *Nystrom v. Trex Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005), *cert. denied*, 547 U.S. 1055 (2006). Although Kraft ultimately bears the burden of proving invalidity, on a motion for preliminary injunction the patentee has to establish a reasonable likelihood that the patent challenger will be unable to establish invalidity by clear and convincing evidence. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Stated differently, P&G must show that Kraft's defense does not raise a substantial question of invalidity when considered in light of the statutory presumption of validity as well as Kraft's burden to prove invalidity by clear and convincing evidence. *Id.* Given the extensive prior art submitted in connection with P&G's initial examination of its patent and the USPTO's recent affirmation of the validity of P&G's patent, P&G has established a reasonable likelihood that Kraft will not be able to prove invalidity by clear and convincing evidence.

From May 24, 2002, when P&G filed its patent application, to January 30, 2007, when the USPTO granted P&G's patent, the USPTO considered an extensive amount of potential prior art: 144

1    United States patents, four foreign patent documents and several non-patent publications. *See* Ex. 1.

2    Moreover, on January 31, 2007 Kraft filed a request for *inter partes* reexamination of P&G's patent

3    seeking to have all 55 claims of P&G's patent held invalid. In its 102-page reexamination request,

4    Kraft argued that P&G's patent claims were invalid based on 48 different combinations of prior art.

5    Yet, despite having four years to obtain evidence and develop arguments to invalidate P&G's patent,

6    Kraft could not find any evidence that P&G's patented inventions were not novel. Kraft instead

7    argued that the inventions would have been "obvious" despite the years and millions of dollars of

8    effort that it took P&G to develop this technology, Kraft's own skepticism about using a plastic

9    container for coffee, the technology's undeniable commercial success, the wide-spread praise that the

10   technology has earned, and Kraft's recent attempt to seek patents for its own plastic coffee container.

11   *See* Davidson Ex. 2 at 81.[8]  In addition, Kraft based many of its invalidity arguments on prior art that

12   the USPTO already had considered. *See id.* Kraft urged the USPTO to reconsider these prior art

13   documents because the original USPTO examiner allegedly had "either forgotten or overlooked," or

14   "fail[ed] to notice" the disclosures in these documents. *Id.* at 89-90.

15        By choosing to attack the validity of P&G's patent at the USPTO, Kraft tried to maximize its

16   chances of proving invalidity because its burden there would be easier to meet. A party attacking a

17   patent in federal court must overcome the statutory presumption of validity by presenting clear and

18   convincing evidence that each challenged claim is invalid. In a reexamination proceeding, however,

19   there is no presumption of validity. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988). The

20   intent of reexaminations is to "start over" at the USPTO and to determine if the claims are valid based

21   on a preponderance of evidence standard. *Id.* Also, while in litigation, the claims must be construed

22   narrowly, if possible, to sustain their validity, *Amhil Enters. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.

23   Cir. 1996), in reexamination examiners must give claims their broadest reasonable interpretations to

24   determine whether the claims impermissibly encompass the prior art. 37 CFR § 1.555(b)(2)(ii).

25

26   [8] In its patent application for its Maxwell House plastic container, Kraft admits that "[c]ontainers for
     particulate (roast or ground) coffee have many unique requirements not considered for other
27   containers." Davidson Ex. 3 at paragraph [0002].

28

-14-   **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1   Despite the more stringent standard, on June 7, 2007, the USPTO reaffirmed the validity of all

2   55 claims and issued an Action Closing Prosecution of the P&G's patent. Ex. 2 at 5-22. In doing so,

3   the assigned three-member panel of USPTO Examiners (different from the examiners that examined

4   the original application) addressed and rejected each and every argument that Kraft had advanced in its

5   reexamination request. *Id.* Because Kraft lost its invalidity challenge at the USPTO, despite its lower

6   standard of proof and its broader claim constructions, it is reasonably likely that Kraft will also fail to

7   invalidate P&G's patent claims at trial. As the Federal Circuit explained in affirming a preliminary

8   injunction, "recognizing the presumption of validity and the fact that the [plaintiff's] patent has already

9   been subjected to reexamination, [plaintiff] has at this point in the case shown that it is reasonably

10  likely to withstand [defendant's] validity challenge." *Oakley*, 316 F.3d at 1342. That is because Kraft

11  would have to show that the USPTO Examiners did not do their jobs properly either during the initial

12  examination or during the reexamination that Kraft initiated. *E. I. Du Pont de Nemours & Co. v.*

13  *Polaroid Graphics Imaging, Inc.*, 706 F. Supp. 1135, 1141 (D. Del. 1989) (after reexamination, a

14  defendant's burden becomes more difficult especially where it relies on prior art that the USPTO

15  considered both during the original and reexamination proceedings).[9] Indeed, once Kraft exhausts its

16  appeals, it will be statutorily precluded from even challenging the validity of the P&G patent on any

17  grounds that it raised or could have raised in the reexamination. 35 U.S.C. § 315(c).

