# EXHIBIT 1

## To The Declaration of Claude M. Stern

quinn emanuel

The Procter and Gamble Company v. Kraft Foods Global, Inc.,
Case No. C-07-4413-PJH (N.D. Cal. 2007)

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
  evettepennypacker@quinnemanuel.com
  Michael D. Powell (Bar No. 202850)
  mikepowell@quinnemanuel.com
  Randy Garteiser (Bar No. 231821)
  randygarteiser@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

Attorneys for Kraft Foods Global, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>KRAFT FOODS GLOBAL, INC.,<br><br>Defendant. | CASE NO. C 07-04413 PJH<br><br>KRAFT FOODS GLOBAL, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF (NOS. 1-33) |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Kraft Foods Global, Inc., by and through its undersigned attorneys, hereby requests that plaintiff Procter & Gamble Company in the above-captioned action produce for inspection, examination and copying, at the offices of Quinn Emanuel Urquhart Oliver & Hedges LLP, 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065, all documents and things responsive to the following requests within ten (10) days of service hereof.

**DEFINITIONS AND INSTRUCTIONS**

As used in these requests for documents, the following terms shall have the meanings indicated below:

1. "Kraft" shall mean Kraft Foods Global, Inc., defendant in the above-captioned action.

2. "P&G," "PLAINTIFF," "YOU," or "YOUR" shall mean The Procter & Gamble Company, plaintiff in the above-captioned action and its subsidiaries, including Folgers Coffee Company, and their officers, directors, employees, agents, successors, assigns, attorneys or persons or entities acting for or on behalf of The Procter & Gamble Company or Folgers Coffee Company.

3. "DOCUMENT" has the same meaning as the term is defined in Fed. R. Civ. P. 34(a) and as the term "writing" is defined in Fed. R. Evid. 1001, and shall include within its meaning any and all papers, videotapes or video recordings, photographs, films, recordings, memoranda, books, records, accounts, letters, telegrams, correspondence, notes of meetings, notes of conversations, notes of telephone calls, inter-office memoranda or written communications of any nature, recordings of conversations either in writing or by means of any mechanical or electrical recording device, notes, papers, reports, analyses, invoices, canceled checks or check stubs, receipts, minutes of meetings, time sheets, diaries, desk calendars, ledgers, schedules, licenses, financial statements, telephone bills, logs and any differing versions of the foregoing whether denominated formal, informal or otherwise, as well as copies of the foregoing which differ in any way, including handwritten notations or other written or printed matter of any nature, from the original.  The foregoing specifically includes information stored in any form, including electronic form, on a computer or in a computer database or otherwise, including electronic mail.

4. The terms "COMMUNICATION" or "COMMUNICATIONS" shall mean, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, DOCUMENT, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail ("E-mail").

5. "PERSON" refers to any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

6. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of each request all responses that might otherwise be construed to be outside the scope.

7. "Any" shall include "all" and "all" shall include "any."

8. "Including" shall mean including but not by way of limitation.

9. The use of any pronoun herein shall include the masculine, the feminine and the neuter.

10. The use of any singular construction shall include the plural, and the use of the plural shall include the singular.

11. The terms "REFLECT," "REFLECTING," "RELATE TO," "REFER TO," "RELATING TO," or "REFERRING TO" shall mean relating to referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

12. The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

13. The "'418 patent" or "ASSERTED PATENT" shall mean U.S. Patent No. 7,169,418.

14. "ACCUSED PRODUCT" shall mean Kraft's thirty-nine ("39") ounce plastic coffee container as identified in P&G's complaint in paragraph 7.

15. The "Huntington Declaration" shall mean the Declaration of Greg Huntington In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 17.

16. The "Gemeiner Declaration" shall mean the Declaration of Jason Gemeiner In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 18.

17. The "Roe Declaration" shall mean the Declaration of Todd Roe In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 19.

18. The "Bello Declaration" shall mean the Declaration of Edward Bello In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 20.

