William C. Rooklidge (SBN 134483)
Ben M. Davidson (SBN 181464)
Gregory S. Cordrey (SBN 190144)
Jesse D. Mulholland (SBN 222393)
HOWREY LLP
2020 Main  Street
Irvine, California 92614
949-721-6900
949-721-6910
E-mail:  rooklidgew@howrey.com
E-mail:  davidsonb@howrey.com
E-mail:  cordreyg@howrey.com
E-mail:  mulhollandj@howrey.com

Mark D. Wegener (*admitted pro hac vice*)
HOWREY LLP
1299 Pennsylvania Ave, NW
Washington, DC 20004
Telephone:  202-783-0800
Facsimile:  202-383-6610
E-mail:  wegenerm@howrey.com

Attorneys for Plaintiff
The Procter & Gamble Company

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, | Case No.: C07-04413 PJH |
| Plaintiff, | **Honorable Phyllis J. Hamilton** |
| v. | |
| KRAFT FOODS GLOBAL, INC., | **THE PROCTER & GAMBLE COMPANY'S OPPOSITION TO THE MOTION OF KRAFT FOODS GLOBAL, INC. FOR STAY, OR, IN THE ALTERNATIVE TO EXPEDITE DISCOVERY AND CONTINUE PRELIMINARY INJUNCTION MOTION HEARING** |
| Defendant. | |
| | **Date:  October 3, 2007** |
| | **Time:  9:00 a.m.** |
| | **Place:  Courtroom 3, 17th Floor** |

HOWREY LLP

1

# TABLE OF CONTENTS

2
Page(s)

3  I.    INTRODUCTION ............................................................................................................. 1

4  II.   THE COURT SHOULD NOT STAY THIS LAWSUIT ................................................ 2

5
       A.    A Stay Is Not Warranted Here Because The PTO Already
6            Has Confirmed The Validity of P&G's Patent Claims ...................................... 3

7      B.    Kraft Cannot Seek A Stay Of Litigation To Pursue An *Inter
             Partes* Reexamination Appeal ........................................................................... 6

8
       C.    The Record Before The Court Compels Granting P&G's
9            Preliminary Injunction Motion .......................................................................... 8

10     D.    A Stay Of Litigation Would Prejudice P&G And Give Kraft
             A Tactical Advantage ....................................................................................... 14
11

12  III.  KRAFT'S REQUEST FOR EXPEDITED DISCOVERY SHOULD
          BE DENIED ................................................................................................................. 16
13
       A.    Kraft Fails To Demonstrate Good Cause To Expedite
14           Discovery .......................................................................................................... 16

15     B.    Kraft Does Not Need The Sought-After Discovery To
             Respond to P&G's Preliminary Injunction Motion .......................................... 18
16
       C.    Kraft's Proposed "Limited" Discovery Is Overly Broad ................................. 19
17
       D.    Kraft's Request For A Two Month Delay Is Unnecessary
18           And, If Granted, Would Cause P&G Irreparable Harm .................................... 23

19
    IV.   CONCLUSION ............................................................................................................. 25
20

21

22

23

24

25

26

27

28

DM_US:20715891_5

# TABLE OF AUTHORITIES

## <u>CASES</u>                                                        Page(s)

*Abbott Labs. v. Andrx Pharms.*, Inc.,
  452 F.3d 1331 (Fed. Cir. 2006) ............................................................................ 13

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.,*
  344 F.3d 1186 (Fed. Cir. 2003) ............................................................................ 23

*Alltech, Inc. v. Cenzone Tech, Inc.,*
  2007 U.S. Dist. LEXIS 19989 (S.D. Cal. Mar. 21, 2007) .................................... 15

*Anascape, Ltd. v. Microsoft Corp.,*
  475 F. Supp. 2d 612 (E.D. Tex. 2007).............................................................. 8, 15

*Archer Daniels Midland v. Aon Risk Services, Inc.,*
  1999 U.S. Dist. LEXIS 11718 (D. Minn. June 7, 1999)....................................... 22

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
  345 F.3d 1318 (Fed. Cir. 2003) ............................................................................ 23

*Atlas Powder Co. v. Ireco Chems.,*
  773 F.2d 1230 (Fed. Cir. 1985) ............................................................................ 15

*Brown v. Shimano Am Corp.,*
  1991 WL 133586 (C.D. Cal. Jan. 29, 1991) .......................................................... 3

*Commodity Futures Trading Comm'n v. Int'l Fin. Servs.,*
  2002 WL 1801723 (S.D.N.Y. July 17, 2002) ...................................................... 17

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
  711 F. Supp. 1205 (D. Del. 1989) .......................................................................... 5

*Echostar Techs. Corp. v. Tivo, Inc.,*
  2006 U.S. Dist. LEXIS 48431 (E.D. Tex. July 14, 2006) ...................................... 8

*eSoft, Inc. v. Blue Coat Sys.,*
  2007 U.S. Dist. LEXIS 11261 (D. Co. Feb. 15, 2007)........................................... 8

*Ethicon v. Quigg,*
  849 F.2d 1422 (Fed. Cir. 1988)........................................................................... 6, 7

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,*
  2007 U.S. Dist LEXIS 44107 (N.D. Cal. June 6, 2007)................................... 6, 15

*FTC v. 1268957 Ontario, Inc.,*
  2001 WL 34135319 (N.D. Ga. Feb. 13, 2001)..................................................... 18

HOWREY LLP

DM_US:20715891_5

1

# TABLE OF AUTHORITIES (cont.)

2      *Grayling Indus., Inc. v. GPAC, Inc.*,                                    **Page(s)**

3          1991 WL 236196 (N.D. Ga. Mar. 25, 1991)...................................................... 3

4      *KSR Int'l Co. v. Teleflex Inc.*,
           127 S. Ct. 1727, 67 L. Ed. 2d 705 (2007) .................................................. 4, 5
5
       *Markman v. Westview Instruments, Inc.*,
6          52 F.3d 967 (Fed. Cir. 1995)..................................................................... 22

7      *Medichem, S.A. v. Rolabo, S.L.*,
           353 F.3d 928 (Fed. Cir 2003) ...................................................................... 4
8
       *Middleton v. Minnesota Mining and Manufacturing Company*,
9          2004 WL 1968669 (S.D. Iowa 2004) ....................................................... 3, 8

10     *Nanometrics, Inv. v. Nova Measuring Instruments, Ltd.*,
11         2007 WL 627920 (N.D. Cal. Feb. 26, 2007) ........................................... 3, 14

12     *Oakley, Inc. v. Sunglass Hut Int'l*,
           316 F.3d 1331 (Fed. Cir. 2003) ................................................................ 23
13
       *Pass & Seymour Inc. v. Hubbell Inc.*,
14         2007 WL 2172648 (N.D.N.Y. July 23, 2007)......................................... 11, 12

15     *Perricone v. Unimed Prof'l Servs., Inc.*,
16         2002 WL 31075868 (D. Conn. July 18, 2002)......................................... 10, 11

17     *Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*,
           1998 U.S. Dist. LEXIS 10511 (E.D. Pa. July 15, 1998)............................... 19
18
       *Pretty Punch Shoppettes, Inc. v. Hauk*,
19         844 F.2d 782 (Fed. Cir. 1988)..................................................................... 9

20     *Purolite Int'l, Ltd. v. Rohm & Haas Co.*,
21         1992 U.S. Dist. LEXIS 13235 (E.D. Pa. Sept. 3, 1992) .............................. 3

22     *Qwest Commc'n Int'l v. Worldquest Networks, Inc.*,
           2003 U.S. Dist. LEXIS 7374 (D. Colo. Jan. 2, 2003) ........................... 17, 19
23
       *RDS Group Ltd. v. Davison*,
24         2003 U.S. Dist. LEXIS 1337 (E.D. Pa. Jan. 17, 2003) .............................. 17

25     *Rohm & Haas Co. v. Brotech Corp.*,
26         1992 U.S. Dist. LEXIS 21721 (D. Del. July 16, 1992) ............................... 3

27

28

DM_US:20715891_5

1

## TABLE OF AUTHORITIES (cont.)

2                                                                      **Page(s)**

*Scattergood v. Perelman,*
3       1990 U.S. Dist. LEXIS 6482 (E.D. Pa. 1990)...................................................... 19

