# EXHIBIT "2"

FOCUS - 2 of 2 DOCUMENTS

Copyright 1999 Omega Communications, Inc.
Intellectual Property Today

August, 1999

**SECTION:** Pg. 28

**LENGTH:** 2884 words

**HEADLINE:** HR1907 -- The American Inventors Protection Act of 1999;
A GRAND COMPROMISE IN THE MAKING

**BYLINE:** BY MICHAEL J. MEHRMAN OF JONES & ASKEW, LLP

**BODY:**

INTRODUCTION

   On May 26, 1999, the House Judiciary Committee unanimously approved the American Inventors Protection Act of 1999. This bill is the latest and most serious step yet in a three-year, very controversial effort to significantly amend the Nation's patent statute and restructure the United States Patent and Trademark Office (Office). It includes a last minute En Block Amendment introduced by Sponsors Howard Coble (R-NC) and Howard Berman (D-CA), and adopted during the mark-up session just prior to the Judiciary Committee vote.

   Given the surprisingly strident positions taken by the various interest groups and the sharp division in the Judiciary Committee during previous attempts at similar legislation, the most remarkable aspect of HR 1907 is that it gained a *unanimous* vote of approval in the Judiciary Committee. This unanimous support was achieved through the art of Grand Compromise. This bill is not just another "log roll" legislative initiative, in which one interest group's pet provision was traded for another's, but instead includes several major new provisions of patent law, which are each tempered by significant and hard-fought compromise.

   Representative Coble engineered the Grand Compromise by conducting negotiations with the other major interest groups to work out a mutually agreeable compromise before the Committee vote. In these negotiations, Coble represented the "large entity lobby" on the one hand, and Dana Rohrabacher (R-CA) represented the other most influential interest groups, including many interests of the independent inventors and the Examiners union, which had joined together to defeat previous attempts to enact similar legislation. In order to resolve the concerns of these interest groups, the bill includes significant compromises on virtually all contested issues. For this reason, Representative Rohrabacher requested that the full House of Representatives suspend the rules and "fast-track" the bill to prevent further amendment on the House floor, which might upset the balance struck by the Committee.

HR1907 SUMMARY BY TITLE

   Title I, short titled the "Inventors' Rights Act," includes mandatory contract terms and a lengthy standard-form mandatory disclosure statement that must be prominently displayed on any contract for invention development services. With the intent to put unscrupulous invention promotion companies out of business, the statement must include a written disclosure of the percentage of the company's clients that earned more from their inventions than they paid to the promotion company. The bill also includes stiff penalties for failure to make the required disclosure. In a civil action the defrauded inventor would be entitled void to the contract and obtain its costs, attorneys' fees, and the greater

Page 2
HR1907 -- The American Inventors Protection Act of 1999;A GRAND COMPROMISE IN THE MAKING Intellectual Property Today August, 1999

of $ 5,000 or the actual damages sustained. In addition, the bill makes failure to include the required disclosure a misdemeanor punishable by a $ 10,000 fine per offense.

Title II, short titled the "First Inventor Defense Act," includes limited prior user rights as a defense to infringement of *method claims* only. The prior user rights would only apply for inventions that were actually reduced to practice more than one year before the patent's effective filing date, commercially used before the application patent's effective filing date, never abandoned, and not derived from the patentee. The defense of prior use would have to be proven by clear and convincing evidence, and a losing party asserting the defense would have to pay the patentee's attorneys' fees. In addition, a successful defense of prior use would be limited to an expandable site license where the invention had been used prior to the suit, and would be transferable only through sale of the entire enterprise.

Title III, short titled the "Patent Term Guarantee Act," would add day-by-day to the effective term of a patent any time (1) from filing until initial examination in excess of 14 months, (2) from an applicant's reply until a subsequent Office action in excess of 4 months, and (3) from payment of the Issue Fee until issuance of the patent in excess of 4 months. As a separate and additional term extension, the patent would be extended by the total time the application is pending in the Patent Office beyond 3 years, less any time beyond 3 months used by the applicant to respond to an Office action. But any reduction in the patent term extension resulting from the applicant's delay would be added back to the patent term if the applicant was unable to respond within 3 months "in spite of all due care." The Office will notify the applicant of any patent term extension prior to issuance. The applicant will then have an opportunity to request reconsideration of the decision, including an opportunity to show that the applicant was unable to respond to any action within 3 months "in spite of all due care." The Office will then make a final determination of the patent term extension. Regardless of whether the applicant agrees with the decision, the Office will grant the patent based on this decision. Within 180 days, the applicant may appeal the decision to the District Court for the District of Columbia.

