QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
    claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
    evettepennypacker@quinnemanuel.com
  Mike D. Powell (Bar No. 202850)
    mikepowell@quinnemanuel.com

555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Attorneys for Defendant
KRAFT FOODS GLOBAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>KRAFT FOODS GLOBAL, INC, a Delaware Corporation,<br><br>Defendant. | CASE NO. C 07-4413 PJH<br><br>**DECLARATION OF JOHN LEBOUTILLIER IN SUPPORT OF KRAFT FOODS GLOBAL, INC.'S REPLY IN SUPPORT OF MOTION TO STAY, OR IN THE ALTERNATIVE, TO EXPEDITE DISCOVERY AND RESCHEDULE PRELIMINARY INJUNCTION HEARING**<br><br>Date: October 3, 2007<br>Time: 9:00 AM<br>Place: Courtroom 3, 17th Floor |

I, John LeBoutillier, declare as follows:

1. I am the Senior Vice President and General Manager for U.S. Coffee at Kraft Foods Global, Inc. ("Kraft"), defendant in the above-referenced action. I make this declaration upon personal knowledge and, if called and sworn as a witness, I could and would testify as to the matters set forth in this declaration.

2. I have been a Kraft employee since 1992. As the General Manager of Kraft's Coffee Division, I am responsible for overseeing the marketing activities of the division. I am well acquainted with Kraft's operations as they pertain to the manufacture and distribution of *Maxwell House*® brand coffee products, at least as it pertains to the product at issue on this case. My responsibilities include assessing *Maxwell House* brand performance as it relates to profit and loss and market share and assessing the *Maxwell House* brand's performance vis-à-vis competitors, including *Folgers* brand coffee.

**Overview of Ground Coffee Market and Competition Between Kraft and P&G**

3. Kraft manufactures and distributes *Maxwell House* brand coffee. The Procter & Gamble Company ("P&G") manufactures and distributes Folgers brand coffee. *Maxwell House* brand coffee and *Folgers* brand coffee together are leaders in this market. For over twenty years, *Folgers* brand coffee has been the market leader, and continues to hold that position as of the date of this declaration.

**Kraft's Decision to Re-Design Its Coffee Container**

4. In April 2007, after spending more than five years and $5 million in researching and developing an appropriate new design for its *Maxwell House* brand ground coffee containers, Kraft began manufacturing its new plastic canister for *Maxwell House* brand coffee in 3 lb. equivalent size.

5. Kraft has spent many tens of millions of dollars in transition costs and new capital improvements to manufacture its new plastic ground coffee containers.

6. In July 2007 Kraft introduced its proprietary new container for *Maxwell House* brand ground coffee.

### Effects on the Marketplace of Kraft's New Container

7. I have reviewed the declarations of Jason Gemeiner, Greg Huntington, Sue Mills, Rudy Schmeller, Edward Bello, Todd Roe and Scott Goodfellow, which I understand P&G has submitted to this Court in an effort to prove that Kraft's new plastic container is causing P&G to suffer economic harm or irreparable injury in various ways. In my opinion, all of the assertions in those declarations that Kraft is causing economic harm to P&G, much less irreparable harm, are as yet unfounded and speculative. In reviewing the statements made by the various P&G representatives, I did not see any reference to any studies or analyses which actually prove or support the conjecture by these P&G employees that, in fact, sales of Kraft coffee in its plastic containers has caused or will cause any actual injury to P&G. By the same token, I did not see any evidence in these declarations that Kraft's sale of *Maxwell House* brand coffee in plastic containers has prompted or will prompt retailers to stop carrying P&G's *Folgers* brand coffee, or that any distributors have reduced or eliminated or would reduce or eliminate orders of *Folgers* brand product, or that consumers have stopped or will stop buying (or reduced or will reduce their purchase of) P&G's *Folgers* brand coffee. I also saw no reference in these declarations to any report or evidence that suggested that the sale of *Maxwell House* brand coffee in plastic containers would hurt the *Folgers*' brand in any way (especially any material way), that the *Folgers* brand has suffered or will suffer any loss in brand loyalty or that P&G's goodwill has been or will be injured. I know of no such facts or injury to P&G's economic or business relationships, brand value, loyalty or good will caused by any Kraft's sale of *Maxwell House* brand coffee in plastic containers.

8. As explained in more detail below, it is my opinion, based on all the data of which I am aware, that P&G has not suffered any economic harm from Kraft's sale of *Maxwell House* brand coffee in plastic containers, and is not being threatened with loss of its market share position, or any other form of injury specifically as a result of Kraft's plastic container.

