# EXHIBIT G

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
    claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
    evettepennypacker@quinnemanuel.com
  Mike D. Powell (Bar No. 202850)
    mikepowell@quinnemanuel.com`
  Randy Garteiser (Bar No. 231821)
    randygarteiser@quinnemanuel.com

555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

Attorneys for Defendant
KRAFT FOODS GLOBAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, a Delaware corporation,<br><br>              Plaintiff,<br><br>      vs.<br><br>KRAFT FOODS GLOBAL, INC, a Delaware Corporation,<br><br>              Defendant. | CASE NO. C 07-4413 PJH<br><br>**KRAFT FOODS GLOBAL, INC.'S CHART SHOWING RELEVANCY OF DISCOVERY REQUESTS** |

| **INTERROGATORIES** | |
|---|---|
| **INTERROGATORY NO. 1:**<br><br>Describe in detail the coffee "aroma value" tests YOU performed in connection with the conception, research, development, and reduction to practice of the purported inventions disclosed in ASSERTED PATENT, including the names of the persons that performed the testing, the number and names of the participants of the test, the names of people that did not pass the "scratch and sniff" prescreening test identified at col. 15:54-61 of the '418 patent, the date the test was conducted, and the physical characteristics of the polyolefinic container tested and described in the '418 patent. | • "Coffee aroma value" is a limitation in asserted claims 33 and 43 of the '418 patent.<br><br>• The tests used by P&G to determine "aroma value" are relevant to determine claim construction and the extent to which P&G has an infringement claim against Kraft. P&G cannot seek a preliminary injunction without satisfying this burden<br><br>• The tests used by P&G to determine "aroma value" are relevant to determine whether asserted claims 33 and 43 are invalid as being indefinite under § 112(1) of the Patent Act. This defense is relevant to determine whether P&G can establish, as it must for its preliminary injunction motion, a likelihood of success on the merits of its claim.<br><br>• The tests used by P&G to determine "aroma value" are relevant to determining whether claims 33 and 43 are invalid under § 102 or § 103 of the Patent Act. This defense is relevant to determine whether P&G can establish, as it must for its preliminary injunction motion, a likelihood of success on the merits of its claim. |

| **INTERROGATORY NO. 2**: | |
|---|---|
|       Describe in detail any infringement analysis or testing YOU conducted on the ACCUSED PRODUCT. | • The extent to which P&G conducted any tests to determine infringement, and P&G's discussions regarding the extent to which the Kraft accused product practiced any of the asserted claims - - for example, whether the Kraft accused product has a "region of deflection," or a "coffee aroma value" or any other identified claim limitation - - is relevant to P&G's claim construction, whether P&G has an infringement case against Kraft, and is also relevant to determine whether P&G has satisfied its pre-filing Rule 11 obligations. An infringement determination is necessary for P&G to obtain a preliminary injunction against Kraft. |
| **INTERROGATORY NO. 3**: | |
|       Describe in detail all formulas, calculations, assumptions or analyses for each type of injury, including loss revenues, loss profits, loss market share, loss of goodwill, loss of reputation, that YOU have or will sustain as a result of sales of the ACCUSED PRODUCT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This request seeks documents that are relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including P&G's claimed irreparable injury, and on the claims that the balance of hardships favors P&G. |

| | |
|---|---|
| **INTERROGATORY NO. 4**: <br><br> Identify the individuals that tested YOUR Folgers 39-ounce plastic coffee container for at least one "region of deflection" and an "overall coffee aroma value" as those terms are used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the terms "region of deflection" and "coffee aroma value," the extent to which P&G can prove infringement, and the extent to which these terms are sufficiently indefinite to render the claims invalid. As such, these are all relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 5**: <br><br> Identify the individuals that tested ACCUSED PRODUCT for at least one "region of deflection" and an "overall coffee aroma value" as those terms are used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the terms "region of deflection" and "coffee aroma value," the extent to which P&G can prove infringement, and the extent to which these terms are sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 6**: <br><br> Identify in detail all areas of the ACCUSED PRODUCT that constitute a "region of deflection," as that term is used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents | • This is relevant to determine the meaning of the terms "region of deflection," the extent to which P&G can prove infringement, and the extent to which the term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |

| | |
|---|---|
| pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | |
| **INTERROGATORY NO. 7**: <br><br> Identify in detail all areas of the ACCUSED PRODUCT that constitute "the body of said container proximate to said region of deflection," as that term is used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the terms "the body of said container proximate to said region of deflection," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is all relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 8**: <br><br> Identify all of the tests and the results of those tests that YOU conducted that aided in the calculation of or resulted in an "overall coffee aroma value" for the ACCUSED PRODUCT as the term "aroma coffee aroma value" is used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the term "coffee aroma value," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |

| | |
|---|---|
| **INTERROGATORY NO. 9**: <br><br> Identify all areas of YOUR 39 ounce plastic container YOU currently sale containing Folgers Classic Roast coffee that constitute a "region of deflection," as that term is used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the term "region of deflection," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 10**: <br><br> Identify all areas of YOUR 39 ounce plastic container YOU currently sale containing Folgers Classic Roast coffee that constitute "the body of said container proximate to said region of deflection," as that term is used in claim 33 of the ASSERTED PATENT. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the term "the body of said container proximate to said region of deflection," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |

| | |
|---|---|
| **INTERROGATORY NO. 11**:<br><br>Identify all of the tests and the results of those tests that YOU conducted that aided in the calculation of or resulted in an "overall coffee aroma value" for one of YOUR 39 ounce plastic container YOU currently sale containing Folgers Classic Roast coffee. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the term "overall coffee aroma value," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 12**:<br><br>For the area or areas of the containers identified in response to Interrogatory Nos. 6 and 9, identify in detail the means or methods used to determine each said "region of deflection," including all documents supporting, contradicting, or RELATING TO YOUR conclusions. A sufficient response to this interrogatory cannot be obtained through a citation to documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. | • This is relevant to determine the meaning of the term "region of deflection," the extent to which P&G can prove infringement, and the extent to which this term is sufficiently indefinite to render the claims invalid. As such, this is relevant to determining whether P&G is likely to succeed on its claim. |
| **INTERROGATORY NO. 13**:<br><br>To the extent P&G's response to a request for admission served in this action is anything other than an unqualified admission, state in detail the factual | • This is relevant to discover the basis for P&G's claim of irreparable injury. |

| bases for each such response. | |
|---|---|
| | |

| **REQUESTS FOR PRODUCTION** | |
|---|---|
| **REQUEST FOR PRODUCTION NO. 1:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to the preparation and/or prosecution of any applications or other materials related to the ASSERTED PATENT and/or any genealogically related patents and/or patent applications, including but not limited to any foreign counterparts to the ASSERTED PATENT and COMMUNICATIONS between the people substantively involved in the prosecution of the patent applications leading to the issuance of the ASSERTED PATENT and/or any genealogically related patents and/or patent applications. | • The file histories of patents related to the patent in suit - - the '418 -- are relevant to claim construction of the claims asserted in this suit. Claim construction is necessary for P&G to establish infringement, and in turn, an infringement determination is necessary for P&G to obtain a preliminary injunction against Kraft. |
| **REQUEST FOR PRODUCTION NO. 2:**<br><br>All DOCUMENTS that refer or relate to any study, analysis, investigation, testing and/or evaluation conducted by or on behalf of P&G concerning the ACCUSED PRODUCT, including but not limited to the "various tests on Kraft's Maxwell House 39-ounce plastic container" as stated in Paragraph 3 of the Zeik Declaration and the test conducted by Jennifer Floyd as stated in Paragraphs 3 through 9 of the Floyd Declaration. | • The extent to which P&G conducted any tests to determine infringement, and P&G's discussions regarding the extent to which the Kraft accused product practiced any of the asserted claims - - for example, whether the Kraft accused product has a "region of deflection," or a "coffee aroma value" or any other identified claim limitation - - is relevant to whether P&G has an infringement case against Kraft, and is also relevant to determine whether P&G has satisfied its pre-filing Rule |



|  | 11 obligations. An infringement determination is necessary for P&G to obtain a preliminary injunction against Kraft. |
|--|--|

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS that REFLECT, REFER or RELATE to research, surveys, focus groups, consumer comments, studies or marketing studies concerning the packaging of coffee in a plastic container, including but not limited to the DOCUMENTS supporting the following statements:

(1) "consumer research performed by our team, including meetings with focus groups and surveys," as stated paragraph 5 in the Mills Declaration;

(2) "In January 2001, our team summarized a consumer test of a round container that we had developed," as stated in Paragraph 6 of the Mills Declaration;

(3) "Based on the extensive consumer research that I supervised at P&G, both before and after introduction of the new plastic container, the innovations in the container create goodwill among coffee consumers," as stated in Paragraph 8 of the Mills Declaration;

(4) "Consumers perceive that Folgers is the brand that brings them a new container that no other brand has, and that is superior to the old metal cans used by its competitors, including Kraft," as stated in Paragraph 8 of the Mills Declaration;

- Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.

- This request seeks documents that is relevant to the credibility and veracity of the identified witnesses.

(5) "I [Greg Huntington] have supervised consumer research to determine how consumers perceive the AromaSeal canister," as stated in Paragraph 7 of the Huntington Declaration;

(6) "Consumers preferred P&G's plastic containers over traditional metal coffee cans, including those sold by Kraft, and they were willing to pay more for the benefits of using P&G's new packaging technology," as stated in Paragraph 8 of the Gemeiner Declaration;

(7) "P&G significantly increased consumer loyalty when it introduced the AromaSeal technology," as stated in Paragraph 8 of the Gemeiner Declaration;

(8) "After introducing its patented plastic containers, P&G recorded an increase of approximately 6% in consumer loyalty in absolute terms," as stated in Paragraph 14 of the Gemeiner Declaration;

(9) "Kraft's continued sales using its plastic container also will affect P&G's penetration of the market among new coffee consumers," as stated in Paragraph 18 of the Gemeiner Declaration;

(10) "P&G was able to achieve significant increases in market share, largely by increasing the percentage of time that consumers bought Folgers over Maxwell House and

other brands of ground, roasted coffee," as stated in

Paragraph 4 of the Roe Declaration;