18      **D.      P&G Will Be Irreparably Harmed Unless Kraft Is Enjoined**

19          **1.      Irreparable Harm Is Presumed From P&G's Strong Showing Of**

20                  **Infringement And Validity**

21      Because P&G has shown a strong likelihood of success on the merits of its infringement claim,

22  it is entitled to a presumption of irreparable harm. *Pfizer, Inc. v. Teva Pharms, USA, Inc.*, 429 F.3d

23

24  [9] *See also E.I. Du Pont de Nemours & Co. v. Cetus Corp.*, No. C-89-2860 MHP, 1990 U.S. Dist
    LEXIS 18414, at **8-10 (N.D. Cal. Dec. 3, 1990) (where the PTO has reissued or upheld the patent, a
25  challenger's burden of proving invalidity in subsequent litigation is heavier than it would otherwise
    be); *Thermal Eng'g Corp. v. Clean Air Sys.*, 706 F. Supp. 436, 444 (W.D.N.C. 1987) (same);
26  *CVI/Beta Ventures v. Custom Optical Frames*, 893 F. Supp. 508, 516 (D. Md. 1995) (in a preliminary
    injunction, the presumption of validity is "enhanced" where the patent survived reexamination).
27

28

-15-   **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1   1364, 1381 (Fed. Cir. 2005). As the Federal Circuit has explained, "because the very nature of a patent

2   provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the

3   absence of exceptions such as a finding that future infringement is no longer likely, that the patentee is

4   willing to forgo its right to exclude by licensing the patent, or that the patentee had delayed in bringing

5   suit." *Id.* at 1381 (citation omitted.)

6           **2.      P&G Has Also Made An Affirmative Showing Of Irreparable Harm**

7           P&G does not rely solely on the presumption of irreparable harm. Its request for an injunction

8   is supported by the need to prevent Kraft from damaging the superior position that P&G has earned in

9   the market, including by (1) eroding P&G's superior market share, ability to attract new market

10  entrants, and position as the market leader; (2) eroding the price that consumers are willing to pay to

11  reward P&G for its R&D investment in the patented technology; (3) preventing P&G from exclusively

12  selling its patented products to create customer loyalty; (4) diminishing the goodwill that P&G has

13  developed with consumers, (5) reducing P&G's sales of specialty products that it provides with its

14  plastic containers; and (6) unfairly taking advantage of P&G's substantial investment in developing

15  superior plastic container technology. Schmeller Decl. ¶¶3-8; Bello Decl. ¶¶6-12; Roe Decl. ¶¶5-9;

16  Gemeiner Decl. ¶¶9-20; Huntington Decl. ¶¶5-8; Mills Decl. ¶¶8-10.

17          These six types of harm all stem from Kraft's position as P&G's principal direct competitor in

18  the ground, roast coffee market. Direct competition is a factor that weighs heavily in the determination

19  of irreparable injury.[10] That is because a competitor has the "right, granted by Congress, not to assist

20  its rivals with the use of proprietary technology." *800 Adept, Inc. v. Murex Sec., Ltd.*, No. 6:02-CV-

21

22

23

24  [10] *See Brooktrout, Inc. v. Eicon Networks Corp.*, No. 2:03-CV-59, 2007 U.S. Dist. LEXIS 43107 at
    **3-4 (E.D. Tex. June 14, 2007) (granting permanent injunction against direct competitor); *Visto Corp.
25  v. Seven Networks, Inc.*, 2:03-CV-333-TJW, 2006 U.S. Dist. LEXIS 91453, at **12-13 (E.D. Tex. Dec.
    19, 2006) (same); *02 Micro Int'l Ltd. v. Beyond Innovation Tech., Co.*, No. 2-04-CV-32 (TJW), 2007
26  U.S. Dist. LEXIS 25948, at **7-8 (E.D. Tex. Mar. 21, 2007) (same); *Jacobsen v. Cox Paving*, No. 89-
    1786 PHX PGR, 1991 U.S. Dist. LEXIS 17787, *4 (D. Ariz. May 16, 1991) (same), *aff'd*, 949 F.2d
27  404 (Fed. Cir. 1991).