19. The "Schmeller Declaration" shall mean the Declaration of Rudy Schmeller In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 21.

20. The "Dalton Declaration" shall mean the Declaration of David Dalton In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 22.

21. The "Floyd Declaration" shall mean the Declaration of Jennifer Floyd In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 23.

22. The "Mills Declaration" shall mean the Declaration of Sue Mills In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 24.

23. The "Zeik Declaration" shall mean the declaration of Douglas B. Zeik, Ph.D In Support Of The Procter & Gamble Company's Motion For A Preliminary Injunction, *The Procter & Gamble Company v. Kraft Foods Global, Inc.*, Case No. C-07-04413-PJH (N.D. Cal. 2007), Docket Item 25.

24. "ProductScan" shall mean a searchable database of new products made available by Marketing Intelligence Service, Ltd., 6473D Route 64, Naples, NY 14512-9726.

## INSTRUCTIONS

1. In response to the requests for production of documents below, you are to produce all requested documents in your possession, custody or control, whether or not the production of such documents requires that they be obtained from one or more of your employees, managers, partners, agents, independent contractors, consultants, attorneys, subsidiaries or any other persons.

2. You are to produce the documents requested herein either in the original file or organizational system in which they are customarily maintained or organized so as to correspond to the specific numbered requests below.

3. If you are unable to produce any document requested herein because such document is no longer in existence or no longer within your possession, custody or control, you are to so state and identify each such document by describing its nature and listing its date, author(s) and recipient(s). In addition, you are to describe the circumstances under which each such document ceased to exist or passed from your possession, custody or control and identify each person known or reasonably believed to have possession, custody or control of such document by listing such person's name, business affiliation, address and telephone number.

4. In the event that any document called for by these requests is withheld on the basis of a claim of privilege or immunity from discovery, that document must be identified by stating: (i) the identity of any addressor and addressee; (ii) any indicated or blind copy; (iii) the document's date, subject matter (without revealing the content as to which the privilege is claimed), number of pages and any attachments or appendices; (iv) the identity of each person to whom the document was distributed, shown or explained; (v) the identity of its present custodian; and (vi) the nature of the privilege or immunity asserted.

5. This request for production of documents is continuing in nature and requires prompt production of supplemental materials if you obtain additional responsive documents or things or if additional documents or things become responsive after the time of your initial response, to the full extent provided by Fed. R. Civ. P. 26(e).

6. These requests encompass all specifically requested items, as well as all drafts and any non-identical copies of specifically requested items or drafts.

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS that REFLECT, REFER or RELATE to the preparation and/or prosecution of any applications or other materials related to the ASSERTED PATENT and/or any genealogically related patents and/or patent applications, including but not limited to any foreign counterparts to the ASSERTED PATENT and COMMUNICATIONS between the people substantively involved in the prosecution of the patent applications leading to the issuance of the ASSERTED PATENT and/or any genealogically related patents and/or patent applications.

REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS that refer or relate to any study, analysis, investigation, testing and/or evaluation conducted by or on behalf of P&G concerning the ACCUSED PRODUCT, including but not limited to the "various tests on Kraft's Maxwell House 39-ounce plastic container" as stated in Paragraph 3 of the Zeik Declaration and the test conducted by Jennifer Floyd as stated in Paragraphs 3 through 9 of the Floyd Declaration.

REQUEST FOR PRODUCTION NO. 3:

All DOCUMENTS that REFLECT, REFER or RELATE to research, surveys, focus groups, consumer comments, studies or marketing studies concerning the packaging of coffee in a plastic container, including but not limited to the DOCUMENTS supporting the following statements:

(1) "consumer research performed by our team, including meetings with focus groups and surveys," as stated paragraph 5 in the Mills Declaration;

(2) "In January 2001, our team summarized a consumer test of a round container that we had developed," as stated in Paragraph 6 of the Mills Declaration;

(3) "Based on the extensive consumer research that I supervised at P&G, both before and after introduction of the new plastic container, the innovations in the container create goodwill among coffee consumers," as stated in Paragraph 8 of the Mills Declaration;