4  *Semitool, Inc. v. Tokyo Electron Am. Inc.*,
        208 F.R.D. 273 (N.D. Cal. 2002) ...................................................................... 16
5
  *Stanley v. Univ. of S. Cal.*,
6       13 F.3d 1313 (9th Cir. 1994).............................................................................. 16

7  *Tesco Corp. v. Varco I/P, Inc.*,
        2006 U.S. Dist. LEXIS 82047 (S.D. Tex. Nov. 9, 2006) ........................................ 8
8
  *TKR Cable Co. v. Cable City Corp.*,
9       1996 U.S. Dist. LEXIS 11941 (D.N.J. July 26, 1996) ......................................... 17

10  *Translogic Tech, Inc. v. Hitachi, Ltd.*,
        404 F. Supp. 2d 1250 (D. Or. 2005) .................................................................... 6
11
12  *Viskase Corp. v. Am. Nat'l Can Co.*,
        261 F.3d 1316 (Fed. Cir. 2001)........................................................................... 3
13

14                              **STATUTES**

15  35 U.S.C. § 318.....................................................................................6, 7, 8

16  Fed. R. Civ. P. 30 ........................................................................................ 22

17  Fed. R. Civ. P. 52(a)...................................................................................... 9

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

The Court should deny Defendant Kraft Foods Global, Inc.'s ("Kraft") motion to stay this litigation and Kraft's alternative request to order expedited discovery and delay by two months the hearing on the motion for preliminary injunction filed by Plaintiff The Procter & Gamble Company ("P&G").

With respect to the motion to stay, Kraft seeks to put the entire case on hold while taking its appeals from a reexamination proceeding that it already has lost.  The U.S. Patent & Trademark Office ("PTO") granted P&G's patent after four years of extensive review by a first Examiner.  Kraft immediately challenged P&G's patent in a reexamination proceeding before a three-examiner panel, a group of examiners different from the original examiner.  That panel, after seven months of review of all of Kraft's invalidity arguments, denied Kraft's challenge in its entirety and upheld the validity of each of the 55 claims of P&G's patent.  Now Kraft, having so dramatically and decisively lost its challenge to the patent, is awaiting permission to initiate a series of appeals that could last two-and-a-half years.  As a result, by asking the Court for a stay of proceedings in this litigation, Kraft is asking this court to deny P&G's preliminary injunction motion and to put P&G out of court completely.  Kraft has provided no clear authority that would justify such extraordinary and unprecedented action by this Court.  The case law is clear that a court should not stay litigation in favor of a reexamination already has so decisively and comprehensively confirmed the validity of asserted patent claims.  *See* Section II, *infra*.

With respect to Kraft's motion seeking "expedited" discovery and a delay of two months in P&G's preliminary injunction motion, P&G already offered to accommodate Kraft with expedited discovery, including offering depositions starting on Monday, September 24, 2007.  Kraft, however, declined that offer and instead has attached extraordinarily broad and burdensome discovery requests to its motion, that are on their face designed to slow, not expedite.  In short, Kraft is not seeking expedited discovery in good faith, but instead is trying to use discovery to delay the hearing on P&G's preliminary injunction motion on its merits.  Kraft's true motive is to continue its infringement through the critical holiday shopping season, where

HOWREY LLP

DM_US:20715891_5

1   P&G expects to make approximately 36% of its Folgers coffee sales for the year. Kraft's own

2   actions show that it has no urgent need for discovery, but instead is trying to use discovery as a

3   way to delay consideration of P&G's motion on its merits. *See* Section III, *infra.*

4        Kraft's alternative motions must be viewed against the backdrop that the sale of its 39-

5   ounce plastic coffee container is a direct and blatant infringement of P&G's patent that has

6   already withstood all of the invalidity arguments Kraft advanced during two exhaustive reviews

7   by the PTO, first during the original examination and then during the reexamination initiated by

8   Kraft. Kraft does nothing to demonstrate that it is not infringing, that the claims in P&G's patent

9   are invalid, that P&G will not suffer irreparable harm from Kraft's continued infringement, or

10  that the harm to Kraft imposed by an injunction would outweigh the harm to P&G from Kraft's

11  continued infringement. It seeks to derail P&G's motion with a strategic request for a stay or for

12  a delay in the hearing on P&G's motion. Such tactics should not be countenanced by this Court.

13  **II.    THE COURT SHOULD NOT STAY THIS LAWSUIT**

14       There are at least four reasons why the Court should deny Kraft's motion to stay this

15  lawsuit.

16       1.   The case law establishes that a stay pending a PTO reexamination is appropriate
          only where the reexamination casts doubt on the validity of the patent claims. In
17        this case the PTO confirmed the validity of P&G's patent and rejected each of
          Kraft's invalidity arguments. Kraft cites no precedent for staying litigation in this
18        circumstance because there is none. Having lost its reexamination, Kraft cannot
          argue that the PTO has called the validity of P&G's patent into question. *See*
19        Section II. A., *infra.*

20

21       2.   Kraft cannot seek a stay because in recently creating the kind of reexamination
          that Kraft has lost—an *inter partes* reexamination—Congress limited the right to
22        seek stays to patent owners. *See* Section II. B., *infra.*

23       3.   P&G has shown that it is entitled to a preliminary injunction. In seeking a stay,
          Kraft attempts to avoid the merits of P&G's motion, including P&G's clear
24        showing of infringement and irreparable harm. On this record, the Court must
          grant a preliminary injunction and deny Kraft's motion for a stay. *See* Section II.
25        C., *infra.*

26

27       4.   Staying this litigation would cause P&G irreparable harm. Kraft would erode
          P&G's technological lead in the market place and tear down P&G's market share,

28

consumer goodwill, consumer loyalty, brand equity, and captaincy position among retailers. *See* Section II. D., *infra*.

A.     **A Stay Is Not Warranted Here Because The PTO Already Has Confirmed The Validity of P&G's Patent Claims**

This is precisely the type of case where a stay is entirely inappropriate, and Kraft has cited no authority that supports a stay under the circumstances presented here.  None of the cases cited in Kraft's motion involved a stay where the movant had already lost on all the patent claims.  Where it appears from the record that claims will survive reexamination, courts do not stay litigation.  *See Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 & n.2 (Fed. Cir. 2001) (affirming denial of stay where PTO indicated one of two families of asserted patents would survive reexamination); *Purolite Int'l, Ltd. v. Rohm & Haas Co.*, No. 91-2740, 1992 U.S. Dist. LEXIS 13235, at *5 (E.D. Pa. Sept. 3, 1992) (lifting stay when PTO indicated some claims would survive reexamination); *Rohm & Haas Co. v. Brotech Corp.*, No. 90-109 (RRM), 1992 U.S. Dist. LEXIS 21721, at **7, 13 (D. Del. July 16, 1992) (lifting stay when PTO indicated some claims would survive reexamination).

The cases cited by Kraft all relate to the very different situation where the PTO was either about to rule on a substantial new question of patentability or had found that substantial questions affected the validity of the patent.  *See Brown v. Shimano Am Corp.*, No. CV88-6565 WJR (BX), 1991 WL 133586, at * 1 (C.D. Cal. Jan. 29, 1991) (PTO was about to consider a request for reexamination, leading to a stay to be immediately lifted if the PTO denied the request); *Nanometrics, Inv. v. Nova Measuring Instruments, Ltd.*, No. C06-2252 SBA, 2007 WL 627920, at *1 (N.D. Cal. Feb. 26, 2007) (PTO had granted reexamination of the patent-in-suit, leading to a good chance that the claims would be canceled or narrowed); *Grayling Indus., Inc. v. GPAC, Inc.*, No. 1:89-CV-451-ODE, 1991 WL 236196, at * 3 (N.D. Ga. Mar. 25, 1991) (PTO had been requested to rule on request for reexamination raising new questions of validity); *Middleton v. Minnesota Mining and Manufacturing Company*, 2004 WL 1968669, at *1 and *10 (S.D. Iowa 2004) (PTO had granted reexamination based on multiple substantial questions of patentability

1   that the district court found would have a dramatic impact on the issues in the litigation).[1]  None

2   of these cases support staying litigation where the PTO has confirmed the validity of the patent

3   claims.