Title IV, short titled the "Publication of Foreign Filed Applications Act," directs the Office to publish all pending U.S. patent applications at 18 months from the effective filing date. However, the Office will not publish an application at the applicant's request if the applicant states in the request that the application has not been filed in another country or under an international agreement (PCT) that requires publication. If the applicant later *does* files the application abroad or with the PCT, the applicant must notify the Office within 45 days, or the U.S. patent application becomes abandoned. But the abandoned application may be revived if the failure to notify the Office was unintentional. The applicant may also submit a redacted application for publication to conform the U.S. publication to the version published abroad.

A U.S. applicant may also request publication *before* the 18-month date. This might be advantageous to obtain the "provisional right" to a reasonable royalty that commences upon publication. To obtain this royalty, the accused infringer must have actual notice of the published application. In addition, a royalty will only be available for infringement of claims in the published application that are "substantially identical" to claims in the issued patent. Early publication might also be beneficial because a published application would become prior art under *35 U.S.C. § 102*(e) as of its effective U.S. filing date.

Title V, short titled the "Patent Litigation Reduction Act," would give a third party reexamination requester the right to file a written response at each stage of the reexamination, and the right to file a written response at each stage of the reexamination, and the right to appeal or participate in the patentee's appeal of the reexamination decision to the Federal Circuit. Any person at any time will have the right to submit prior art patents and printed publications for consideration during reexamination. Within three months from the request, the Patent Office will make a final, *non-appealable* decision whether a reexamination request raises a "substantial new question of patentability." This section explicitly gives the Director of the Patent and Trademark Office complete discretion over whether to allow or disallow reexaminations on a case-by-case basis "with or without consideration of other patents or printed publications," which is similar to the present system except that the applicant would not longer have the right to a petition the Commissioner for a different decision.

This overtly strong-handed aspect of Title V would give the Director an unrestrained power to base the decision of

Case 3:07-cv-04413-PJH    Document 54-3    Filed 09/25/2007    Page 4 of 5

Page 3
HR1907 -- The American Inventors Protection Act of 1999;A GRAND COMPROMISE IN THE MAKING Intellectual Property Today August, 1999

whether to grant a reexamination on policy, budgetary, political, or other considerations that need not be explained to the requester. As a practical matter, this provision may reflect an important recognition that the Office may need an effective way to limit the reexamination burden, without exposing the Office to litigation, if the flood gates open to a sea of reexamination requests based on non-patent prior art that was not available to the Office during initial examination. This may be a realistic concern, given that the Office itself recently began a series of public hearings on its acknowledged lack of searchable non-patent prior art in the increasingly popular areas of software and method-of-doing-business patents.

As an apparent trade off for increased reexamination participation, the third party requester would be estopped in a subsequent civil action from raising any issue that was or could have been raised in the reexamination. The third party requester would also be estopped in a subsequent civil action from challenging any fact decided in the reexamination. Neither the patent owner nor the third party requester, nor privies of either, would be allowed to start a new reexamination before the first one reaches a conclusion. In what appears to be an intentional and gaping loophole, Title V would require the third party requester to identify the "real party at interest" in a reexamination request, but the estoppel provisions would apply only the third party requester named in the reexamination request, and *not* the real party at interest or privies of either. In addition, the patent owner, but not the third party requester, would be entitled to a stay of pending litigation unless the court hearing the case decides that a stay would not serve the interests of justice.

Title VI, short titled the "Patent And Trademark Office Efficiency Act," would establish the Office as an agency of the Department of Commerce subject to the policy direction of the Secretary of Commerce. A sub-cabinet level Director of the Patent and Trademark Office would be appointed by the President with the advice and consent of the Senate. The Secretary of Commerce would appoint a Commissioner for Patents and a Commissioner for Trademarks, who would each serve five-year terms. The Director would be responsible for supervision and policy direction, whereas the Commissioners would be responsible for management and direction of all activities of the Office. The Director would serve at the pleasure of the President, and the Commissioners would be removable for non-satisfactory performance under a performance agreement between each Commissioner and the Secretary of Commerce.

Title VI would also establish a 9-voting-member Patent Public Advisory Committee, with each voting member appointed for a three-year term by the Secretary of Commerce. The terms are staggered so that three positions come up for reappointment every year. At least 25% of the voting members (three members) must represent small entity patent applicants. The Committee will also include a non-voting member from each labor organization recognized by the Office. The Committee will advise the Director on the policies, goals, performance and budget of the Office, and prepare an annual report for the Secretary of Commerce.