9. Kraft's best information indicates that, contrary to P&G's asserted experience with *Folgers* brand coffee, Kraft's launch of a new plastic container for 3 lb. equivalent *Maxwell House* brand coffee will not in and of itself result in an increase in sales. Instead, Kraft's sales of

*Maxwell House* brand coffee are expected to rise primarily from the introduction of its 100% Arabica blend. This is why Kraft's new marketing campaign touts the advantages of *Maxwell House* brand's 100% Arabica coffee blend, whereas P&G's marketing for *Folgers* brand coffee touts the advantages of its AromaSeal® container.

10.  I also note that several P&G declarations have asserted that if P&G were to lose market share to Kraft, it would not be able to reclaim it. (*See, e.g.*, Gemeiner Decl. ¶ 16, Roe Decl. ¶ 9 and Schmeller Decl. ¶ 3.) This speculation is entirely at odds with the same declarants' testimony that, because of Hurricane Katrina, P&G lost market share, but then *within six months*, recovered this market share. (*See, e.g.*, Gemenier Decl. ¶ 11.)

11.  Equally important, P&G seems to suggest that a loss of market share is an injury that cannot be assessed in, or compensated for, in money damages. But when we calculate P&G's or Kraft's market share position, we are really looking at the total dollar "spend" in the U.S. ground coffee market, and allocating a percentage of the revenue based on revenues attributable to each particular competitor in that market. So, by way of example only, if the total customer "spend" in a market is $1 billion, a competitor in that market who has a 30% market share is receiving $300 million of the $1 billion of market revenue. If that competitor loses 10% (or 1/3) of its 30% share, that 10% loss has a value of $100 million. If in fact P&G were somehow able to prove with certainty that Kraft's sale of *Maxwell House* brand coffee in plastic containers was wrongful and that that those sales were the cause of a certain specific percentage of P&G's market share, P&G does not explain why any such loss cannot be recovered in the form of a damages recovery. (Again, I know of no evidence which even suggests that any such loss in market share is provable or is plausible.)

### P&G's Argument about Captaincy

12.  Folgers currently holds an approximately 12 point lead in market share as compared to *Maxwell House*. P&G has cited no survey, study or analysis which suggests that *Folgers'* "captaincy" is being threatened by Kraft's sale of *Maxwell House* brand coffee in plastic containers.

### P&G's Arguments about Price Decrease

13. According to the declaration of P&G's Senior Account Executive for *Folgers*, P&G did not increase the price of its coffee when it introduced its AromaSeal canisters. (*See* Rudy Schmeller Decl. ¶ 8.)

14. Similarly, when Kraft introduced its new plastic packaging, Kraft did not change the price it had charged for *Maxwell House* brand coffee that was offered in its new canisters.

15. Accordingly, the introduction of Kraft's new packaging is not expected to have any effect on the price that consumers are willing to pay for coffee, whether sold in metal or in plastic containers.

16. I am aware of no studies or information demonstrating that the current and historical pricing situation will be any different when both coffees are sold in plastic containers.

### Harm to Kraft from an Injunction

17. In his declaration, Scott Goodfellow offers his speculation as to the economic harm Kraft would face were this Court to issue the injunction sought by P&G in this litigation. As explained further below, Mr. Goodfellow's speculation is based on mistaken assumptions and the conclusions he draws are incorrect.

18. In my declaration in support of Kraft's motion to stay, I explained that it would take Kraft up to approximately 25 weeks to switch back to metal containers for its *Maxwell House* brand 3 lb. coffee container. Mr. Goodfellow recounts P&G's experience in dealing with Hurricane Katrina, and concludes that Kraft "could shift [to metal canisters] a significant portion of packaging of roast, ground coffee within just several weeks." Mr. Goodfellow is silent about the increased costs that P&G incurred when making its post-Katrina shift in production. In any event, Mr. Goodfellow's speculation as to what Kraft could do is incorrect.

19. Kraft could not in any economically feasible way replicate P&G's experience in responding to Hurricane Katrina. The experience of P&G when confronting the effects of Hurricane Katrina, and the effect on Kraft of an injunction, are markedly different. P&G and its retailers must have had existing inventory; *i.e.*, they needed only to acquire fill-in volume and they had inventory to access while they re-vamped their production. Assuming an injunction would

1  require Kraft to not only discard its existing plastic container inventory, as well as recall any
2  plastic container inventory held by retailers, Kraft would not have the interim supply that P&G
3  had when responding to Katrina. Unlike P&G when responding to Katrina, Kraft would, in effect,
4  immediately lose its entire plastic container inventory and have to begin production of 3 lb. metal
5  cans -- including acquiring metal, lids, labels, etc. -- from scratch.