(11) "P&G has earned a leadership position among

retailers because their customers – coffee consumers –

prefer Folgers' innovative plastic packaging over metal

cans," as stated in Paragraph 4 of the Schmeller

Declaration;

(12) "After introducing AromaSeal in 2003, P&G found

that consumers, on average, were willing to pay about 25

to 40 cents more for Folgers than for the equivalent size

Maxwell House 39 ounce container," as stated in

Paragraph 8 of the Schmeller Declaration;

(13) "Currently, the retail price of Kraft's Maxwell

House coffee is the same whether it is sold in metal cans

or plastic containers," as stated in Paragraph 9 of the

Schmeller Declaration;

(14) "P&G began looking at packaging forms as an

alternative to the traditional metal can, including using

plastic coffee containers," as stated in Paragraph 5 of the

Dalton Declaration; and

(15) "In 1999, a team of P&G engineers conducted

consumer focus groups to identify features that the

conventional metal cans lacked," as stated in Paragraph 5

of the Dalton Declaration.

**REQUEST FOR PRODUCTION NO. 4:**

      All DOCUMENTS that REFLECT, REFER or RELATE to the "overall coffee aroma value" testing conducted and described in the ASSERTED PATENT and "overall coffee aroma value" testing conducted with respect to the ACCUSED PRODUCT, including that which is described in Paragraphs 3 through 9 of the Floyd Declaration, and further including all DOCUMENTS concerning all 'overall coffee aroma value" tests conducted by YOU or at YOUR direction indicating (1) the size of group of individuals that the forty participants were chosen from, (2) the names of the forty participants selected to perform each set of tests, (3) the names of the individuals that did not pass the preliminary screening test in each group, (4) the names of the individuals conducting each set of tests, (5) calculations tabulating an overall coffee aroma value, (6) testing procedures given by YOU to the individuals conducting each set of tests, (7) the number of times the same test container was used by a different tester, (8) the amount of space between the item being tested and the nose of each tester, (9) the test procedure protocol implemented to ensure compliance with the spacing

- "Coffee aroma value" is a limitation in asserted claims 33 and 43 of the '418 patent.

- The tests used by P&G to determine "aroma value" are relevant to determine the extent to which P&G has an infringement claim against Kraft. An infringement determination is necessary for P&G to obtain a preliminary injunction against Kraft.

- The tests used by P&G to determine "aroma value" are relevant to determine whether asserted claims 33 and 43 are invalid as being indefinite under § 112(1) of the Patent Act.

- The tests used by P&G to determine "aroma value" are relevant to determining whether claims 33 and 43 are invalid under § 102 or § 103 of the Patent Act. Evidence of any such defense would preclude P&G from establishing a likelihood of success on its claim.

between the nose of the tester and the item being tested, (10) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the "overall coffee aroma value," (11) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the "aroma," as the term aroma is used in Paragraphs 7 and 9 of the Floyd Declaration, (12) the definition of "aroma" as the term aroma is used in Paragraphs 7 and 9 of the Floyd Declaration, (13) the criteria explained to the testers to identify a value of 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the "freshness scale" as the term freshness scale is used in Paragraphs 7 and 9 of the Floyd Declaration, (14) the amount of time given to smell each item being tested, (15) the number of times the same container is used, (16) the amount of time a test sample is exposed to the atmosphere prior to each test, (17) the definitions and relationships between "coffee aroma" value, "freshness scale," and "overall coffee aroma value" as those terms are used in paragraphs 7 and 9 of the Floyd Declaration, (18) the definition and calculation of "overall coffee aroma value" as that term appears in col. 18:64-65 of the ASSERTED PATENT, (19) the test procedure identified in the ASSERTED PATENT at col. 15:1-16:32, and (20)

| | |
|---|---|
| the physical characteristics of the polyolefinic container tested and described in the '418 patent. | |

**REQUEST FOR PRODUCTION NO. 5:**

      All DOCUMENTS that support and/or contradict or otherwise RELATE TO the statement that "The Permeable walls of the semi-rigid plastic packages of the present invention retain a high level of aroma gas chromatograph counts compared to the impermeable prior art metal cans," as stated in Column 25 at lines 20-24 of U.S. Patent 4,966,780, including but not limited to research and development documents, product testing, prototype testing, emails, and lab notebooks.

- "Coffee aroma value" is a limitation in asserted claims 33 and 43 of the '418 patent.

- These documents are relevant to establishing whether P&G's claims are enabled and practice the best mode known to P&G at the time of filing the '418 patent. Such a defense is relevant to whether P&G can establish a likelihood of success in this case.

- The tests used by P&G to determine "aroma value" are relevant to determine whether asserted claims 33 and 43 are invalid as being indefinite under § 112(1) of the Patent Act. Such a defense is relevant to whether P&G can establish a likelihood of success in this case.

- The tests used by P&G to determine "aroma value" are relevant to determining whether claims 33 and 43 are invalid under § 102 or § 103 of the Patent Act. Such a defense is relevant to whether P&G can establish a likelihood of success in this case.