28

1354-Orl-28 DAB, 2007 U.S. Dist. LEXIS 27051 at *24 (M.D. Fla. Apr. 12, 2007); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007).

The Federal Circuit recognizes that harm to a company's market position and its relationship with its customers can support a finding of irreparable harm. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (testimony regarding price erosion and loss of market position supported the irreparable-harm showing needed to obtain preliminary injunction); *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566-67 (Fed. Cir. 1996) (affirming preliminary injunction based, in part, on irreparable harm from threat to patentee's market position). While "there is no *presumption* that money damages" is always inadequate compensation for a potential loss of market share, once a showing of irreparable harm has been made, a defendant cannot rebut that showing by asserting that it has sufficient funds to answer for any losses. *Polymer Techs. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996) (quoting *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991)). As the Federal Circuit has emphasized, "[t]he patent statute . . . provides injunctive relief to preserve the legal interests of the parties *against future infringement* which may have market effects never fully compensable in money." *Atlas Powder*, 773 F.2d at 1233. If monetary relief were the sole relief available to patentees, then "infringers could become compulsory licensees for as long as the litigation lasts." *Id. See also Roper Corp.*, 757 F.2d at 1269 n.2 (rejecting the view that there is no irreparable harm when an alleged infringer has the ability to compensate patentee in money damages). The Federal Circuit also explained in *Polymer Technologies* that an award of money damages at the end of litigation cannot make the patentee whole when the infringer has taken away the patentee's exclusive market position or otherwise changed the marketplace:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat.

*Polymer Techs.*, 103 F.3d at 975-76. *See also Oakley*, 316 F.3d at 1345 (affirming preliminary injunction based in part on exclusive market share).

Courts in this district also have recognized that an infringer's threats to interfere with a

-17-   **MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION CASE NO. C07-04413 PJH H**

1    competitor patentee's exclusive market position can support a finding of irreparable harm. *See Visto*

2    *Corp. v. Sproqit Techs., Inc.* 413 F. Supp. 2d 1073, 1092 (N.D. Cal. 2006) (irreparable harm found, in

3    part, based on direct competition, rapidly changing market, and potential that infringing sales could

4    establish long-term relationships); *Kristar Enters., Inc. v. Revel Envtl. Mktg., Inc.*, No. C98-3094 CRB,

5    1998 U.S. Dist LEXIS 19914, at **14-16 n. 9 (N.D. Cal. Dec. 16, 1998) ("By inserting products which

6    likely infringe . . . into the market, [defendant] is not merely taking profits away from plaintiff [but is]

7    is developing relationships with potential . . . clients [of the plaintiff] and detracting from [plaintiff's]

8    ability to present its product to the consuming public as one that is uniquely designed to serve its

9    needs."); *Sinclair Int'l v. FMC Corp.*, No. C97-01885 CAL, 1997 U.S. Dist. LEXIS 14963, at *6 (N.D.

10   Cal. Sept. 10, 1997) ("Sinclair has made an adequate showing of irreparable injury resulting from

11   FMC's conduct, including threatened loss of Sinclair's market share and good will.").

12              a.    **Irreparable Harm From Erosion of P&G's Superior Market Share**

13   Beginning in 2003, when P&G introduced its patented container, it increased its share of the

14   total market for ground, roast coffee in the United States from about 29% to between 32% and 33%.

15   Gemeiner Decl. ¶¶10-11 and Gemeiner Decl. Ex. 2. As P&G's Senior Account Executive for Folgers

16   explains, this was a significant win in the competitive market for ground, roast coffee. Schmeller Decl.