(4) "Consumers perceive that Folgers is the brand that brings them a new container that no other brand has, and that is superior to the old metal cans used by its competitors, including Kraft," as stated in Paragraph 8 of the Mills Declaration;

(5) "I [Greg Huntington] have supervised consumer research to determine how consumers perceive the AromaSeal canister," as stated in Paragraph 7 of the Huntington Declaration;

(6) "Consumers preferred P&G's plastic containers over traditional metal coffee cans, including those sold by Kraft, and they were willing to pay more for the benefits of using P&G's new packaging technology," as stated in Paragraph 8 of the Gemeiner Declaration;

(7) "P&G significantly increased consumer loyalty when it introduced the AromaSeal technology," as stated in Paragraph 8 of the Gemeiner Declaration;

(8) "After introducing its patented plastic containers, P&G recorded an increase of approximately 6% in consumer loyalty in absolute terms," as stated in Paragraph 14 of the Gemeiner Declaration;

(9) "Kraft's continued sales using its plastic container also will affect P&G's penetration of the market among new coffee consumers," as stated in Paragraph 18 of the Gemeiner Declaration;

(10) "P&G was able to achieve significant increases in market share, largely by increasing the percentage of time that consumers bought Folgers over Maxwell House and other brands of ground, roasted coffee," as stated in Paragraph 4 of the Roe Declaration;

(11) "P&G has earned a leadership position among retailers because their customers – coffee consumers – prefer Folgers' innovative plastic packaging over metal cans," as stated in Paragraph 4 of the Schmeller Declaration;

(12) "After introducing AromaSeal in 2003, P&G found that consumers, on average, were willing to pay about 25 to 40 cents more for Folgers than for the equivalent size Maxwell House 39 ounce container," as stated in Paragraph 8 of the Schmeller Declaration;

1                    (13) "Currently, the retail price of Kraft's Maxwell House coffee is the same whether it is sold in metal cans or plastic containers," as stated in Paragraph 9 of the Schmeller Declaration;

                     (14) "P&G began looking at packaging forms as an alternative to the traditional metal can, including using plastic coffee containers," as stated in Paragraph 5 of the Dalton Declaration; and

                     (15) "In 1999, a team of P&G engineers conducted consumer focus groups to identify features that the conventional metal cans lacked," as stated in Paragraph 5 of the Dalton Declaration.

REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS that REFLECT, REFER or RELATE to the "overall coffee aroma value" testing conducted and described in the ASSERTED PATENT and "overall coffee aroma value" testing conducted with respect to the ACCUSED PRODUCT, including that which is described in Paragraphs 3 through 9 of the Floyd Declaration, and further including all DOCUMENTS concerning all 'overall coffee aroma value" tests conducted by YOU or at YOUR direction indicating (1) the size of group of individuals that the forty participants were chosen from, (2) the names of the forty participants selected to perform each set of tests, (3) the names of the individuals that did not pass the preliminary screening test in each group, (4) the names of the individuals conducting each set of tests, (5) calculations tabulating an overall coffee aroma value, (6) testing procedures given by YOU to the individuals conducting each set of tests, (7) the number of times the same test container was used by a different tester, (8) the amount of space between the item being tested and the nose of each tester, (9) the test procedure protocol implemented to ensure compliance with the spacing between the nose of the tester and the item being tested, (10) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the "overall coffee aroma value," (11) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the "aroma," as the term aroma is used in Paragraphs 7 and 9 of the Floyd Declaration, (12) the definition of "aroma" as the term aroma is used in Paragraphs 7 and 9 of the Floyd Declaration, (13) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5,

8

quinn emanuel

6, 7, 8, and 9 of the "freshness scale" as the term freshness scale is used in Paragraphs 7 and 9 of the Floyd Declaration, (14) the amount of time given to smell each item being tested, (15) the number of times the same container is used, (16) the amount of time a test sample is exposed to the atmosphere prior to each test, (17) the definitions and relationships between "coffee aroma" value, "freshness scale," and "overall coffee aroma value" as those terms are used in paragraphs 7 and 9 of the Floyd Declaration, (18) the definition and calculation of "overall coffee aroma value" as that term appears in col. 18:64-65 of the ASSERTED PATENT, (19) the test procedure identified in the ASSERTED PATENT at col. 15:1-16:32, and (20) the physical characteristics of the polyolefinic container tested and described in the '418 patent.