4          Without citing any relevant precedent, Kraft says the Court should stay this litigation, not

5   because the PTO has yet to make a decision, but because Kraft says the PTO made the wrong

6   decision.  Kraft concedes that the PTO "issued a decision confirming the '418 patent claims on or

7   about June 7, 2007 . . . ."[2]  The PTO granted P&G's patent after an examiner considered P&G's

8   application for four and half years and studied over 150 patents and other publications.  A three-

9   examiner panel of the PTO then spent another four months considering Kraft's 48 new invalidity

10  arguments and 11 new patents and other publications in the reexamination proceeding that Kraft

11  initiated the day after P&G's patent issued.   On June 7, 2007, the PTO issued the Action Closing

12  Prosecution—rejecting all of Kraft's arguments and confirming all claims of P&G's patent—two

13  months before Kraft introduced its infringing 39-ounce plastic Maxwell House coffee container.

14         Effectively having lost twice in the PTO already, Kraft now pins its argument that the

15  Court should stay the case on its hope that it might overturn the original examiner and the three-

16  examiner reexamination panel on appeal to the PTO's Board of Appeals and Patent Interferences.

17  Kraft tries to bolster that hope by arguing that it filed its reexamination before the Supreme Court

18  decided *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 67 L. Ed. 2d 705 (2007).  But the PTO

19  had already issued an internal memorandum on the effect of *KSR,* and the PTO Board had

20  already issued an opinion showing how to apply *KSR*, before the three-examiner panel issued the

21  Action Closing Prosecution.  Cordrey Decl. Exs. 1-2.[3]

22  _____

23  [1] Another case cited by Kraft, *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 936 (Fed. Cir 2003),
    was not even a reexamination case.  It dealt with the completely different procedure of an
24  interference contest between two parties claiming to have invented the same claimed inventions.
    *Id.* at 936.  Interference disputes are heard by the Board of Patent Appeals and Interferences
25  ("BPAI").

26  [2] *See* Kraft's Motion To Shorten Time at 3:13-14.

27  [3] P&G filed the declaration of Gregory Cordrey and Scott Goodfellow with its opposition to
    Defendant's motion for administrative relief.  P&G filed the declarations of Ben M. Davidson,

28                                                                      (Continued...)

1    Even Kraft, moreover, did not argue when its reexamination was pending that *KSR* raised

2  any new questions of patentability.  Kraft could have raised this argument while the *inter partes*

3  reexamination was pending or in a new *ex parte* reexamination.  Once the PTO issued the Action

4  Closing Prosecution, however, Kraft could do neither.  See Mulholland Decl. ¶ 2, Ex. 1.[4]  Kraft's

5  reliance on this argument now is belied by its failure to raise it when it could have, during the

6  reexamination.  Just as tellingly, Kraft does not present its new arguments based on *KSR* in

7  support of its motion so that P&G can address them and show why they do not justify keeping

8  P&G out of court.

9    Kraft is also wrong to suggest that a stay would promote judicial economy.  Motion at 4-

10 7.  Judicial economy is not promoted by the needless delay of a litigation based on arguments

11 that have already failed to convince two different sets of PTO examiners.  Moreover, while P&G

12 recognizes that judicial resources should be saved wherever possible, those resources are needed

13 now to prevent Kraft from carrying out a calculated strategy to usurp its competitor's market

14 leadership through blatant patent infringement.  Even Kraft does not press its judicial-economy

15 arguments very far, only venturing that its appeal "*may* even render the entire litigation moot."

16 Motion at 4 (emphasis added).  That speculation does not justify staying this case.  *See E. I. Du*

17 *Pont de Nemours & Co. v. Phillips Petroleum Co.*, 711 F. Supp. 1205, 1208 (D. Del. 1989)

18 (declining "to stay the ordinary course of its proceedings simply because the outcome of the

19 Patent Office proceedings *may* moot the issues remanded.")  Kraft similarly argues that the Court

20 should stay this case because Kraft's appeal will somehow simplify the issues.  *Id.*  But the

21 subject matter of P&G's patent is straightforward, and Kraft does not explain how its appeal will

22 make the issues any simpler than they were made by the PTO's rejection of Kraft's invalidity

23 arguments.

24 _____

25 (...Continued)

26 Jason Gemeiner, Todd Roe, Eduard Bello, Rudy Schmeller, David A. Dalton, Jennifer Floyd, Sue
   Mills, and Douglas B. Zeik with its motion for preliminary injunction.

27 [4] P&G filed the declaration of Jesse D. Mulholland with this opposition.

28

1    Kraft's only remaining argument is that in the absence of a stay its appeal might possibly

2    result in a decision that is different from that of the district court.  Motion at 3.  That speculative

3    possibility, however, is no reason to derail this litigation.  District courts routinely conduct patent

4    litigation at the same time that the PTO considers reexaminations, even when, unlike here, the

5    reexaminations have been shown to have merit and to raise doubts about the validity of the patent

6    claims.  *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C03-1431 SBA, 2007

7    U.S. Dist LEXIS 44107, at *11 (N.D. Cal. June 6, 2007) (there is no *per se* rule that patent cases

8    should be stayed pending reexaminations because such a rule would invite parties to unilaterally

9    derail litigation).  As the Federal Circuit has explained, any "awkwardness presumed to result if

10    the PTO and court reach different conclusions is more apparent than real."  *Ethicon v. Quigg*, 849

11    F.2d 1422, 1428 (Fed. Cir. 1988).  That is because "[t]he two forums take different approaches in

12    determining invalidity and on the same evidence could quite correctly come to different

13    conclusions."  *Id.*[5]

14    As demonstrated by Kraft's failure to cite any relevant authority, Kraft's mere intention to

15    appeal the PTO's decision is not the type of circumstance that justifies staying district court

16    litigation needed to address clear patent infringement.

17    **B.    Kraft Cannot Seek A Stay Of Litigation To Pursue An *Inter Partes***

18    **Reexamination Appeal**

19    Kraft does not even have the right to seek a stay to pursue an appeal of its *inter partes*

20    reexamination, the kind of reexamination proceeding that it initiated and lost. Relying on 35

21    U.S.C. § 318, Kraft argues that "[f]or *inter partes* reexaminations, the Patent Act *presumes* that

22    the court case should be stayed unless 'the court . . . determines that a stay would not serve the

23

24    ────────────────

25    [5] For example, district courts and the Board of Patent Appeals and Interferences must use
     different standards to interpret claims—district courts have to preserve the validity of the claims
     whereas the Board must give claims their broadest reasonable interpretations.  *Translogic Tech,*

26    *Inc. v. Hitachi, Ltd.*, 404 F. Supp. 2d 1250, 1254 n.2 (D. Or. 2005).  Therefore, district courts are
     not bound by the Board's rulings and are not required to stay litigation based on a possible

27    inconsistent Board decision.  *Id.* at 1253-54.

28

1  interests of justice." Motion at 4. Kraft neglected to quote the most relevant part of the statute.

2  Section 318 provides that "[o]nce an order for inter partes reexamination of a patent has been

3  issued under section 313, *the patent owner may obtain a stay* of any pending litigation which

4  involves an issue of patentability of any claims of the patent which are the subject of the inter

5  partes reexamination order, unless the court before which such litigation is pending determines

6  that a stay would not serve the interests of justice." 35 U.S.C. § 318 (emphasis added.)

7      An *inter partes* reexamination gives third parties requesting reexaminations greater rights

8  to participate in the proceeding than *ex parte* reexaminations, including the right to appeal an

9  adverse decision. *See* Mulholland Ex. 1 at 6. (Steven E. Lipman, *Parallel Patent Litigation and*

10 *Reexamination Proceedings 2007: Keeping Your Case on Track,* August 2007). When it

11 enacted the *inter partes* reexamination statute, Congress chose to specify that only the patent

12 owner could decide whether to proceed with litigation or to seek a stay.[6] In particular, the

13 American Inventors Protection Act of 1999, which included Section 318, provided a number of

14 trade offs for a challenger's increased participation in reexamination proceedings, including that

15 "the patent owner, but not the third party requester, would be entitled to a stay of pending

16 litigation unless the court hearing the case decides that a stay would not serve the interests of

17 justice." M. Mehrman, *HR1907 -- The American Inventors Protection Act of 1999; A GRAND*

18 *COMPROMISE IN THE MAKING*, Intellectual Property Today, August 1999 (attached as

19 Mulholland Ex. 2 at 3). *See also* S. Lipman (Mulholland Ex. 1) at 6-7 ("In an inter partes

20 reexamination, the patent owner has a statutory right to obtain a stay of a pending litigation. No

21 such right is granted to the third party requester.")