In addition, the Office will be allowed to retain and spend all of the fees that it collects, and will be allowed to purchase assets directly, without requesting them through the Government Services Administration (GSA) and without following the restrictive purchasing procedures of the Federal Acquisition Regulations. The Office will be bound by any existing contracts, however, including the recently announced 20-year GSA office space lease. Title VI would also adopt all existing labor agreements, and continue applicability of Title 5 (Civil Service protections) to all Office employees. The bill also requires that Patents and Trademarks remain separate operating entities within the Office, and maintains the Copyright Office as a separate entity from the Patent and Trademark Office.

Title VII, which is titled "Miscellaneous Patent Provisions," could well be short titled the "Patent Practitioner's Stress Reduction Act." This section removes several troublesome and seemingly unnecessary technical hurdles in the patent application procedure. Most important of these is the extension of the prior art exception under *35 U.S.C. § 103*(c) to prior art under *35 U.S.C. § 102*(e). The bill would also allow a provisional patent application to be converted into a non-provisional application upon filing a timely request, regardless of whether the provisional application includes a patent claim. The bill would also remove the co-pendency requirement for claiming priority to a provisional patent application, and extend the time to claim priority to a provisional patent application to the next business day if the expiration date falls on a Saturday, Sunday, or holiday. In addition, the bill would authorize electronic filing as an alternative to filing a hard copy of a patent application, and authorize the Office to issue a patent on allowed claims and

Page 4
HR1907 -- The American Inventors Protection Act of 1999;A GRAND COMPROMISE IN THE MAKING Intellectual Property Today August, 1999

continue prosecution of the underlying application.

THE HISTORY BEHIND HR1907

The present effort to amend the patent statute got started in earnest two years ago in the 104th Congress. There, Senator Orin Hatch proposed a bill in the Senate Judiciary Committee that would have consolidated a number of other patent and copyright related bills into an omnibus statute. This early effort included provisions to penalize fraudulent invention development companies and stop the "invention tax" practice of diverting tens of millions dollars in Office fees to general governmental purposes. Although these provisions garnered nearly universal support, other provisions introduced into the proposed bill, mainly by the large entity lobby, became hotly contested. Although this first effort died in Committee, it launched the patent reform debate into a serious legislative effort.

Leadership in the battle shifted to the House in the 105th Congress, where Howard Coble sponsored HR400, more or less to put the large entity wish list on the table. The Coble bill included provisions regarding invention development companies, publishing U.S. patent applications at 18 months after filing, increasing third party participation in reexamination, prior user rights, and "corporatizing" the PTO. The independent inventor and Examiners lobbies objected strongly and effectively, and eventually obtained significant amendments before the bill was reported out of Committee and later on the House floor.

HR400 was eventually approved by the full House with a number of last-minute amendments adopted just prior to the Committee and House votes, including a publication exception for patent applications that are not filed abroad and wholesale elimination of the reexamination provision. The companion Senate bill S507 included a similar publication exception, but retained the reexamination provision. S507 also differed from H400 in that the Senate bill would have reconstituted the Office as a government agency rather than a government corporation. The Clinton Administration may have played a part in this aspect of the debate by threatening to veto any proposed legislation that removed the Office from direct executive-branch control. But time ran out in the 105th Congress, and S507 died in Committee.

Representative Coble then reintroduced the bill into the 106th Congress as HR1907. This time around, however, his tactic was to address the concerns of the various interest groups and build a consensus around a compromise bill. This led to the negotiations between Howard Coble and Dana Rohrabacher, who represented many interests of independent inventors and the Examiners union. This process culminated in adoption of Coble's En Bloc Amendment during the HR1907 mark-up session. This last minute, consensus securing amendment extended the estoppel effect of reexamination to any fact determined during reexamination, added 5-year terms for the Commissioners, and continued the applicability of Title 5 to Office employees by deleting a lengthy "personnel flexibility" section. With these last-minute changes, the Grand Compromise achieved unanimous support in the House Judiciary Committee, and Representative Rohrabacher's request that the full House suspend the rules to prevent amendment of the bill on the House floor.

CONCLUSION -- READY OR NOT, HERE IT COMES

The importance of the HR1907 legislative effort to the various interest groups, as well as the amount of effort expended over the past three years on patent reform, makes Senate consideration of a companion bill inevitable. And the multilateral support aligned behind HR1907 makes it very likely that the Senate version of the bill will include most or all of the elements of the Grand Compromise embodied in HR1907. With the Clinton Administration also in support of the bill, the most likely result is that HR 1907 will find its way into the patent statute, more or less intact, in this Congress.

**LOAD-DATE:** September 24, 1999