6      20.    Kraft is unaware of any practical third-party coffee production and packaging
7  alternatives to Massimo Zenetti Beverage USA ("Massimo"). The known alternatives do not have
8  the capacity or capability to package the volume that Kraft requires. Even Massimo does not have
9  the capacity to support the kind of production that Kraft would require in the face of the injunction
10 sought by P&G. There are no third party alternatives that are Kraft-qualified; *i.e.*, that have
11 demonstrated that they can adequately produce and package Kraft's coffee products.

12     21.    Moreover, Kraft had considered using Massimo to produce and package Kraft
13 coffee, but Massimo proved unable to meet Kraft's quality requirements. A coffee producer and
14 packager is required to develop a coffee blend that matches the specifications of Kraft's
15 proprietary blends. The only way Massimo could be expected to meet Kraft's quality
16 requirements would be for Kraft to disclose to Massimo Kraft's trade secret coffee formulas.
17 Considering that Massimo is a major producer for P&G, one of Kraft's major competitors, this is
18 not a realistic option. In other words, the only practical third party alternative, Massimo, is not an
19 option for Kraft.

20     22.    If the injunction sought by P&G were to issue, Kraft would therefore be required to
21 use its own facilities to produce and package in metal cans its coffee that is currently sold in
22 plastic containers.

23     23.    Kraft has very little remaining inventory of *Maxwell House* brand 3 lb. coffee in
24 metal cans, and that inventory will be exhausted within a month. To shift its production of
25 *Maxwell House* brand 3 lb. coffee back to metal cans, Kraft would have to obtain the appropriate
26 metal, lids, labels, valves, etc., very little of which Kraft has in stock. Kraft would have to contact
27 suppliers for all these products to shift Kraft's production back to metal, and these suppliers would
28 also have to procure their raw materials and supplies before Kraft can shift production.

24. In addition, Mr. Goodfellow assumes that Kraft has not replaced or significantly retooled its existing metal production lines (*see* Goodfellow Decl. ¶ 11.). This assumption is incorrect. When Kraft switched its production of 3 lb. *Maxwell House* brand coffee to plastic containers, it removed a significant proportion of its capacity to produce and package coffee in metal cans.

25. Thus, in the face of the injunction sought by P&G, and unlike P&G when faced with Hurricane Katrina, Kraft would be required to essentially start its production of 3 lb. *Maxwell House* brand coffee from scratch. Kraft would not only have to revamp all of its production of 3 lb. *Maxwell House* brand to metal cans, it also would be required -- unlike P&G when faced with Katrina -- to rebuild sufficient inventory to commence shipment. Kraft's entire pipeline of 3 lb. *Maxwell House*® brand coffee would have to be replenished so that Kraft could deploy its inventory to national distribution centers in sufficient quantities to fulfill its commitments to all of its customers.

26. Contrary to Mr. Goodfellow's speculation, my estimate that it would take Kraft no less than 20 weeks (if Kraft were to pay a very substantial premium to expedite supplies), and up to 25 weeks, to convert all of its coffee production back to metal cans is accurate, and Mr. Goodfellow's speculation to the contrary is incorrect.

27. In my declaration, I also explained that Kraft's loss in sales alone (assuming the full 25 weeks) would amount to up to an estimated $250 million loss in revenue for Kraft. Mr. Goodfellow's dispute with this estimate is based on several incorrect assumptions.

28. For example, Mr. Goodfellow's estimate of Kraft's lost revenues assumes that Kraft sells only its original blend in the new plastic containers. In fact, Kraft produces 7 of its 8 varieties of its 3 lb. U.S. *Maxwell House* brand coffees in the new plastic containers; the 8th variety will be produced in the plastic container by November 1. Further contrary to Mr. Goodfellow's assumption, nearly 70% of Kraft's *Maxwell House* roast and ground total coffee sales are 3 lb. containers, which are all now (or will be, by November 1) packaged in the new plastic containers.

29. In short, Mr. Goodfellow's assumptions about the volume of Kraft's sales of coffee in plastic containers are simply incorrect. My original estimate of an approximate $250 million loss in gross revenue is correct.

30. Mr. Goodfellow also takes issue with my declaration by noting that I did not explain how I arrived at inventory losses. To obtain that number I calculated the average retail inventory of 3 lb. *Maxwell House* brand coffee using Kraft's internal financial model. Assuming an injunction prohibited retailers from selling *Maxwell House* brand coffee in their plastic containers, Kraft would be required to recoup that coffee at the same price Kraft received for its sale.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on September 27, 2007, at Tarrytown, New York.

_____
JOHN LEBOUTILLIER

DECLARATION OF JOHN LEBOUTILLIER
CASE NO. C 07-4413 PJH