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS that support and/or contradict or otherwise RELATE TO P&G's contention that it will suffer irreparable harm unless the Court issues an order enjoining Kraft from infringing the ASSERTED PATENT, including but not limited to DOCUMENTS that support and/or contradict the following statements:

(1) "If Kraft continues to sell ground coffee in its plastic container, it will significantly hurt P&G's ground coffee business in several ways," as stated in Paragraph 9 of the Gemeiner Declaration;

(2) "By providing the same benefits that Folgers provides, Kraft will increase its market share and take away market share gains made by P&G in recent years," as stated in Paragraph 10 of the Gemeiner Declaration;

(3) "P&G's market share started to increase in 2003, when the AromaSeal container was launched. By the end of 2004, when P&G had been selling coffee only in its plastic containers, P&G's market share increased significantly while Kraft's market share declined," as stated in Paragraph 11 of the Gemeiner Declaration;

(4) "In 2006, P&G was able to recover all the market share that it had lost [after its plant shutdown due to Hurricane Katrina in 2005] because of consumers' preference for its product, especially the benefits

- Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.

- This request seeks documents that is relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G.

provided by the AromaSeal plastic container technology," as stated in Paragraph 11 of the Gemeiner Declaration;

(5) "Kraft's sales using 39-ounce plastic containers will diminish sales of P&G's 39-ounce containers," as stated in Paragraph 18 of the Gemeiner Declaration;

(6) "converting its [P&G's] line of metal-can roast and ground coffee production to its new plastic canister design. This effort took several months to implement and cost P&G at least $30 million," as stated in Paragraph 3 of the Huntington Declaration;

(7) "P&G invested approximately five years of effort and about $5 million in research & development costs to develop the AromaSeal container technology" as stated in Paragraph 3 of the Huntington Declaration;

(8) "By continuing to sell products that have the same or similar advantages as P&G's product, Kraft also would increase its own consumer loyalty," as stated in Paragraph 16 of the Gemeiner Declaration;

(9) "With its own plastic container for ground, roasted coffee, Kraft is now in position to regain all or part of the increased market share that P&G was able to win since 2003," as stated in Paragraph 5 of the Roe Declaration;

(10) "By competing with P&G using its own version of P&G's plastic container, Kraft will chip away at the consumer goodwill that P&G has built," as stated in Paragraph 8 of the Roe Declaration;

(11) "By launching Maxwell House in its new plastic container, Kraft is going to encourage consumer to buy its ground, roasted coffee," as stated in Paragraph 9 of the Roe Declaration;

(12) "If Kraft is allowed to sell its Maxwell House product in its new plastic containers, it will take significant market share away from P&G," as stated in Paragraph 6 of the Bello Declaration;

(13) "Kraft can potentially recapture all of the market share that it lost to P&G when P&G introduced its plastic container," as stated in Paragraph 3 of the Schmeller Declaration;

(14) "Many consumers also will try Maxwell House simply because it is being offered in a new plastic container that is similar to Folger's plastic container," as stated in Paragraph 3 of the Schmeller Declaration;

(15) "Kraft's sales of a product in a new plastic container with similar advantages to P&G's container will erode P&G's leadership position with retailers," as stated in Paragraph 5 of the Schmeller Declaration; and

(16) "Kraft will have to spend substantial resources offering promotions to retailers and otherwise marketing its products to slow down the pace at which it will lose market share to Kraft," as stated in Paragraph 7 of Schmeller Declaration.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS that REFLECT, REFER or RELATE to any commercial success or lack of success of the inventions claimed in the ASSERTED PATENT, including but not limited DOCUMENTS that provide the factual bases for the statements listed below:

(1) "In addition to selling its products for a higher retail price, P&G was able to use the advantages of its new packaging technology to achieve significant increases in market share," as stated in Paragraph 8 of the Gemeiner Declaration;

(2) "I [Greg Huntington] have never seen the level of professional recognition that the AromaSeal canister received in any other product area" as stated in Paragraph 6 of the Huntington Declaration;

(3) "In 2006, P&G was able to recover all the market share that it had lost [after its plant shutdown due to Hurricane Katrina in 2005] because of consumers' preference for its product, especially the benefits provided by the AromaSeal plastic container technology," as stated in Paragraph 11 of the Gemeiner Declaration; and

(4) "P&G's launch of its AromaSeal plastic container starting in 2003 allowed P&G to gain about 3 to 4

- Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.

- This request seeks documents that are relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G.

- This request also is relevant to determine whether the '418 patent's claims are invalid as being obvious under § 103 of the Patent Act.

percentage points of market dollar share of ground coffee," as stated in Paragraph 3 of the Schmeller Declaration.

**REQUEST FOR PRODUCTION NO. 8:**

      All DOCUMENTS which constitute research and development efforts, product definition sheets, trade literature, specification sheets, technical data sheets, publications, emails, abstracts, speeches, or descriptive documents of any kind which REFLECT, REFER OR RELATE to any plastic container product that YOU contend embodies the ASSERTED PATENT or any model, sample or prototype to any such product, including but not limited to ALL DOCUMENTS that REFLECT, REFER OR RELATE to the followings statements:

(1) "P&G spent millions of dollars and devoted years of research and development effort to develop its new plastic container technology," as stated in Paragraph 12 of the Bello Declaration;

(2) "P&G engineers utilized a plastic container using a multi-layered plastic structure, coupled with structural design elements to: (1) provide an internal layer to absorb coffee odors and oils so the container itself would give consumers a pleasant coffee aroma; (2) provide a middle, barrier layer to block outside gases (chiefly oxygen) from entering the container and making the coffee smell bad or

- Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.