17   ¶3. While P&G was gaining market share because of the introduction of its plastic container, Kraft's

18   market share declined significantly. Gemeiner Decl. ¶¶10-11; Gemeiner Decl. Exs. 1-2. By

19   competing with P&G using infringing plastic container, Kraft is poised to regain at least part of the

20   market share advantage that P&G has earned. *Id.* ¶¶10-13; Bello Decl. ¶6; Schmeller Decl. ¶3. Kraft's

21   new plastic packaging also will make it more difficult to grow market share among consumers who are

22   just beginning to brew coffee at home. Gemeiner Decl. ¶18. An award of damages could not

23   adequately compensate P&G for the loss of its superior market position. "This is because it is

24   impossible to determine the portions of the market the patent owner would have secured but for the

25   infringer's actions or how much damage was done to the patent owner's brand." *Commonwealth*

26   *Scientific & Indus. Research Org. v. Buffalo Tech, Inc.*, 492 F. Supp. 2d 600, 605 (E.D. Tex. 2007).

27   Kraft will inflict more harm on P&G by diminishing its superior market share than can be accounted

28

1  for by an award of infringement damages. It also would be extremely difficult to calculate secondary

2  effects of P&G's lost market share on P&G's business. Diminishing sales will lead to qualitative

3  losses, including the loss of "captaincy" status, which allows P&G to partner with retailers to meet

4  shoppers' needs and strengthen long-term relationships. Schmeller Decl. ¶¶4-7.

5              **b.    Irreparable Harm From Kraft's Ability As A Free-Rider To Sell**

6                        **Infringing Products At Lower Prices**

7          Kraft also will cause irreparable harm by eroding the price that consumers are willing to pay for

8  the use of P&G's patented technology. Not having made the investment that led to the development of

9  P&G's patented technology, Kraft can and does sell coffee in its plastic containers for the same price it

10  charges for coffee sold in metal cans. Schmeller Decl. ¶7; Gemeiner Decl. ¶17; Bello Decl. ¶7. Until

11  now, consumers have been willing to pay up to 40 cents more for P&G's 39-ounce containers because

12  of the advantages the patented technology has offered.[11]  Schmeller Decl. ¶8. Kraft's use of P&G's

13  own patented technology will eliminate or at least reduce consumers' incentive to pay for the use of

14  the technology. *Id.* After becoming accustomed to using the patented technology at the lower prices

15  driven by Kraft's infringing sales, consumers will not be easily persuaded to pay for the use of the

16  technology at prices currently charged by P&G. As the Federal Circuit recognized in *Polymer*

17  *Technologies*, "[r]equiring purchasers to pay higher prices after years of paying lower prices to

18  infringers is not a reliable business option." *Polymer Techs.*, 103 F.3d at 976.

19              **c.    Irreparable Harm From Loss Of Customer Loyalty**

20          A third type of harm caused by Kraft's infringement affects P&G's ability to foster customer

21  loyalty toward the Folgers brand. A certain percentage of coffee consumers are considered

22  "switchers" because they have not yet become loyal to any one brand of coffee and can still be

23  persuaded to buy a different brand of coffee from one shopping trip to the next. Roe Decl. ¶7. P&G

24

---

25  [11]  As a packaging consultant explained in a recent article about this lawsuit, "Packaging is critically
26  important in commodity-type products like coffee, orange juice and sugar -- products that are very
    similar . . . . A successful packaging innovation can help boost sales." Gemeiner Decl. Ex. 3.

27

28

                                    -19-    **MEMORANDUM IN SUPPORT OF THE MOTION**
                                            **FOR A PRELIMINARY INJUNCTION**
                                            **CASE NO. C07-04413 PJH H**

1  has historically tracked the percentage of consumers who are loyal to the Folgers brand. Gemeiner

2  Decl. ¶15. After introducing its patented plastic containers, P&G recorded an increase of 6% in

3  customer loyalty. *Id.* This increase is significant because it strengthens the value of P&G's Folgers

4  brand, making it less like a commodity based on price alone. By continuing to sell infringing products

5  that have the same advantages as P&G's product, Kraft diminishes P&G's ability to develop long-term

6  relationships and loyalty with customers who otherwise would have associated the advantages of

7  P&G's innovative plastic container with the Folgers brand. Gemeiner Decl. ¶14-16; Rose Decl. ¶7.

8  Kraft also would increase its own customer loyalty by using P&G's patented technology to get

9  consumers to start drinking, and develop a taste for, Maxwell House coffee. *See TiVo Inc. v. EchoStar*

10 *Commc'n Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006) (defendants' infringement caused

11 irreparable harm to plaintiff's long-term customer base because DVR consumers are "sticky

12 customers" who tend to remain loyal to the company from which they first obtained their DVR).