REQUEST FOR PRODUCTION NO. 5:

All DOCUMENTS that support and/or contradict or otherwise RELATE TO the statement that "The Permeable walls of the semi-rigid plastic packages of the present invention retain a high level of aroma gas chromatograph counts compared to the impermeable prior art metal cans," as stated in Column 25 at lines 20-24 of U.S. Patent 4,966,780, including but not limited to research and development documents, product testing, prototype testing, emails, and lab notebooks.

REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS that support and/or contradict or otherwise RELATE TO P&G's contention that it will suffer irreparable harm unless the Court issues an order enjoining Kraft from infringing the ASSERTED PATENT, including but not limited to DOCUMENTS that support and/or contradict the following statements:

(1) "If Kraft continues to sell ground coffee in its plastic container, it will significantly hurt P&G's ground coffee business in several ways," as stated in Paragraph 9 of the Gemeiner Declaration;

(2) "By providing the same benefits that Folgers provides, Kraft will increase its market share and take away market share gains made by P&G in recent years," as stated in Paragraph 10 of the Gemeiner Declaration;

(3) "P&G's market share started to increase in 2003, when the AromaSeal container was launched. By the end of 2004, when P&G had been selling coffee only in its plastic containers, P&G's market share increased significantly while Kraft's market share declined," as stated in Paragraph 11 of the Gemeiner Declaration;

(4) "In 2006, P&G was able to recover all the market share that it had lost [after its plant shutdown due to Hurricane Katrina in 2005] because of consumers' preference for its product, especially the benefits provided by the AromaSeal plastic container technology," as stated in Paragraph 11 of the Gemeiner Declaration;

(5) "Kraft's sales using 39-ounce plastic containers will diminish sales of P&G's 39-ounce containers," as stated in Paragraph 18 of the Gemeiner Declaration;

(6) "converting its [P&G's] line of metal-can roast and ground coffee production to its new plastic canister design. This effort took several months to implement and cost P&G at least $30 million," as stated in Paragraph 3 of the Huntington Declaration;

(7) "P&G invested approximately five years of effort and about $5 million in research & development costs to develop the AromaSeal container technology" as stated in Paragraph 3 of the Huntington Declaration;

(8) "By continuing to sell products that have the same or similar advantages as P&G's product, Kraft also would increase its own consumer loyalty," as stated in Paragraph 16 of the Gemeiner Declaration;

(9) "With its own plastic container for ground, roasted coffee, Kraft is now in position to regain all or part of the increased market share that P&G was able to win since 2003," as stated in Paragraph 5 of the Roe Declaration;

(10) "By competing with P&G using its own version of P&G's plastic container, Kraft will chip away at the consumer goodwill that P&G has built," as stated in Paragraph 8 of the Roe Declaration;

(11) "By launching Maxwell House in its new plastic container, Kraft is going to encourage consumer to buy its ground, roasted coffee," as stated in Paragraph 9 of the Roe Declaration;

(12) "If Kraft is allowed to sell its Maxwell House product in its new plastic containers, it will take significant market share away from P&G," as stated in Paragraph 6 of the Bello Declaration;

(13) "Kraft can potentially recapture all of the market share that it lost to P&G when P&G introduced its plastic container," as stated in Paragraph 3 of the Schmeller Declaration;

(14) "Many consumers also will try Maxwell House simply because it is being offered in a new plastic container that is similar to Folger's plastic container," as stated in Paragraph 3 of the Schmeller Declaration;

(15) "Kraft's sales of a product in a new plastic container with similar advantages to P&G's container will erode P&G's leadership position with retailers," as stated in Paragraph 5 of the Schmeller Declaration; and

(16) "Kraft will have to spend substantial resources offering promotions to retailers and otherwise marketing its products to slow down the pace at which it will lose market share to Kraft," as stated in Paragraph 7 of Schmeller Declaration.