22

23

24 _____

25 [6] This was a departure from Congress's decision not to specify whether one or both parties could
   seek reexamination in *ex parte* cases, leaving the matter to the inherent power of the courts to

26 manage their dockets. *Ethicon*, 849 F.2d at 1427 (citing 1980 U.S. Code Cong. & Admin. News
   at 6463).

27

28

1    Under Section 318, infringers like Kraft cannot use *inter partes* reexamination

2  proceedings to prevent patent owners from enforcing their rights in district court.[7]  For this

3  reason alone, Kraft's motion to stay should be denied.

4    **C.    The Record Before The Court Compels Granting P&G's Preliminary**

5         **Injunction Motion**

6    As P&G established in its preliminary injunction motion, Kraft is clearly infringing a

7  patent that survived each of the 48 invalidity arguments that Kraft presented during the PTO

8  reexamination, and its infringement will cause massive irreparable harm to P&G.  Kraft

9  effectively asks the Court to deny P&G's motion by ordering a stay of the entire litigation.

10  Motion at 1.  Based on Kraft's stated intention to appeal even after losing at the Board of Patent

11  Appeals and Interferences (Docket 33, at 2:7-9), it intends to cause a delay of two and a half

12  years or more.  That is because Kraft is now waiting for the PTO's issuance of a Right to Appeal

13  Notice, which has yet to occur, and would consume an average of 18 months to appeal to the

14

15  ────────────────

16  [7] The cases on which Kraft relies involved stays in the different context of *ex parte*
reexaminations.  While the district court in *Middleton, Inc. v. Minnesota Mining and Mfg. Co.*,
No. 4:03-CV-40493, 2004 WL 1968669 (S.D. Iowa Aug. 24, 2004) suggested that those
challenging patents may also seek a stay, its comments were *dicta* because, as the court
17  recognized, that case involved "an *ex parte* reexamination, while the statutes relied on by
Middleton in raising this argument apply to *inter partes* reexaminations."  *Id.* at *3 & n.6.  Four
18  other cases have stayed litigation pending an *inter partes* reexamination, but the district courts in
these cases did not consider the statutory limitation in Section 318 that "the patent owner may
19  obtain a stay."  *See eSoft, Inc. v. Blue Coat Sys.,* No. 06-CV-00442-EWN-PAC, 2007 U.S. Dist.
20  LEXIS 11261, at *2-*15 (D. Co. Feb. 15, 2007); *Echostar Techs. Corp. v. Tivo, Inc.*, No. 5:05-
CV-81 (DF), 2006 U.S. Dist. LEXIS 48431, at *3-*12 (E.D. Tex. July 14, 2006); *Tesco Corp. v.
21  Varco I/P, Inc.*, No. H-05-2118, 2006 U.S. Dist. LEXIS 82047, at *1-*14 (S.D. Tex. Nov. 9,
22  2006); *Anascape, Ltd. v. Microsoft Corp.*, 475 F. Supp. 2d 612, 614-17 (E.D. Tex. 2007).  In
addition, these cases confirm that an reexamination can only justify staying litigation where it
23  calls into question the validity of a patent, not where it has confirmed that every patent claim is
valid.  *See eSoft*, 2007 U.S. Dist. LEXIS at *10 ("the court may dissolve the stay when
24  preliminary reports from the [PTO] reveal that some of the claims at issue will survive
25  reexamination") (citation ommited); *Echostar*, 2006 U.S. Dist. LEXIS at *13 ("the Court will
benefit from the PTO's expertise and determination on reexamination"); *Tesco*, 2006 U.S. Dist.
26  LEXIS at *14 ("If the PTO denies the request, the stay is automatically lifted."); *Anascape*, 475
27  F. Supp. 2d at 616 ("Any stay granted by the court will remain in effect only if the PTO decides
to proceed with reexamination.")

28

-8-    P&G's OPP TO MTN OF KRAFT FOODS FOR STAY
OR ALTERNATIVELY EXPEDITE DISCOVERY
Case No.: C07-04413 PJH

DM_US:20715891_5

1  Board, followed by an average of 11 months to pursue yet another appeal at the United States

2  Court of Appeals for the Federal Circuit.  Cordrey at ¶¶ 4-5 and Exs. 3 and 4.

3          Under Federal Rule of Civil Procedure 52(a) the Court must make factual findings in

4  ruling on any motion for injunctive relief.  As the Federal Circuit has emphasized, these findings

5  must be sufficient to allow meaningful appellate review of each basis for the court's decision.

6  *Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 785 (Fed. Cir. 1988) (vacating order

7  denying preliminary injunction motion where trial court made only conclusory findings on

8  patentee's probability of prevailing on merits).   Here, Kraft cannot prevail on the merits of

9  P&G's motion, so it argues for a stay based on inadmissible statements by its counsel, including

10 that Kraft has told him "that Kraft sincerely believes that it has compelling invalidity arguments

11 to be made."  *See* Docket 32, Stern Decl. at 4, ¶ 6.

12         Kraft similarly shrinks from the record, which established that Kraft's free-riding on

13 P&G's innovative packaging technology will destroy P&G's lead in the market place and create

14 long-term irreparable harm, including:

15         (1) lost market share and position as leader in the competitive market for ground, roast

16         coffee;

17         (2) erosion of the price consumers will be willing to pay for P&G's innovations;

18         (3) reduced ability to draw consumers to Folgers brand coffee and maintain consumer

19         loyalty;

20         (4) diminished goodwill from being the exclusive provider of a superior technology that

21         is desired by consumes;

22         (5) decreased ability to promote specialty products using P&G's plastic containers; and

23         (6) inability to prevent its principal competitor from improving its own market position,

24         brand equity, consumer loyalty, and goodwill by usurping a rare innovation that—until

25         now—has set P&G apart from the competition.

26 *See* Declarations of Edward Bello (¶¶ 6-12), Greg Huntington (¶¶ 5-8), Todd Roe (¶¶ 5-9), Sue

27 Mills (¶¶ 8-10), Jason Gemeiner (¶¶ 9-20), and Rudy Schmeller (¶¶ 3-8) In Support of P&G's

28

1   Motion For Preliminary Injunction.  Kraft did not even try to rebut these declarations through its

2   own declarants, including those Kraft employees responsible for increasing Kraft's market share,

3   brand loyalty, and "captaincy" positions with retailers.  Kraft instead retreated to its own

4   counsel's declaration, which stated his "view [that] the case law cited in [Kraft's] motion

5   supports, if not compels, the stay being requested."  Docket 32, Stern Decl. at 4, ¶ 7.

6        But the two cases highlighted by Kraft, and which Kraft claims "govern here" because of

7   their "nearly identical facts" (Kraft Motion at 9-10), show why the Court should grant P&G's

8   preliminary injunction motion.  On page 9 of its brief, Kraft partially quotes from the first case,

9   *Perricone v. Unimed Prof'l Servs., Inc.*, No. Civ. A. 301 CV 512 (CFD), 2002 WL 31075868 (D.

10  Conn. July 18, 2002), and unfairly crops out the most important part of the court's analysis.

11  Immediately after stating that "the erosion of plaintiff's position in the market, while serious,

12  does not amount to undue prejudice," the *Perricone* court explained that the defendant's sales

13  occurred through *limited* channels and had *limited* geographic scope:

14        As indicated at the hearing on the motion to stay, sales of the allegedly infringing product

15        occur primarily through radio advertisement and mail order and reach a limited

16        geographic market (the Northeast) as compared to the nationwide market reached by

17        plaintiff's product.

18  *Perricone*, 2002 WL 31075868 at *3.  This analysis highlights the irreparable nature of the harm

19  that Kraft will inflict on P&G here.  Unlike the *Perricone* defendant's sales, Kraft's sales are not

20  limited to discrete channels of trade or to a small part of P&G's nationwide market.  Kraft

21  competes with P&G in the same market, for the same consumers, through the same retailers, and

22  on the same retail shelves.  *See* Bello Decl. ¶¶ 6-12; Schmeller Decl. ¶¶ 3-8.  Just in the past few

23  days, Kraft has revealed that it plans to engage in a massive advertising campaign, doubling the

24  advertising budget that it had for the same period last year.  Mulholland Ex. 3.  Timed to coincide

25  with Kraft's introduction of its infringing product and the critical Thanksgiving and Christmas

26  holidays, Kraft's advertising campaign will inflict significant lost sales and lost market position

27  on P&G.  Goodfellow Decl. ¶ 17.