- This request seeks documents that are relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including Kraft's defenses of best mode, lack of enablement, and invalidity under §§ 102 and 103 of the Patent Act.

becoming stale; and (3) to provide a rigid support to the

container," as stated in Paragraph 9 of the Dalton

Declaration;

(3) "P&G engineers designed the container to have

flexible regions called 'regions of deflection.' These

regions of deflection control how the container deforms

in response to internal or external pressures to help

prevent it from becoming dented or otherwise distorted,"

as stated in Paragraph 9 of the Dalton Declaration;

(4) "P&G engineers built a ridge on top of the container

at its opening to attach an easy-to-peel foil seal to keep

the coffee fresh before it was sold, as stated in Paragraph

8 of the Dalton Declaration;

(5) "To prevent the emitted coffee gases from damaging

the container, P&G's engineers placed a one-way valve

on the seal to allow the emitted gases to escape without

letting air back into the container," as stated in Paragraph

9 of the Dalton Declaration;

(6) "P&G engineers made the wide-mouth container

easier to hold than traditional metal containers by

forming a handle into the container," as stated in

Paragraph 9 of the Dalton Declaration; and

(7) "P&G also developed a flexible 'overcap' on top of

the container with an airtight seal reminiscent of Tupperware," as stated in Paragraph 9 of the Dalton Declaration.

| | |
|---|---|
| **REQUEST FOR PRODUCTION NO. 9:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to (a) YOUR knowledge of prior art RELATING TO the ASSERTED PATENT, and (b) the date and circumstances pursuant to which YOU first learned of each prior art document or thing. | • This request seeks documents that are relevant to Kraft's defenses of inequitable conduct and the invalidity of the '418 patent under §§ 102 and 103 of the Patent Act. |
| **REQUEST FOR PRODUCTION NO. 10:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to marketing plans, market demand, and/or market share analysis (projected or actual) for any product covered by the ASSERTED PATENT, including but not limited to DOCUMENTS that REFLECT, REFER or RELATE to the following statements made by P&G employees:<br><br>(1) "P&G gained significant market share when it introduced its new plastic container technology in 2003 under its AromaSeal trademark," as stated in Paragraph 4 of the Bello Declaration;<br><br>(2) "If Kraft is allowed to sell its Maxwell House product in its new plastic containers, it will take significant market share away from P&G," as stated in Paragraph 6 of the Bello Declaration; and<br><br>(3) "P&G's likely loss of market share to Kraft, the | • Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.<br><br>• This request seeks documents that are relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G. |

| | |
|---|---|
| Maxwell House plastic container is going to hurt the strong relationship that P&G has with its retailers," as stated in Paragraph 11 of the Bello Declaration. | |
| **REQUEST FOR PRODUCTION NO. 11:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE TO any analyses, studies, reports, memoranda, opinions, advice, communications or correspondence by P&G or any entity affiliated with P&G regarding any decision to commercialize or not commercialize any product that practices or embodies any of the claims of the ASSERTED PATENT. | • This request seeks documents that are relevant to interpreting the claims (and claim limitations) of the '418 patent, the extent to which the claims of the '418 patent (which P&G claims are embodied in its Folger's packaging) are invalid as being obvious under § 103 of the Patent Act, not enabled or invalid as being offered for sale in violation of the on-sale bar. These defenses are relevant to whether P&G can establish a likelihood of success in this case. |

| | |
|---|---|
| **REQUEST FOR PRODUCTION NO. 12:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to the market of the ASSERTED PATENT and/or the subject matter disclosed in the ASSERTED PATENT, including DOCUMENTS that REFLECT, REFER OR RELATE to competitors in the industry, prices, revenues, profits, product designs, and/or any products that compete with any product connected to the ASSERTED PATENT, including but not limited to documents that provide the bases for the following statements:<br><br>(1) "the market for roast, ground coffee (also referred to as 'ground' coffee) in the United States is $2.2 billion," as stated in Paragraph 4 of the Gemeiner Declaration; and (2) "P&G's Folgers current market share is estimated at between 32% and 33% while Kraft's Maxwell House accounts for an estimated 19% share of the market," as stated in Paragraph 4 of the Gemeiner Declaration. | • Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.<br><br>• This request seeks documents that are relevant to the credibility and veracity of the identified witnesses on a variety of subjects, including P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G. |
| **REQUEST FOR PRODUCTION NO. 13:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to the first three (a) uses, (b) offers to sell, (c) shipments, and (d) sales of any product, method, or service that practices or embodies any of the claims of the ASSERTED PATENT. | • This request seeks documents that are relevant to Kraft's defense that that the '418 patent is invalid as the invention was being offered for sale in violation of the on-sale bar. This defense is relevant to determine whether P&G can establish, as it must for its |

<table>
<tr>
<td></td>
<td>preliminary injunction motion, a likelihood of success on the merits of its claim.</td>
</tr>
<tr>
<td>

**REQUEST FOR PRODUCTION NO. 14:**

All DOCUMENTS that REFLECT, REFER or RELATE to the revenues and/or royalties derived from the sale of any product that practices or embodies any of the claims of the ASSERTED PATENT, including on a monthly, quarterly, and/or annual basis.