13                    **d.    Irreparable Harm From Lost Goodwill**

14        The fourth area in which P&G would suffer irreparable harm from Kraft's continued

15 infringement is in the goodwill that it has created by developing its patented product. For generations,

16 coffee has been delivered to the American consumer using standard metal cans that are difficult to

17 open, heavy, and awkward to hold with one hand. Mills Decl. ¶8. By delivering its patented,

18 lightweight plastic container with an easy-to-hold handle, P&G eliminated these problems and

19 provided additional advantages, including improved coffee aroma from the plastic container itself. *Id.*

20 All these innovations create goodwill among coffee consumers, who appreciate that P&G is the

21 innovative company that brought them a container that improved upon the old metal cans used by

22 Kraft and other competitors. *Id.* The goodwill created by P&G is reflected in awards it received,

23 including an award from the Arthritis Foundation, which recognized the ease with which arthritis

24 patients were opening and handling P&G's lightweight plastic containers, and which P&G uses in its

25 advertisements and promotions. ¶9. The goodwill is reflected in numerous packaging design awards

26 recognizing that P&G's product design provided added value to consumers. Huntington Decl. ¶7.

27

28

1    By competing with P&G using P&G's patented technology, Kraft is diminishing the goodwill

2    that P&G is entitled to enjoy as the exclusive provider of its patented container. Mills Decl. ¶¶8-10.

3    Where, as here, "a company pioneers an invention in the marketplace, irreparable harm flows from a

4    competitor's attempts to usurp the pioneering company's market position and goodwill." *800 Adept*,

5    2007 U.S. Dist. LEXIS 27051 at *24; *see also MPT, Inc. v. Marathon Labels, Inc.*, No. 1:04-cv-2357,

6    2007 U.S. Dist. LEXIS 3992, at *49 (N.D. Ohio Jan. 19, 2007 ("usurping this market by inducing or

7    contributing to infringement will irreparably harm [plaintiff]"). P&G invented the plastic container for

8    ground, roast coffee, actively created a market despite Kraft's negative advertising, and established a

9    strong market position and customer goodwill. Kraft's usurping this market and goodwill by

10   infringing P&G's patent would irreparably harm P&G for years to come. Bello Decl. ¶8. *See MPT*,

11   2007 U.S. Dist. LEXIS 3992, at *49; *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.

12   1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages

13   flowing from such losses are difficult to compute."). Despite spending millions of dollars, P&G would

14   be unable to enhance further the goodwill and reputation it has created through its patented packaging

15   system. *See Pittway v. Black & Decker*, 667 F. Supp. 585, 592 (D. Ill. 1987) ("Black & Decker's

16   FlashLiter products have preempted the opportunity for Pittway to enhance further the good will and

17   reputation symbolized by its patented switch and First Alert Rechargeable Flashlights.")

18                   e.      **Irreparable Harm From Lost Sales Of Specialty Products**

19          A fifth category of irreparable harm from Kraft's infringing sales comes from lost sales of

20   specialty products that P&G promotes using its patented container. P&G augments some of its Folgers

21   coffee containers with a clear plastic lid that both holds and displays packets of gourmet coffee or

22   other specialty products that have a higher profit margin than Folgers coffee. Bello Decl. ¶9. This

23   project has been successful for P&G: in 2007 alone, P&G sold 2 million containers of Folgers coffee

24   with samples of specialty products. Gemeiner Decl. ¶19. As a result, P&G plans to sell 4-5 million

25   more units next year to promote gourmet coffee products and Dunkin Donuts brand coffee. *Id.*

26          Kraft's infringing sales will diminish sales of P&G's patented container and limit distribution

27   of its specialty product samples, thereby diminishing sales of the specialty products. Bello Decl. ¶10.

28

-21-    **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1   But, as a matter of patent law, P&G cannot recover damages based on these diminished sales because

2   P&G's specialty products are unpatented and do not share a functional relationship with the Folgers

3   coffee sold in the patented containers. *See, e.g., Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1549-51

4   (Fed. Cir. 1995) (*en banc*) (limiting recovery for unpatented goods to those with a functional

5   relationship to patented goods with which they are sold). As the Federal Circuit recently made clear in

6   an *en banc* opinion, the Court cannot enhance damages to cover this kind of additional sales, but only

7   to compensate for willful infringement. *In re Seagate Tech.,* No. 830, 2007 U.S. App. LEXIS 19768,

8   at *12 (Fed. Cir. Aug. 20, 2007) ("an award of enhanced damages requires a showing of willful

9   infringement"). P&G's lost sales of unpatented specialty products—stemming from its lost

10  opportunities to promote those higher-profit products—is a harm for which P&G has no adequate legal

11  remedy.