REQUEST FOR PRODUCTION NO. 7:

All DOCUMENTS that REFLECT, REFER or RELATE to any commercial success or lack of success of the inventions claimed in the ASSERTED PATENT, including but not limited DOCUMENTS that provide the factual bases for the statements listed below:

(1) "In addition to selling its products for a higher retail price, P&G was able to use the advantages of its new packaging technology to achieve significant increases in market share," as stated in Paragraph 8 of the Gemeiner Declaration;

(2) "I [Greg Huntington] have never seen the level of professional recognition that the AromaSeal canister received in any other product area" as stated in Paragraph 6 of the Huntington Declaration;

(3) "In 2006, P&G was able to recover all the market share that it had lost [after its plant shutdown due to Hurricane Katrina in 2005] because of consumers' preference for

11

KRAFT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF
Case No. 07-4413

51282/2223255.2

1  its product, especially the benefits provided by the AromaSeal plastic container technology," as
2  stated in Paragraph 11 of the Gemeiner Declaration; and
3                    (4) "P&G's launch of its AromaSeal plastic container starting in 2003
4  allowed P&G to gain about 3 to 4 percentage points of market dollar share of ground coffee," as
5  stated in Paragraph 3 of the Schmeller Declaration.
6  REQUEST FOR PRODUCTION NO. 8:
7             All DOCUMENTS which constitute research and development efforts, product
8  definition sheets, trade literature, specification sheets, technical data sheets, publications, emails,
9  abstracts, speeches, or descriptive documents of any kind which REFLECT, REFER OR RELATE
10 to any plastic container product that YOU contend embodies the ASSERTED PATENT or any
11 model, sample or prototype to any such product, including but not limited to ALL DOCUMENTS
12 that REFLECT, REFER OR RELATE to the followings statements:
13                   (1) "P&G spent millions of dollars and devoted years of research and
14 development effort to develop its new plastic container technology," as stated in Paragraph 12 of
15 the Bello Declaration;
16                   (2) "P&G engineers utilized a plastic container using a multi-layered plastic
17 structure, coupled with structural design elements to: (1) provide an internal layer to absorb coffee
18 odors and oils so the container itself would give consumers a pleasant coffee aroma; (2) provide a
19 middle, barrier layer to block outside gases (chiefly oxygen) from entering the container and
20 making the coffee smell bad or becoming stale; and (3) to provide a rigid support to the
21 container," as stated in Paragraph 9 of the Dalton Declaration;
22                   (3) "P&G engineers designed the container to have flexible regions called
23 'regions of deflection.' These regions of deflection control how the container deforms in response
24 to internal or external pressures to help prevent it from becoming dented or otherwise distorted,"
25 as stated in Paragraph 9 of the Dalton Declaration;
26                   (4) "P&G engineers built a ridge on top of the container at its opening to
27 attach an easy-to-peel foil seal to keep the coffee fresh before it was sold, as stated in Paragraph 8
28 of the Dalton Declaration;

51282/2223255.2
12
KRAFT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF
Case No. 07-4413

(5) "To prevent the emitted coffee gases from damaging the container, P&G's engineers placed a one-way valve on the seal to allow the emitted gases to escape without letting air back into the container," as stated in Paragraph 9 of the Dalton Declaration;

(6) "P&G engineers made the wide-mouth container easier to hold than traditional metal containers by forming a handle into the container," as stated in Paragraph 9 of the Dalton Declaration; and

(7) "P&G also developed a flexible 'overcap' on top of the container with an airtight seal reminiscent of Tupperware," as stated in Paragraph 9 of the Dalton Declaration.