28

-10-    P&G's OPP TO MTN OF KRAFT FOODS FOR STAY
OR ALTERNATIVELY EXPEDITE DISCOVERY
Case No.: C07-04413 PJH

DM_US:20715891_5

1    Another distinguishing fact is that in *Perricone* the PTO had found "a substantial

2  likelihood that a reasonable examiner would consider 'the teachings [of a prior art article]'

3  important in deciding whether or not the claims are patentable . . . ." *Perricone*, 2002 WL

4  31075868 at *2.  The PTO has reached the opposite conclusion here, rejecting Kraft's 48

5  arguments for invalidity, finding that 11 new patents and other publications cited by Kraft, either

6  alone or in combination with the over 150 patents and other publications considered in the

7  original prosecution, did not invalidate a single one of the 55 claims of P&G's patent.  While the

8  *Perricone* court was interested in having the prior art "first considered by the PTO, with its

9  particular expertise," *id*. at *1, in this case the PTO has now considered all the prior art.  Kraft

10  has done nothing to explain why the PTO's findings on the disclosure of these patents and

11  publications are erroneous, or how any of these findings could be overturned on appeal.

12    Kraft also fails to find support in *Pass & Seymour Inc. v. Hubbell Inc.*, No. 5:07-CV-

13  0272, 2007 WL 2172648 (N.D.N.Y. July 23, 2007), the second case that it claims governs here.

14  While *Pass & Semour* involved a preliminary injunction motion, its similarity to this case ended

15  there.  The district court in that case reached the merits of the plaintiff's preliminary injunction

16  motion, something Kraft is trying to prevent in this case.  *Id*. at *3.  In reaching the merits, the

17  court found "serious questions regarding obviousness" with respect to the two claims on which

18  the plaintiff relied in its preliminary injunction motion—claims 25 and 29.  *Id*. at *3-*8.  Here,

19  Kraft did not establish how *any* of the asserted claims are invalid, and therefore failed to show

20  why it should not be enjoined from infringing.

21    Kraft's only attempt to address the merits of P&G's preliminary injunction motion with

22  evidence was to submit the declaration of Kraft's John Leboutillier regarding the alleged

23  hardship to Kraft from the issuance of an injunction.  Without offering any factual support, Mr.

24  Leboutillier exaggerates that "it *could* take Kraft *up to* approximately 25 weeks to switch back to

25  using tin containers for its Maxwell House coffee."  Leboutillier Decl. ¶ 5 (emphasis added).

26  Kraft's Mr. Leboutillier could not support his counsel's earlier assertion that it actually would

27  take 25 weeks to "re-shift" to using only metal cans.  Docket 32, Stern Decl. ¶ 5.  P&G knows

28

1   exactly how long it takes to gear up in metal cans after halting production of its plastic containers

2   because P&G needed only three weeks to restart 20% of its Folgers metal can production after it

3   lost its sole Folgers plastic container production line in Hurricane Katrina.  Goodfellow Decl. ¶¶

4   4-8.  Kraft offers nothing to explain why it could not quickly shift production to its metal-can

5   manufacturing capability, which it still appears to be using to sell coffee in metal cans, or why it

6   could not obtain production in metal cans from a third party.  *Id.* ¶ 11.

7          Kraft goes so far as to imply that P&G is trying to stop Kraft from selling Maxwell House

8   coffee or Maxwell House coffee in any plastic container.  P&G, however, is only trying to stop

9   Kraft from infringing its patent and at present Kraft's only infringing product is its 39-ounce

10  plastic container.  Kraft sells its Maxwell House coffee in a variety of other containers, including

11  one pound metal can, three pound metal can, and bag, that would not be affected by the requested

12  injunction.  Goodfellow Decl. ¶ 13.  Ignoring that the infringing container accounts for less than

13  20% of Kraft's Maxwell House coffee sales and expanding the time that it would take Kraft to

14  shift production from the actual three weeks that P&G experienced to the hypothesized 25 weeks

15  are but two false premises for Kraft's assertion that P&G's preliminary injunction motion could

16  cause Kraft $250 million in damages.  Docket 32, Stern Decl. ¶ 5.  Kraft's attorney-declarant

17  merely took the 25-week hiatus hypothesized by "various people [he had] spoken to at Kraft,"

18  and used that as a figure to halve Kraft's $500 million annual sales of Maxwell House coffee in

19  all containers.  Docket 35, Stern Decl. at 3:13-17.  Mr. Leboutillier arrived at the same number

20  by "assuming the full 25 weeks."  Leboutillier Decl. at 3:1-2.  Kraft's loss estimate ignores that

21  P&G's requested injunction would not affect any Maxwell House coffee except the 39-ounce

22  size, and that the 25-week hiatus has no basis in fact.

23         Kraft's losses, moreover, would not equate with its lost revenue.  Kraft's profit on the lost

24  revenue is the accurate measure of its loss.  That profit is likely only 40% of the revenue.

25  Goodfellow Decl. ¶ 13.  When Kraft's $250 million figure is reduced to account for the facts that

26  its 39-ounce Maxwell House branded coffee sold in the infringing plastic container account for

27  less than 20% of its Maxwell House coffee sales, that its hypothesized 25 weeks of delay are

28

-12-    P&G's OPP TO MTN OF KRAFT FOODS FOR STAY
        OR ALTERNATIVELY EXPEDITE DISCOVERY
        Case No.: C07-04413 PJH

DM_US:20715891_5

1   more accurately at most three, and that its profit accounts for only 40% of revenue on its lost

2   sales, Kraft's potential, worst-case losses are but a fraction (a mere several million dollars) of the

3   claimed $250 million.

4          But even if Kraft's estimates of its losses were accurate, they would not justify denying

5   P&G's preliminary injunction motion.  As the cases cited by P&G in support of its preliminary

6   injunction motion have held, the self-inflicted harm of a party that made a calculated risk to

7   infringe does not justify denying a preliminary injunction.  *See* Memorandum In Support of

8   P&G's Motion For A Preliminary Injunction at 22-24.  Mr. Leboutillier was himself involved in

9   the decision to seek a reexamination of the P&G patent and he was fully aware that "the PTO

10  issued a decision confirming all the [P&G] patent claims on June 7, 2007."  Leboutillier Decl.

11  ¶ 3.  Despite the PTO's decision confirming each and every claim of P&G's patent, he and others

12  at Kraft decided to introduce Kraft's infringing 39-ounce plastic container.  They did so despite

13  the impact that they knew Kraft's infringement would cause to what they acknowledge is P&G's

14  "long-standing lead position in the market" (Motion at 8), including losses to P&G's market

15  share, consumer loyalty, brand equity, ability to penetrate new market entrants, and its influence

16  among retailers.  Mr. Leboutillier tellingly does not address these losses to P&G, and does not

17  provide Kraft's own estimates of how its infringing product would impact P&G's lead position in

18  the market, particularly after Kraft unleashes a flurry of marketing to promote that product, as it

19  recently revealed it would do.  Mulholland Ex. 3.

20         Consistent with its suggestion that the Court stay this litigation and ignore the merits of

21  P&G's motion, Kraft fails to address the public interest supporting P&G's motion.  The public

22  interest is served by enforcing the patent laws and protecting patent rights.  *Abbott Labs. v. Andrx*

23  *Pharms.*, Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006).  Kraft has offered no countervailing public

24  interest in favor of allowing an infringer who filed and lost a meritless reexamination to continue

25  infringing until it runs out of appellate arguments.  In sum, the record before the Court compels

26  granting P&G's requested preliminary injunction and denying Kraft's motion to stay the

27  litigation.

28

1    **D.    A Stay Of Litigation Would Prejudice P&G And Give Kraft A Tactical**

2            **Advantage**

3        The Court also should not stay this litigation because a stay would severely prejudice

4    P&G. *Nanometrics*, 2007 WL 627920 at *3. Kraft argues that "P&G will not be harmed by

5    entry of a stay" because (1) P&G only recently filed this action, (2) "Kraft believes it has

6    compelling invalidity and non-infringement arguments that preclude P&G from obtaining a

7    preliminary injunction"; and (3) P&G allegedly did not present sufficient evidence to show that it

8    will be irreparably harmed. Motion at 2, 7. None of these arguments has any merit.