</td>
<td>

- This request seeks documents that are relevant to P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G.

- This request seeks documents that are relevant to any royalty or damages claimed by P&G from Kraft's sale of its packaging.

</td>
</tr>
<tr>
<td>

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS that REFLECT, REFER or RELATE to any projections of sales, sales prices, royalties and/or revenues associated with any product that practices or embodies any of the claims of the ASSERTED PATENT, including on a monthly, quarterly, and annual basis, including All DOCUMENTS that REFLECT, REFER or RELATE to the support or contradict the following statement: "Kraft's introduction of a plastic container will diminish that perception among both consumer and retailers [that P&G is an innovative

</td>
<td>

- Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.

- This request seeks documents that are relevant to P&G's claimed irreparable injury, and to P&G's argument that the balance of hardships favors P&G.

- This request seeks documents that are relevant to any royalty or damages claimed by P&G from

</td>
</tr>
</table>

| | |
|---|---|
| company with technology that is superior to its competitors] . . . Combined with P&G's likely loss of market share to Kraft, the Maxwell House plastic container is going to hurt the strong relationship that P&G has with its retailers," as stated in Paragraph 11 of the Bello Declaration. | Kraft's sale of its packaging. |
| **REQUEST FOR PRODUCTION NO. 16:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to gain or loss of sales of P&G's products from Kraft's alleged infringement, including DOCUMENTS that REFLECT, REFER or RELATE to providing a factual basis for the following statement: "Promoting specialty products on top of P&G's AromaSeal containers [using free samples] has been a very successful program for P&G . . . If P&G loses market share because of Kraft's sales of a competing product using plastic container it will have fewer consumers to whom it can introduce its specialty products, and will lose sales that it otherwise would have | <ul><li>Each of these requests is specifically tailored to "quoted" testimony offered by P&G through any of its 10 declarants in support of its motion for preliminary injunction.</li><li>This request seeks documents that are relevant to P&G's alleged irreparable injury, and to P&G's argument that the balance of hardships favors P&G.</li></ul> |

| | |
|---|---|
| made of those products," as stated in Paragraph 10 of the Bello Declaration. | |
| **REQUEST FOR PRODUCTION NO. 17:**<br><br>　　　All DOCUMENTS that REFLECT, REFER or RELATE to YOUR allegations that the ASSERTED PATENT is infringed by Kraft. | • This request seeks documents that are relevant to P&G's claim construction and infringement allegation, which is relevant to the requirement that P&G establish, for its preliminary injunction motion, a likelihood of success on the merits. |
| **REQUEST FOR PRODUCTION NO. 18:**<br><br>　　　All DOCUMENTS that REFLECT, REFER or RELATE to any license of all or any portion of the ASSERTED PATENT. | • This request seeks documents that are relevant to P&G's alleged irreparable injury, and to P&G's argument that the balance of hardships favors P&G. |

| | |
|---|---|
| **REQUEST FOR PRODUCTION NO. 19:**<br><br>        All DOCUMENTS that REFLECT, REFER or RELATE to communications to or from any of the named inventors of the ASSERTED PATENT concerning any of the following topics:<br><br>(a)     the ASSERTED PATENT;<br><br>(b)     the conception and reduction to practice of the ASSERTED PATENT, including without limitation any invention disclosures;<br><br>(c)     the applications for the ASSERTED PATENT;<br><br>(d)     any patent genealogy related to the ASSERTED PATENT, including any foreign counterpart(s) to the ASSERTED PATENT;<br><br>(e)     the application for any patent genealogically related to the ASSERTED PATENT, including any foreign counterpart to the ASSERTED PATENT;<br><br>(f)     this lawsuit. | • This request seeks documents that are relevant to construction for any asserted claims of the '418 patent, which is critical for a determination of infringement against Kraft.<br><br>• This request seeks documents that are relevant to establishing the extent to which there was appropriate and valid reduction to practice of the '418 patent. and whether the names inventors are in fact the true inventors of the '418 patent. This defense is relevant to P&G's argument that it is likely to succeed on the merits of its claim. |
| **REQUEST FOR PRODUCTION NO. 20:**<br><br>        All DOCUMENTS that REFLECT, REFER or RELATE to papers authored by any inventor of the ASSERTED PATENT. | • This request seeks documents that are relevant to determining whether there was public disclosure of the '418 claims by any of the inventors, which would invalidate the '418 patent under § 102(b) of the Patent Act. This defense is relevant to P&G establishing a likelihood of success on the merits.<br><br>• This request seeks documents that are relevant |