12              **f.        Irreparable Harm From Kraft's Trading On P&G's Investment**

13          A sixth category of irreparable harm to P&G is the fact that Kraft is unfairly reaping the benefit

14  of P&G's substantial investment in developing the patented plastic container for ground, roast coffee

15  and the market for coffee in that container. Bello Decl. ¶12. *See Sanofi, S.A. v. Med-Tech*

16  *Veterinarian Prods., Inc.,* No. 83-2198, 1983 U.S. Dist. LEXIS 13684, *20 (D. Kan. Sept. 16, 1983)

17  ("[T]he invasion of the rights of [plaintiffs] to exploit their rights in the patent, and the taking

18  advantage of the research and promotional activities performed by [plaintiff] before the expiration of

19  the patent protection is sufficient irreparable harm."); *Oscar Mayer Foods Corp. v. Sara Lee Corp.,*

20  743 F. Supp. 1326, 1332 (W.D. Wis. 1990) (irreparable harm shown, in part, by plaintiff's large

21  investment in marketing patented product). An award of damages for past infringement cannot

22  adequately compensate P&G for subsidizing a competitor's use of technology that P&G spent years

23  and millions of dollars to develop.

24          **E.        The Balance of The Hardships Favors Granting An Injunction.**

25          The balance of the hardships to the parties weighs heavily in favor of enjoining Kraft's

26  infringing sales. When a defendant makes a calculated risk to launch a product that infringes a patent,

27  any harm that it suffers from being enjoined does not weigh against the granting of a preliminary

28

-22-   **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1    injunction. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (balance of

2    hardships weighed in favor of granting preliminary injunction because defendant's "harms were

3    'almost entirely preventable' and were the result of its own calculated risk to launch its product" before

4    conclusion of litigation regarding validity of patent); *Smith Int'l Inc. v. Hughes Tool Co.*, 718 F.2d

5    1573, 1581 (Fed. Cir. 1983) (holding that balance of hardships did not favor the accused infringer

6    because it "knew of the [plaintiff's] patents when it design[ed] the [accused product] and took a

7    calculated risk that it might infringe those patents"); *A.K. Stamping Co. v. Instrument Specialties Co.*,

8    106 F. Supp. 2d 627, 655-656 (D.N.J. 2000) ("Any hardship ISC suffers is a necessary, and

9    predictable, consequence of its decision to sell the [accused product] following the issuance of the '632

10    patent"); *Jacobsen*, 1991 U.S. Dist. LEXIS 17787 at 59 ("Those who take calculated risks should be

11    well aware that they thereby assume the risk of being put out of business by the issuance of the

12    preliminary injunction.") This is but a reflection of well- and long-established law in other areas, such

13    as real property, that courts will not consider defendant's hardship where defendant intentionally and

14    knowingly encroached on plaintiff's property rights. *See, e.g., Keith v. Superior Ct.*, 26 Cal. App. 3d

15    521, 524-25, 103 Cal. Rptr. 314 (2d Dist. 1972) (vacating and remanding denial of preliminary

16    injunction to stop encroachment that was not innocent).

17        Like the landowner that builds her building with knowledge that it encroaches onto her

18    neighbor's land, Kraft introduced its plastic Maxwell House coffee container with full knowledge of

19    P&G's patent and the USPTO's rejection of its invalidity challenges to the claims of P&G's patent.

20    Kraft should not now be heard to complain about the hardship it would face from being forced to

21    abandon its infringing plastic container and return to its metal can. Kraft can avoid causing irreparable

22    harm to P&G and continue to make hundreds of millions of dollars, simply by continuing to sell coffee

23    in its metal cans. *See Dippin' Dots v. Mosey*, No. 3:96-CV-1959-X, 1997 U.S. Dist. LEXIS 20896,

24    *22 (N.D. Tex. Mar. 31, 1997) (granting preliminary injunction where accused infringer "entered into

25    this market with full knowledge of the [patentee] and the . . . patent"); *Lubrizol Corp. v. Exxon Corp.*,