REQUEST FOR PRODUCTION NO. 9:

All DOCUMENTS that REFLECT, REFER or RELATE to (a) YOUR knowledge of prior art RELATING TO the ASSERTED PATENT, and (b) the date and circumstances pursuant to which YOU first learned of each prior art document or thing.

REQUEST FOR PRODUCTION NO. 10:

All DOCUMENTS that REFLECT, REFER or RELATE to marketing plans, market demand, and/or market share analysis (projected or actual) for any product covered by the ASSERTED PATENT, including but not limited to DOCUMENTS that REFLECT, REFER or RELATE to the following statements made by P&G employees:

(1) "P&G gained significant market share when it introduced its new plastic container technology in 2003 under its AromaSeal trademark," as stated in Paragraph 4 of the Bello Declaration;

(2) "If Kraft is allowed to sell its Maxwell House product in its new plastic containers, it will take significant market share away from P&G," as stated in Paragraph 6 of the Bello Declaration; and

(3) "P&G's likely loss of market share to Kraft, the Maxwell House plastic container is going to hurt the strong relationship that P&G has with its retailers," as stated in Paragraph 11 of the Bello Declaration.

REQUEST FOR PRODUCTION NO. 11:

All DOCUMENTS that REFLECT, REFER or RELATE TO any analyses, studies, reports, memoranda, opinions, advice, communications or correspondence by P&G or any entity affiliated with P&G regarding any decision to commercialize or not commercialize any product that practices or embodies any of the claims of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 12:

All DOCUMENTS that REFLECT, REFER or RELATE to the market of the ASSERTED PATENT and/or the subject matter disclosed in the ASSERTED PATENT, including DOCUMENTS that REFLECT, REFER OR RELATE to competitors in the industry, prices, revenues, profits, product designs, and/or any products that compete with any product connected to the ASSERTED PATENT, including but not limited to documents that provide the bases for the following statements:

(1) "the market for roast, ground coffee (also referred to as 'ground' coffee) in the United States is $2.2 billion," as stated in Paragraph 4 of the Gemeiner Declaration; and

(2) "P&G's Folgers current market share is estimated at between 32% and 33% while Kraft's Maxwell House accounts for an estimated 19% share of the market," as stated in Paragraph 4 of the Gemeiner Declaration.

REQUEST FOR PRODUCTION NO. 13:

All DOCUMENTS that REFLECT, REFER or RELATE to the first three (a) uses, (b) offers to sell, (c) shipments, and (d) sales of any product, method, or service that practices or embodies any of the claims of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 14:

All DOCUMENTS that REFLECT, REFER or RELATE to the revenues and/or royalties derived from the sale of any product that practices or embodies any of the claims of the ASSERTED PATENT, including on a monthly, quarterly, and/or annual basis.

REQUEST FOR PRODUCTION NO. 15:

All DOCUMENTS that REFLECT, REFER or RELATE to any projections of sales, sales prices, royalties and/or revenues associated with any product that practices or

embodies any of the claims of the ASSERTED PATENT, including on a monthly, quarterly, and annual basis, including All DOCUMENTS that REFLECT, REFER or RELATE to the support or contradict the following statement: "Kraft's introduction of a plastic container will diminish that perception among both consumer and retailers [that P&G is an innovative company with technology that is superior to its competitors] . . . Combined with P&G's likely loss of market share to Kraft, the Maxwell House plastic container is going to hurt the strong relationship that P&G has with its retailers," as stated in Paragraph 11 of the Bello Declaration.

REQUEST FOR PRODUCTION NO. 16:

All DOCUMENTS that REFLECT, REFER or RELATE to gain or loss of sales of P&G's products from Kraft's alleged infringement, including DOCUMENTS that REFLECT, REFER or RELATE to providing a factual basis for the following statement: "Promoting specialty products on top of P&G's AromaSeal containers [using free samples] has been a very successful program for P&G . . . If P&G loses market share because of Kraft's sales of a competing product using plastic container it will have fewer consumers to whom it can introduce its specialty products, and will lose sales that it otherwise would have made of those products," as stated in Paragraph 10 of the Bello Declaration.