9        First, as P&G explained in its preliminary injunction motion, it only recently filed this

10   action because Kraft only recently introduced its new plastic container. Second, Kraft failed to

11   demonstrate that it has compelling invalidity and non-infringement arguments with anything

12   other than the hearsay statement of its trial counsel. *Id.* Third, P&G presented ample evidence of

13   irreparable harm. As explained in P&G's preliminary injunction motion, P&G's witnesses

14   established the different ways in which P&G will be harmed from Kraft's continued

15   infringement. Kraft appears to contend that only the report of a paid "expert economist" or other

16   third party can show that Kraft will actually cause any "actual, material injury" to P&G. Motion

17   at 8. That is wrong. P&G's witnesses were actually responsible for creating and maintaining the

18   market share, consumer goodwill, brand equity, consumer loyalty, retailer captaincy, and other

19   tangible and intangible benefits provided by P&G's technological lead in the marketplace. They

20   are far more competent and knowledgeable than a third party expert to testify on these issues.

21       Kraft's complaint that P&G's witnesses have not provided a "quantitative" measure of the

22   harm to P&G (Motion at 8) does not show that P&G will not suffer irreparable harm. Changes in

23   market share cannot yet be calculated with precision because Kraft only recently started

24   infringing. Other changes, including P&G's loss of good-will, brand equity, and leadership

25   position among retailers, can never be quantitatively measured. Kraft's failure to rebut P&G's

26   witnesses with the testimony of its own employees can only be seen as a concession that they do

27   not disagree with P&G's assessment of how Kraft's new plastic container will affect P&G in the

28

1  marketplace. In the absence of any evidence in the form of a competent witness, Kraft's attorney

2  argument that money damages can compensate for any harm is factually baseless and simply

3  wrong. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("If monetary

4  relief were the sole relief afforded by the patent statute then injunctions would be unnecessary

5  and infringers could become compulsory licensees for as long as the litigation lasts.")

6       The harm that P&G will suffer in the absence of a preliminary injunction will be

7  compounded if P&G is deprived not only of a preliminary injunction but of a venue in which to

8  pursue this litigation. Kraft has alleged in its motion that it plans to present non-infringement as

9  well as invalidity defenses, but it seeks to preclude P&G from even taking discovery on those

10  defenses until it has completed all of its appeals. The delay that Kraft intends to cause will

11  prejudice P&G's ability to obtain evidence that the Court will need on the issues of infringement

12  and damages, as well as to consider Kraft's invalidity arguments. Much of the discovery that

13  P&G will take relates to events that occurred more than four years ago, when P&G introduced its

14  new packaging, including Kraft's skepticism in 2003 that P&G's plastic containers would keep

15  coffee fresh. *See* Bello Decl. ¶ 4. Contrary to Kraft's argument, the fact that P&G has no

16  discovery on these events, and the additional two and a half year delay that Kraft wants the Court

17  to impose, show why P&G would be prejudiced from a stay. *See Fresenius*, 2007 U.S. Dist

18  LEXIS 44107 at *18-*19 (denying motion to stay because in "the lengthy delay that would

19  inevitably ensue if a stay were granted, evidence could be lost and witnesses' memories could

20  fade.") *See also Alltech, Inc. v. Cenzone Tech, Inc.*, No. 06 CV 0153 JM (RBB), 2007 U.S. Dist.

21  LEXIS 19989, at *9 (S.D. Cal. Mar. 21, 2007) (denying stay in part because "the risk that

22  witness memories could fade while waiting for reexamination is not insubstantial."); *Anascape*,

23  475 F. Supp. 2d at 617 ("It does seem that crucial witnesses are more likely to be located if

24  discovery is allowed to proceed now, rather than later. Anascape would be at a severe tactical

25  disadvantage if the entire case were stayed.") There is no question that P&G will be prejudiced if

26  this lawsuit is brought to a standstill while Kraft pursues its appeals over the next two-and-a-half

27  years.

28

1    Allowing Kraft to stay this litigation to pursue its appeal also would provide Kraft an

2    undeserved tactical advantage, not only by delaying this litigation indefinitely, but also by

3    allowing Kraft to use P&G's technical innovation for years so as to gain technological parity

4    with P&G and change marketplace conditions.  *See* Bello Decl. ¶¶ 6-12; Schmeller Decl. ¶¶ 3-8;

5    Huntington Decl. ¶¶ 5-8.

6    Kraft's request for a stay is not supported by the patent statute or case law, would not

7    further the interests of justice, would not lead to an efficient resolution of this litigation, and

8    would cause a manifestly unfair appropriation of P&G's patented technology and consequent

9    irreparable harm to P&G's long-term position in the marketplace and among consumers and

10   retailers.  The Court should deny Kraft's motion for a stay.

11   **III.    KRAFT'S REQUEST FOR EXPEDITED DISCOVERY SHOULD BE DENIED**

12        **A.    Kraft Fails To Demonstrate Good Cause To Expedite Discovery**

13   Kraft's request for expedited discovery and to continue the hearing on P&G's preliminary

14   injunction motion for two months should be denied because it is neither necessary nor warranted.

15   In order to obtain expedited discovery, Kraft correctly notes that it must show good cause.

16   *Semitool, Inc. v. Tokyo Electron Am. Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).  Good cause

17   may exist if Kraft can show an urgent need for the discovery to respond to P&G's preliminary

18   injunction.  *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994) ("good cause [for

19   such an order] may exist because of the urgent need for discovery in connection with an

20   application for TRO or preliminary injunction") (citations omitted).  Yet, Kraft's own actions

21   disprove its supposed "urgent" need for expedited discovery and thus negate any claim of good

22   cause.  Kraft already rejected P&G's offer of true expedited discovery.  Docket 35, Stern Decl. at

23   7:23-8:3; Motion at 12.  Even though it has been attacking the validity of P&G's patent since

24   January, Kraft refused to begin deposing P&G's inventors on September 24.  And, Kraft waited

25   five days after receiving P&G's preliminary injunction motion before notifying the Court that it

26   wanted expedited discovery.  Finally, despite including draft, unsigned discovery in its motion

27

28

**HOWREY LLP**

DM_US:20715891_5

1   papers, Kraft has yet to serve P&G with discovery.[8]  Kraft therefore cannot show good cause for

2   expediting discovery.

3       Kraft instead contends that good cause exists based on its unsubstantiated assertion that

4   "it stands to immediately lose at least $250 million if P&G's preliminary injunction motion is

5   successful."  Motion at 11.  Even if this were remotely true (which it is not, as is explained above

6   and in the Goodfellow Decl.  ¶¶ 12-13), Kraft fails to explain how this assertion demonstrates

7   any need for the sought-after discovery in order to respond to P&G's preliminary injunction

8   motion.  Kraft also fails to identify any authority that such an assertion constitutes good cause to

9   expedite discovery.  In fact, while Kraft states that such expedited discovery is routine in

10  infringement cases, Motion at 11, Kraft fails to point out that in the infringement cases where

11  expedited discovery is granted, it is the plaintiff that is granted the expedited discovery in the

12  context of supporting its TRO or preliminary injunction.  *See Qwest Commc'n Int'l v. Worldquest*

13  *Networks, Inc.,* No. 02-WM-2195 (CBS), 2003 U.S. Dist. LEXIS 7374, at *4 (D. Colo. Jan. 2,

14  2003) ("The good cause standard may be satisfied . . . where the moving party has asserted

15  claims of infringement and unfair competition.").  Kraft's own authority bears this out and,

16  notably, none of the cases upon which Kraft relies for requesting expedited discovery involve a

17  patent infringement defendant, like Kraft, that is seeking expedited discovery, into the "issues of

18  invalidity, unenforceability, non-infringement, and irreparable harm."  Motion at 11.  *See e.g.,*

19  *RDS Group Ltd. v. Davison,* No. 02-8168, 2003 U.S. Dist. LEXIS 1337, at *8 - *11 (E.D. Pa.