|  | to claim construction. As noted earlier, without a claim construction, P&G cannot establish infringement, which is critical to a finding of likelihood of success on the merits. |
|---|---|
| **REQUEST FOR PRODUCTION NO. 21:**<br><br>All DOCUMENTS that REFLECT,<br><br>REFER or RELATE to prior testimony of any inventor of<br><br>the ASSERTED PATENT, whether in the form of a<br><br>declaration, affidavit, deposition or otherwise. | • This request seeks documents that are relevant to determining whether there was public disclosure of the '418 claims by any of the inventors, which would invalidate the '418 patent under § 102(b) of the Patent Act. This defense is relevant to P&G establishing a likelihood of success on the merits.<br><br>• This request seeks documents that are relevant to claim construction. Without a claim construction, P&G cannot establish infringement, which is critical to a finding of likelihood of success on the merits. |
| **REQUEST FOR PRODUCTION NO. 22:**<br><br>All DOCUMENTS that REFER, describe,<br><br>discuss, or illustrate YOUR document retention policies,<br><br>including but not limited to policies regarding schematic<br><br>diagrams, technical specifications, source code, invention<br><br>disclosures, documents relating to inventions and patents, | • P&G's preliminary injunction motion is suspiciously devoid of any studies, reports, analysis or surveys that relate to any testimony offered by the P&G declarants. This request seeks documents that are relevant to determining whether P&G has in fact |

| | |
|---|---|
| voicemail systems and electronic mail systems. | fabricated testimony to this Court, or has documents that in fact contradict P&G's presented testimony. |
| **REQUEST FOR PRODUCTION NO. 23:**<br><br>All DOCUMENTS that REFLECT,<br><br>REFER OR RELATE to any reports, studies, analyses,<br><br>search results or reports, including any opinions of legal<br><br>counsel and claim charts, whether written or oral, relating<br><br>to the infringement or non-infringement, validity or<br><br>invalidity, or enforceability or unenforceability of any<br><br>claim of the ASSERTED PATENT. | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, which is critical for a determination of infringement against Kraft.<br><br>• This request seeks documents that are relevant to establishing any of numerous defenses Kraft has to P&G's claim of infringement, including invalidity of the patent or the unenforceability of the patent. Any of these defenses is relevant to P&G's argument that it is likely to succeed on the merits. |
| **REQUEST FOR PRODUCTION NO. 24:**<br><br>All DOCUMENTS that REFLECT,<br><br>REFER or RELATE to the ASSERTED PATENT. | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, which is critical for a determination of infringement against Kraft.<br><br>• This request seeks documents that are relevant to establishing any of numerous defenses Kraft has to P&G's allegation of infringement, including invalidity of the patent or the unenforceability of the |

| | patent. All of these defenses are relevant to P&G's argument that it is likely to succeed on the merits. |
|---|---|
| **REQUEST FOR PRODUCTION NO. 25:**<br><br>All DOCUMENTS that REFLECT, REFER or RELATE to the databases available to P&G during product development, including databases containing and archiving new products such as ProductScan. | • P&G's preliminary injunction motion is suspiciously devoid of any studies, reports, analysis or surveys that relate to any testimony offered by the P&G declarants. This request seeks documents that are relevant to determining whether P&G has in fact fabricated testimony to this Court, or has documents that in fact contradict P&G's presented testimony. |
| **REQUEST FOR PRODUCTION NO. 26:**<br><br>A physical sample of any plastic container associated with the research, develop, and reduction to practice of the ASSERTED PATENT. | • P&G's preliminary injunction motion is suspiciously devoid of any studies, reports, analysis or surveys that relate to any testimony offered by the P&G declarants. This request seeks documents that are relevant to determining whether P&G has in fact fabricated testimony to this Court, or has documents that in fact contradict P&G's presented testimony.<br><br>• This request seeks documents that are relevant to claim construction and P&G's infringement claim. |

| **REQUEST FOR PRODUCTION NO. 27:** | |
|---|---|
| ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR document retention policies, including retention of samples tested and reported in a patent application to the United States Patent And Trademark Office concerning a container. | • P&G's preliminary injunction motion is suspiciously devoid of any studies, reports, analysis or surveys that relate to any testimony offered by the P&G declarants. This request seeks documents that are relevant to determining whether P&G has in fact fabricated testimony to this Court, or has documents that in fact contradict P&G's presented testimony.<br><br>• This request seeks documents that are relevant to claim construction and P&G's infringement claim. |
| **REQUEST FOR PRODUCTION NO. 28:** | |
| ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR retention of the container or containers tested and described in the ASSERTED PATENT concerning the testing of for a "region of deflection" and/or "overall coffee aroma value" as these terms are described in the ASSERTED PATENT. | • This request seeks documents that are relevant to construction for any asserted claims of the '418 patent, and the method by which P&G determined whether any Kraft package practiced any claim of the '418 patent. These documents are critical for a determination of infringement against Kraft, which is directly relevant to whether P&G can establish a likelihood of success against Kraft. |