26    696 F. Supp. 302, 318 (N.D. Ohio 1988) (granting preliminary injunction where accused infringer had

27    a non-infringing alternative available and proceeded with selling and developing new products with

28

-23-  **MEMORANDUM IN SUPPORT OF THE MOTION
FOR A PRELIMINARY INJUNCTION
CASE NO. C07-04413 PJH H**

1    knowledge of patentee's infringement allegations); *Rubbermaid Commercial Prods., Inc. v. Contico*

2    *Int'l, Inc.*, 836 F. Supp. 1247, 1258 (W.D. Va. 1993) (granting preliminary injunction where accused

3    infringer's "knowing entrance into a risky venture lays much of the harm at its own doorstep").

4        The balance of the hardships also weighs in favor of granting an injunction because every part

5    of the overall product here—Kraft's 39-ounce plastic container—uses the benefits of the claimed

6    inventions. This is not a case in which the claimed invention represents only a very small part of the

7    overall product defendant sells. *See, e.g., Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF,

8    2006 U.S. Dist. LEXIS 61600, at **15-16 (E.D. Tex. Aug. 16, 2006) (injunction denied in part

9    because patented transmission was only a small part of Toyota's hybrid vehicle). The Maxwell House

10    containers use the claims' regions of deflection to minimize denting, the claims' external ridge to keep

11    coffee fresh using a top foil and lid, the claims' one-way valve to avoid excess pressure from damaging

12    the containers, the claims' multi-layered plastic and use of certain plastic materials to maintain

13    structural integrity and coffee freshness, and the claims' requirement of materials having certain tensile

14    strength and top load capacity to ensure the container's structural integrity. Zeik Decl. ¶ 15.

15        The balance of hardships also tips in favor of P&G because it was the only provider of the

16    patented plastic containers for ground, roast coffee before Kraft's introduction of its infringing

17    product. P&G has invested significant time and effort in educating the marketplace on the benefits of

18    the containers and in essentially "building the market," a task made more difficult by Kraft's

19    advertisements criticizing plastic containers. Bello Decl. ¶12. P&G has been creating its market for

20    the patented packaging since 2003. *Id.* In contrast, Kraft has only recently begun manufacturing and

21    offering for sale its infringing products – another factor that helps tip the balance of hardships

22    decidedly in P&G's favor. *See 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1051-52 (C.D.

23    Cal. 2000) ("[T]he fact that plaintiffs have invested more time and effort into marketing their patented

24    invention also weighs in favor of plaintiffs.").

25        **F.    The Public Interest Favors Enjoining Kraft's Infringement**

26        The public interest generally is best served by enforcing the patent laws and protecting patent

27    rights. *Abbott Labs.*, 452 F.3d at 1348. This case is about containers for ground coffee, so concerns

28

1    about public health and safety that could warrant denial of injunctive relief are not present. *See 3M*

2    *Innovative Props. Co. v. Avery Dennison Corp.*, No. 01-1781 (JRT/FLN), 2006 U.S. Dist. LEXIS

3    70263, at \*6 (D. Minn. Sept. 25, 2006). Although the public has an interest in competition in the

4    coffee market, that interest is not implicated because Kraft would remain free to market its Maxwell

5    House ground coffee in the metal cans it used before switching to the infringing plastic containers. *See*

6    *MGM Well Servs., Inc. v. Mega Lift Sys.*, LLC, No. H-05-1634, 2007 U.S. Dist. LEXIS 30536 at \*49

7    (S.D. Tex. Apr. 25, 2007) (finding, in a permanent injunction, that public interest in competition would

8    not be affected where defendant would remain free to market a non-infringing product).

9    **V.    CONCLUSION**

10    This Court should enjoin Kraft from making, using, selling, offering to sell and importing its

11    Maxwell House coffee in the infringing plastic 39-ounce container, any other size of that infringing

12    container, or any other container not more than colorably different from that infringing container.

13

14    DATED: September 14, 2007                Respectfully submitted,

15

16                                                                  By_____

17                                                                  William C. Rooklidge
                                                                         HOWREY LLP
18                                                                  2020 Main Street, Suite 1000
                                                                         Irvine, CA 92614
19                                                                  Telephone: (949) 721-6900
                                                                         Facsimile: (949) 721-6910

20

21

22

23

24

25

26

27

28

HOWREY LLP

DM_US:20690368_1