REQUEST FOR PRODUCTION NO. 17:

All DOCUMENTS that REFLECT, REFER or RELATE to YOUR allegations that the ASSERTED PATENT is infringed by Kraft.

REQUEST FOR PRODUCTION NO. 18:

All DOCUMENTS that REFLECT, REFER or RELATE to any license of all or any portion of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 19:

All DOCUMENTS that REFLECT, REFER or RELATE to communications to or from any of the named inventors of the ASSERTED PATENT concerning any of the following topics:

(a)   the ASSERTED PATENT;

      (b)    the conception and reduction to practice of the ASSERTED PATENT, including without limitation any invention disclosures;

      (c)    the applications for the ASSERTED PATENT;

      (d)    any patent genealogy related to the ASSERTED PATENT, including any foreign counterpart(s) to the ASSERTED PATENT;

      (e)    the application for any patent genealogically related to the ASSERTED PATENT, including any foreign counterpart to the ASSERTED PATENT;

      (f)    this lawsuit.

REQUEST FOR PRODUCTION NO. 20:

All DOCUMENTS that REFLECT, REFER or RELATE to papers authored by any inventor of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 21:

All DOCUMENTS that REFLECT, REFER or RELATE to prior testimony of any inventor of the ASSERTED PATENT, whether in the form of a declaration, affidavit, deposition or otherwise.

REQUEST FOR PRODUCTION NO. 22:

All DOCUMENTS that REFER, describe, discuss, or illustrate YOUR document retention policies, including but not limited to policies regarding schematic diagrams, technical specifications, source code, invention disclosures, documents relating to inventions and patents, voicemail systems and electronic mail systems.

REQUEST FOR PRODUCTION NO. 23:

All DOCUMENTS that REFLECT, REFER OR RELATE to any reports, studies, analyses, search results or reports, including any opinions of legal counsel and claim charts, whether written or oral, relating to the infringement or non-infringement, validity or invalidity, or enforceability or unenforceability of any claim of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 24:

All DOCUMENTS that REFLECT, REFER or RELATE to the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 25:

All DOCUMENTS that REFLECT, REFER or RELATE to the databases available to P&G during product development, including databases containing and archiving new products such as ProductScan.

REQUEST FOR PRODUCTION NO. 26:

A physical sample of any plastic container associated with the research, develop, and reduction to practice of the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 27:

ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR document retention policies, including retention of samples tested and reported in a patent application to the United States Patent And Trademark Office concerning a container.

REQUEST FOR PRODUCTION NO. 28:

ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR retention of the container or containers tested and described in the ASSERTED PATENT concerning the testing of for a "region of deflection" and/or "overall coffee aroma value" as these terms are described in the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 29:

The container or containers tested and described in the ASSERTED PATENT concerning the terms "region of deflection" and/or "overall coffee aroma value" as those terms appear in the ASSERTED PATENT.

REQUEST FOR PRODUCTION NO. 30:

ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR retention of the container or containers tested and described in the Zeik Declaration and the Floyd Declaration, including containers tested to meet the asserted claim limitations concerning "region of deflection" in the ACCUSED PRODUCT and "overall coffee aroma value" in the ACCUSED PRODUCT.

REQUEST FOR PRODUCTION NO. 31:

The ACCUSED PRODUCTS tested and described in the Zeik Declaration and the Floyd Declaration.

REQUEST FOR PRODUCTION NO. 32:

ALL DOCUMENTS that REFLECT, REFER or RELATE TO any portion of a P&G coffee container having or not having a "region of deflection," "area of deflection," or "location of deflection."

REQUEST FOR PRODUCTION NO. 33:

ALL DOCUMENTS that REFLECT, REFER or RELATE TO any portion of ACCUSED PRODUCT having or not having a "region of deflection," "area of deflection," or "location of deflection."

DATED: September 19, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By_____
Claude M. Stern
Evette D. Pennypacker
Michael D. Powell
Randy Garteiser
Attorneys for Kraft Foods Global, Inc.