20  Jan. 17, 2003) (limiting defendant's discovery to the issue of ownership of certain plaintiff

21  entities); *TKR Cable Co. v. Cable City Corp.,* No. 96-2877 (GEB), 1996 U.S. Dist. LEXIS

22  11941, at *32 - *35 (D.N.J. July 26, 1996) (granting plaintiff's preliminary injunction and

23  confirming order granting discovery to plaintiff regarding infringing products and related

24  business records); *Commodity Futures Trading Comm'n v. Int'l Fin. Servs.,* No. 02-CIV. 5497

25  _____

26  [8] Kraft incorrectly states that it only has 14 days to prepare its opposition.  In fact, because P&G
    filed and served its motion on September 14 with the hearing set for October 24, Kraft has 19
27  days to file its opposition on October 3.

28

DM_US:20715891_5

1  GEL, 2002 WL 1801723, at *7 (S.D.N.Y. July 17, 2002) (granting plaintiff's restraining order

2  and request for discovery concerning "the nature, location, status, and extent of assets of

3  Defendants or the Relief Defendant, and the location of documents reflecting the business

4  transactions of Defendants or Relief Defendant, . . ."); *FTC v. 1268957 Ontario, Inc.,* No. 01-

5  CV-0423, 2001 WL 34135319, at *2 - *4 (N.D. Ga. Feb. 13, 2001) (granting plaintiff's

6  restraining order and related discovery).

7        As explained below, Kraft's motivation for seeking expedited discovery has more to do

8  with delaying P&G's preliminary injunction motion than obtaining discovery truly needed to

9  respond to the merits of P&G's preliminary injunction motion.

10        **B.**     **Kraft Does Not Need The Sought-After Discovery To Respond to P&G's**

11            **Preliminary Injunction Motion**

12        Contrary to its assertion, Kraft does not need discovery to respond to P&G's preliminary

13  injunction motion.  As explained earlier, in response to P&G's clear and well founded

14  infringement showing, Kraft relies on a declaration by its counsel alleging that "Kraft believes it

15  has compelling invalidity and non-infringement arguments that preclude P&G from obtaining a

16  preliminary injunction in this case."  Docket 32, Stern Decl. ¶ 5.  Kraft's invalidity argument

17  rests on its unsupported assumption that the panel of examiners in the reexamination did not

18  apply the correct legal standard.  Yet, nowhere does Kraft identify how the discovery it urgently

19  seeks relates to its hope that the USPTO examiners will be reversed on appeal.  About its non-

20  infringement defense, Kraft's attorney alleges only that "Kraft also has substantial non-

21  infringement arguments."  *Id*.  Nowhere does Kraft identify these arguments, even though it has

22  been aware of P&G's patent application for years and has been attacking that patent since the day

23  after it issued.  Accordingly, Kraft cannot articulate why the sought-after discovery is urgently

24  needed for its non-infringement arguments.  To the extent Kraft truly has "substantial non-

25  infringement arguments," then it should be able to articulate those arguments without the need

26  for any urgent discovery from P&G, especially considering that Kraft designed, makes and sells

27  the accused product, the mechanical nature of the patent claims, the plain terms used in the

28

1   claims to describe the claimed inventions and the literal correspondence between the asserted

2   claims and features of Kraft's 39-ounce plastic coffee container.  Likewise, Kraft's claim that it

3   needs urgent discovery regarding P&G's irreparable harm is specious.  In its motion to expedite

4   discovery, Kraft did not attack or even provide its own evidence refuting P&G's showing of

5   irreparable harm.  Instead, Kraft focused on its own (self-inflicted) harm that P&G's preliminary

6   injunction motion allegedly would cause.  Critically, in its motion for expedited discovery, Kraft

7   does not identify a single example where a district court granted expedited discovery to a patent

8   infringement defendant under the circumstances present here.

9            **C.    Kraft's Proposed "Limited" Discovery Is Overly Broad**

10           Kraft's request for expedited discovery also should be denied because its discovery

11  requests are excessive for the limited purpose of responding to the issues raised in P&G's

12  preliminary injunction motion.  In such circumstances, "courts generally deny motions for

13  expedited discovery when the movant's discovery requests are overly broad." *Philadelphia*

14  *Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.,* No. 98-CV-2782, 1998 U.S. Dist.

15  LEXIS 10511, at *6 (E.D. Pa. July 15, 1998); *Scattergood v. Perelman*, No. 90-3451, 1990 U.S.

16  Dist. LEXIS 6482, *18-19 (E.D. Pa. 1990).  Kraft made no attempt to show that the discovery it

17  seeks is narrowly tailored to the specific issues in P&G's preliminary injunction motion.  *Qwest*

18  *Commc'n Int'l,* 2003 U.S. Dist. LEXIS 7374, at *7 (denying request for expedited discovery

19  because discovery requests were overly broad and not reasonably tailored to specific issues to be

20  addressed at preliminary injunction hearing for which expedited discovery was sought).  Kraft's

21  overly broad discovery includes:[9]

22           •   Depositions of all six of the named inventors of P&G's asserted patent

23

24  [9]  In addition to the fact that Kraft has failed to show any nexus between any of the discovery it
     seeks and the issues raised in P&G's preliminary injunction motion, the following are clear
25   examples of discovery requests that are not needed for Kraft to respond to the issues in P&G's
     motion.  Should it become necessary, P&G will serve its objections to Kraft's discovery requests
26   if and when Kraft serves its discovery and P&G's come due.  As of the filing of this opposition,
27  Kraft had not yet served any discovery on P&G.  Mulholland Decl.  ¶ 6.

28

1    • Depositions of attorneys that prosecuted P&G's asserted patent

2    • Depositions of all the P&G employees that provided declarations

3    • Deposition of P&G on 19 topics, including, in part,

4       o "The research, development, testing, and commercialization efforts of
          P&G concerning it current and past coffee containers, including all efforts
5          related to the purported inventions disclosed in U.S. Patent No. 4,966,780
          and the asserted patent" (Topic No. 2)
6

7       o "The databases that P&G has access to in connection with product
          development…" (Topic No. 4)
8

9       o "The research, surveys, focus groups, consumer comments, studies or
          marketing studies…concerning the packaging of coffee in a plastic
10         container" (Topic No. 9)

11   • Thirty-three (33) document requests, including

12      o "All documents that reflect, refer or relate to the preparation and/or
          prosecution of any applications or other materials related to the assert[ed]
13         patent and/or any genealogically related patents and/or patent applications,
          including but not limited to any foreign counterparts to the asserted patent
14         and communications between the people substantively involved in the
          prosecution of the patent applications…" (RFP No. 1)
15

16      o "All documents that reflect, refer or relate to research, surveys, focus
          groups, consumer comments, studies or marketing studies concerning the
17         packaging of coffee in a plastic container…" (RFP No. 3)

18      o "All documents that support and/or contradict or otherwise relate to the
19         statement that 'the permeable walls of the semi-rigid plastic packages of
          the present invention retain a high level of aroma gas chromatograph
20         counts compared to the impermeable prior art metal cans' as stated in
          Column 25 at lines 20-24 of U.S. Patent No. 4,966,780, including but not
21         limited to research and development documents, product testing, prototype
          testing, emails, and lab notebooks." (RFP No. 5)
22

23      o "All documents that reflect, refer or relate to any commercial success or
          lack of success of the inventions claimed in the asserted patent…" (RFP
24         No. 7)

25      o "All documents which constitute research and development efforts,
          product definition sheets, trade literature, specification sheets, technical
26         data sheets, publications, emails, abstracts, speeches, or descriptive
          documents of any kind which reflect, refer or relate to any plastic
27