| **REQUEST FOR PRODUCTION NO. 29:** | |
|---|---|
| The container or containers tested and described in the ASSERTED PATENT concerning the terms "region of deflection" and/or "overall coffee aroma value" as those terms appear in the ASSERTED PATENT. | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, and the method by which P&G determined whether any Kraft package practiced any claim of the '418 patent. These documents are critical for a determination of infringement against Kraft, which is directly relevant to whether P&G can establish a likelihood of success against Kraft. |
| **REQUEST FOR PRODUCTION NO. 30:** | |
| ALL DOCUMENTS that REFLECT, REFER or RELATE TO YOUR retention of the container or containers tested and described in the Zeik Declaration and the Floyd Declaration, including containers tested to meet the asserted claim limitations concerning "region of deflection" in the ACCUSED PRODUCT and "overall coffee aroma value" in the ACCUSED PRODUCT. | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, and the method by which P&G determined whether any Kraft package practiced any claim of the '418 patent. These documents are critical for a determination of infringement against Kraft, which is directly relevant to whether P&G can establish a likelihood of success against Kraft. |
| **REQUEST FOR PRODUCTION NO. 31:** | |
| The ACCUSED PRODUCTS tested and described in the Zeik Declaration and the Floyd Declaration. | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, and the method by which P&G determined whether any Kraft package practiced any claim of the '418 patent. These documents are critical for a determination of |

| | infringement against Kraft, which is directly relevant to whether P&G can establish a likelihood of success against Kraft. |
|---|---|
| **REQUEST FOR PRODUCTION NO. 32:**<br><br>ALL DOCUMENTS that REFLECT, REFER or RELATE TO any portion of a P&G coffee container having or not having a "region of deflection," "area of deflection," or "location of deflection." | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, which is critical for a determination of infringement against Kraft.<br><br>• This request seeks documents that are relevant to establishing any of numerous defenses Kraft has to P&G's claim of infringement, including invalidity of the patent or the unenforceability of the patent. Any of these defenses is relevant to P&G's argument that it is likely to succeed on the merits of its claim. |
| **REQUEST FOR PRODUCTION NO. 33:**<br><br>ALL DOCUMENTS that REFLECT, REFER or RELATE TO any portion of ACCUSED PRODUCT having or not having a "region of deflection," "area of deflection," or "location of deflection." | • This request seeks documents that are relevant to construction of any asserted claims of the '418 patent, which is critical for a determination of infringement against Kraft.<br><br>• This request seeks documents that are relevant to establishing any of numerous defenses Kraft has to P&G's claim of infringement, including invalidity of the patent or the unenforceability of the patent. All of these defenses are relevant to P&G's claim |

|  | that it is likely to succeed on the merits. |
|--|--|
|  |  |

| KRAFT'S DISCOVERY REQUESTS | RELEVANCE TO P&G'S PRELIMINARY INJUNCTION MOTION |
|---|---|
| **REQUEST FOR ADMISSIONS** | |
| **REQUEST FOR ADMISSION NO. 1:**<br><br>Describe in detail the coffee "aroma value" tests YOU performed in connection with the conception, research, development, and reduction to practice of the purported inventions disclosed in ASSERTED PATENT, including the names of the persons that performed the testing, the number and names of the participants of the test, the names of people that did not pass the "scratch and sniff" prescreening test identified at col. 15:54-61 of the '418 patent, the date the test was conducted, and the physical characteristics of the polyolefinic container tested and described in the '418 patent. | • "Coffee aroma value" is a limitation in asserted claims 33 and 43 of the '418 patent.<br><br>• The tests used by P&G to determine "aroma value" are relevant to determine claim construction and the extent to which P&G has an infringement claim against Kraft. P&G cannot obtain a preliminary injunction without satisfying this burden.<br><br>• The tests used by P&G to determine "aroma value" are relevant to determine whether asserted claims 33 and 43 are invalid as being indefinite under § 112(1) of the Patent Act. This defense is relevant to determine whether P&G can establish, as it must for its preliminary injunction motion, a likelihood of success on the merits.<br><br>• The tests used by P&G to determine "aroma value" are relevant to determining whether claims 33 and 43 are invalid under § 102 or § 103 of the Patent Act. This defense is relevant to determine whether P&G can establish, as it must for its preliminary injunction motion, a likelihood of success on the merits. |

| | |
|---|---|
| **REQUEST FOR ADMISSION NO. 2:**<br><br>    Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 3:**<br><br>    Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in profits due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 4:**<br><br>    Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 5:**<br><br>    Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those |

| | |
|---|---|
| or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 6:**<br><br>Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in goodwill due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 7:**<br><br>Admit that as of the date of YOUR response to this request P&G has not reported to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in tarnished reputation due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 8:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |

| | |
|---|---|
| **REQUEST FOR ADMISSION NO. 9:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange Commission a of loss of more than $250 million in profits due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 10:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 11:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in revenue due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 12:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is |

| | |
|---|---|
| Commission a loss of more than $250 million in goodwill due to sales of the ACCUSED PRODUCT. | relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |
| **REQUEST FOR ADMISSION NO. 13:**<br><br>Admit that as of the date of YOUR response to this request P&G will not report by April 30, 2008 to its shareholders or U.S. Securities And Exchange Commission a loss of more than $250 million in tarnished reputation due to sales of the ACCUSED PRODUCT. | • The extent to which P&G is in a position to allege that Kraft has caused or is likely to cause P&G damages exceeding those claimed by Kraft from issuance of the requested injunction is relevant to determine whether P&G can establish irreparable injury or that the balance of hardships tips in favor of P&G. |