28

DM_US:20715891_5

container product that you contend embodies the asserted patent…" (RFP No. 8)

o "All documents that reflect, refer or relate to (a) your knowledge of prior art relating to the asserted patent, and (b) the date and circumstances pursuant to which you first learned of each prior art document or thing." (RFP No. 9)

o "All documents that reflect, refer or relate to any analysis, studies, reports, memoranda, opinions, advice, communications or correspondence by P&G or any entity affiliated with P&G regarding any decision to commercialize or not commercialize any product that practices or embodies any of the claims of the asserted patent." (RFP No. 11)

o "All documents that reflect, refer or relate to the first three (a) uses, (b) offers for sale, (c) shipments, and (d) sales of any product, method, or service that practices or embodies any of the claims of the asserted patent." (RFP No. 13)

o "All documents that reflect, refer or relate to the revenues and/or royalties derived from the sale of any product that practices or embodies any of the claims of the asserted patent…"  (RFP No. 14)

o "All documents that reflect, refer or relate to any projections of sales, sales prices, royalties and/or revenues associated with any product that practices or embodies any claims of the asserted patent…"  (RFP No. 15)

o "All documents that reflect, refer or relate to any license of all or any portion of the asserted patent." (RFP No. 18)

o "All documents that reflect, refer or relate to communications to or from any of the named inventors of the asserted patent…" (RFP No. 19)

o "All documents that reflect, refer or relate to papers authored by any inventor of the asserted patent…" (RFP No. 20)

o "All documents that reflect, refer or relate to prior testimony of any inventor of the asserted patent…" (RFP No. 21)

o "All documents that reflect, refer or relate to the asserted patent."  (RFP No. 24)

o "All documents that reflect, refer or relate to the databases available to P&G during product development…" (RFP No. 25)

HOWREY LLP

DM_US:20715891_5

- Thirteen interrogatories seeking everything from the minute details of tests referenced in P&G's patent (Interrogatory No.1) to the testing of P&G's Folgers container (Interrogatory Nos. 4, 9, 10, 11 and 12); and

- Thirteen requests for admission seeking admissions that "P&G has not [or by April 30, 2008 will not have] reported to its shareholders or U.S. Securities and Exchange Commission a loss of more than $250 million in revenue [or profits, goodwill, or tarnished reputation] due to sales of the accused product."

Far from being limited to the issues raised in P&G's preliminary injunction motion, it is clear that Kraft's proposed discovery is designed not to be "limited and specifically tailored," but to be a fishing expedition for some basis to attack P&G's clear showing of infringement, validity and irreparable harm. Notwithstanding that Kraft noticed 16 depositions, exceeding by six the number of depositions permitted under Fed. R. Civ. P. 30, Kraft categorically has designated entire groups of individuals (e.g., named inventors, prosecuting attorneys and declarants) without demonstrating any nexus between this discovery and the need for such discovery to prepare its response to P&G's preliminary injunction motion.[10] In its motion, P&G relied on a single inventor to discuss the problems P&G faced in designing a plastic coffee container and the novel solutions that P&G claimed in its asserted patent. *See* Declaration of David Dalton. The other two named inventors who provided declarations limited their testimony to the methods used to test the Maxwell House container and the results of those tests. *See* Declarations of Douglas Zeik and Jennifer Floyd.[11] And, only nine of fifteen individuals noticed provided declarations in

---

[10] It is well settled that a party seeking leave to take more than the 10 depositions than allowed under Fed. R. Civ. P. 30, must make a particularized showing why the discovery is necessary. *Archer Daniels Midland v. Aon Risk Services, Inc.,* No. 97-2185 (JRT/RLE), 1999 U.S. Dist. LEXIS 11718, at *25 - *26 (D. Minn. June 7, 1999). Here, Kraft's overly broad discovery is apparent in its initial request for 16 depositions, including one of P&G over 19 different topics. Stern Decl. Exs. 4 and 5.

[11] Kraft's request for taking the depositions of all of the named inventors regarding the issues of claim construction, infringement and validity also is unnecessary. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 983 (Fed. Cir. 1995) (en banc) (noting that an inventor's testimony as to the meaning of claims in her patent was "entitled to no deference"), *aff'd*, 517

(Continued...)

DM_US:20715891_5

1   support of P&G's preliminary injunction motions.  Each of the declarations was limited in scope

2   and most of them related to testimony that is not likely to be disputed or controversial.

3        Kraft also seeks documents that are unnecessary to respond to P&G's preliminary

4   injunction motion.  For example, Kraft fails to explain how documents related to P&G's research

5   into plastic containers generally, or documents related to statements made in patents not asserted

6   in this lawsuit, or documents related to P&G's knowledge of the prior art are needed to respond

7   to the issues raised in P&G's motion.  Finally, Kraft's request for admissions regarding whether

8   P&G did or did not make statements to shareholders or the U.S. Securities and Exchange

9   Commission about whether the accused sales will cause it a loss of $250 million exemplifies the

10   overbreadth of Kraft's discovery.  Aside from not relating to invalidity or non-infringement,

11   P&G's irreparable harm, by its nature, is not quantifiable.  Thus, these requests for admissions

12   and other unnecessary discovery requests are overly broad and intended to delay P&G's

13   preliminary injunction motion until after the critical holiday sales have passed and P&G has

14   suffered irreparable harm.

15       **D.**    **Kraft's Request For A Two Month Delay Is Unnecessary And, If Granted,**

16                **Would Cause P&G Irreparable Harm**

17        Kraft's real objective is to delay reaching the merits of P&G's motion for preliminary

18   injunction motion until at least after the critical holiday sales take place.  By delaying the hearing

19   on P&G's motion a full two months, Kraft will have succeeded in getting its product out for the

20   holiday season and thereby will inflict upon P&G the very irreparable harm P&G's motion seeks

21   to avoid.  As explained above, Kraft recently announced that it intends to more than double the

22

---

23   (...Continued)

24   U.S. 370 (1996); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,* 345 F.3d 1318, 1330 (Fed. Cir. 2003) (holding an inventor's testimony "is of little consequence in the claim

25   construction analysis", which "must be based primarily on the record established at the time the patent was granted."); *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.,* 344 F.3d

26   1186, 1194 (Fed. Cir. 2003) (rejecting inventor's testimony regarding the scope of the asserted claims*); Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1342 n.2 (Fed. Cir. 2003) (rejecting

27   inventor's testimony regarding invalidity analysis).

28

1  Maxwell House marketing expenditures in the fourth quarter of this year.  Mulholland Ex. 3.

2  Under Kraft's proposed briefing schedule, the hearing on P&G's preliminary injunction motion

3  will not occur until December 19, 2007—well beyond the point where an injunction would

4  prevent irreparable harm to P&G.  The irreparable harm that P&G will suffer due to Kraft's

5  infringement—including loss of market share, consumer loyalty, brand equity, and leadership

6  position—will be magnified during the holiday season when consumers buy more 39-ounce

7  containers of coffee than at any other time of the year.  Goodfellow Decl. ¶ 17.  This prejudice

8  will be amplified by Kraft's planned advertising during this period.

9      Even if it is later forced to return to the use of a metal can—or a non-infringing plastic

10  can—Kraft's delay will rob P&G of the benefits of being a market leader on packaging

11  technology that up to now has been promoted only by P&G.  Kraft will reach many consumers

12  with its infringing product and marketing for that product, and it will gain market share,

13  visibility, and the loyalty of consumers who try its coffee brand and switch over to Maxwell

14  House coffee.  *See* Roe Decl. ¶¶ 5-9; Gemeiner Decl. ¶¶ 9-20.  Kraft itself complains of massive

15  irreparable injury it allegedly will face from the disruption of having to stop using its plastic 39-

16  ounce container—including loss of "customers," "goodwill," and market share.  (Motion at 8;

17  Docket 32, Stern Decl. at 3:9-14).  It similarly complains that any disruption in its sales will

18  cause irreparable harm by "only strengthen[ing] P&G's already long-standing lead position in the

19  market."  Motion at 8.  Kraft can avoid or at least minimize such a disruption by shifting its

20  production back to metal cans, which do not infringe.  But P&G cannot similarly mitigate the

21  harmful effects of a disruption caused by competition with a product that Kraft will claim is

22  superior, or at least equivalent, to P&G's container.  In just a few months of intense sales and

23  advertising, Kraft can undo the years of effort by P&G to develop and market a breakthrough

24  technology.

HOWREY LLP

DM_US:20715891_5

**IV.    CONCLUSION**

Kraft's request for a stay of all litigation and its alternative request that the Court continue the hearing on P&G's preliminary injunction motion have the common goal of derailing P&G's right to obtain badly-needed and well-deserved injunctive relief against Kraft's infringement. The Court should deny both of Kraft's requests and consider P&G's motion on its merits.

The electronic filer hereby attests that the individual whose name appears below has signed this document.  See General Order 45. Section X.

Respectfully submitted,

DATED: September 25, 2007                    HOWREY LLP


By   /s/  William C. Rooklidge
            William C. Rooklidge
Attorneys for THE PROCTER AND GAMBLE
COMPANY

DM_US:20715891_5