William C. Rooklidge (SBN 134483)
Ben M. Davidson (SBN 181464)
Gregory S. Cordrey (SBN 190144)
Jesse D. Mulholland (SBN 222393)
HOWREY LLP
2020 Main Street
Irvine, California 92614
949-721-6900
949-721-6910
E-mail: rooklidgew@howrey.com
E-mail: davidsonb@howrey.com
E-mail: cordreyg@howrey.com
E-mail: mulhollandj@howrey.com

Mark D. Wegener (admitted *pro hac vice*)
HOWREY LLP
1299 Pennsylvania Ave, NW
Washington, DC 20004
Telephone: 202-783-0800
Facsimile: 202-383-6610
E-mail: wegenerm@howrey.com

Attorneys for Plaintiff
The Procter & Gamble Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, <br><br> Plaintiff and Counter-Defendant, <br><br> v. <br><br> KRAFT FOODS GLOBAL, INC., <br><br> Defendant and Counter-Claimant. | Case No.: C07-04413 PJH <br><br> **Honorable Phyllis J. Hamilton** <br><br> **THE PROCTER & GAMBLE COMPANY'S OBJECTIONS TO THE DECLARATIONS OF CLAUDE STERN AND JOHN LEBOUTILLIER IN SUPPORT OF KRAFT GLOBAL, INC.'S REPLY IN SUPPORT OF MOTION FOR STAY, OR, IN THE ALTERNATIVE MOTION TO EXPEDITE DISCOVERY AND RESCHEDULE PRELIMINARY INJUNCTION HEARING** <br><br> **Date: October 3, 2007** <br> **Time: 9:00 a.m.** <br> **Place: Courtroom 3, 17th Floor** |

Plaintiff The Procter & Gamble Company ("P&G") objects to portions of the Declarations of Claude Stern and John Leboutillier, In Support of Kraft Food Global, Inc.'s Reply In Support Of Motion To Stay, Or, Alternative Motion To Expedite Discovery And To Continue Preliminary Injunction Hearing, filed September 27, 2007 ("Leboutillier Reply Decl.").

## I. SPECIFIC OBJECTIONS TO STERN REPLY DECLARATION

### A. Objection: Paragraph 3 (2:6-14)

Mr. Stern states in paragraph 3 of his reply declaration:

> 3. Attached hereto as Exhibit A is a true and correct copy of a J.P. Morgan North American Equity Research Report, issued last week, and dated September 18, 2007, which addresses the extent to which Kraft is likely to cause Procter & Gamble ("P&G") injury or damage as a result of Kraft's sale of *Maxwell House*® brand coffee in the new plastic container. In the very introduction of the report, the author states:
>
> > The PG lawsuit against Maxwell House's new packaging led us to take a detailed look at KFT's [Kraft's]coffee business. There is little evidence that the KFT coffee business has started to turnaround. **So for now PG may see the new format as a threat but the damage so far** *(if there is any)* **is not evident** *(Emphasis added)*

P&G objects to Mr. Stern's argument because it: (1) violates Local Rule 7-5(b) in providing counsel's arguments as testimony; (2) mischaracterizes the document; (3) is irrelevant to the issue of prejudice to P&G, as it focuses on whether Kraft has so far turned its business around, not whether P&G is likely to be harmed; and (4) offers a hearsay statement under Federal Rule of Evidence 802.

Mr. Stern argues that the document "addresses the extent to which Kraft *is likely to cause* Procter & Gamble ('P&G') injury or damage." Stern Decl. ¶ 3 (emphasis added.) This argument mischaracterizes the article. The writer only claims to have assessed evidence of a turnaround in Kraft's coffee business from its very recent packaging "for now" or "so far," *i.e.,* as of September 18, 2007. The writer did not claim to have predicted the "likely" harm to P&G at any point after

1  September 18, 2007, but in fact explained that P&G's gains in market share have been based on

2  innovation, including its innovative packaging: "KFT's [Kraft's coffee business] share has

3  dropped consistently since 2004 . . . but during the same period PG managed to recover market

4  share lost to smaller brands *on the back of improved innovation and marketing, and revamped*

5  *packaging . . . .*" Stern Decl., Exh. A (p. 1, first bullet point) (emphasis added).  If any conclusion

6  can be drawn from this assessment, it is that Kraft's use of the same innovative packaging will

7  prevent P&G from continuing to gain market share and also will cause P&G to lose market share.

8        The writer further confirmed that he was not predicting absence of harm to P&G when he

9  stated that he "assume[s] the new Maxwell House (new packaging; and new coffee made from

10 Arabica beans) will be more actively featured at WMT [Wal-Mart]." *Id*. (p.2, first bullet point).

11 More active featuring of Maxwell House sold in the new packaging indicates an erosion of P&G's

12 position with the number one retailer in the U.S., not the absence of future harm.

13       **B.**      **Objection: Paragraphs 5-7 (3:1-22)**

14       Paragraphs 5 and 6 of the Stern reply declaration quote from press releases issued by P&G

15 in which P&G predicts continued expected sales growth.  These press releases relate to sales

16 growth for P&G's overall business, not just for the coffee business, which contributes only a

17 fraction of P&G's overall business.  These press releases are therefore irrelevant to Kraft's

18 allegation that P&G will not be harmed by a stay or a delay in the Court's consideration of P&G's

19 preliminary injunction motion.  Fed. R. Evid. 401, 402.

20       Paragraph 7 refers to Mr. Stern's Google and P&G website search for press releases from

21 P&G that its Folgers business will be adversely affected by Kraft's continuing sales in its new

22 plastic container:

23     7.    I have searched the P&G website and Google generally to find
24 any press release or other securities filings where P&G states that P&G
expected its Folgers brand earnings or sales in the coming quarter or two
25 quarters to be adversely affected (whether materially or not) by Kraft's release
in July 2007 of its *Maxwell House* brand coffee in plastic containers, or by the
26 continued sale of Kraft's product.  I could find no such press release, filing or
report.

27

28

-2-    P&G's Objections to Reply Declarations of
Stern, Leboutillier,
Case No.: C07-04413 PJH

LP

DM_US:20719938_1

That Mr. Stern was unable to find any of these press releases—including press releases through which P&G informed investors regarding its filing of this lawsuit and its seeking a preliminary injunction—is irrelevant. P&G has hardly made a secret of the fact that it believes Kraft's infringement is going to hurt its business. To the contrary, it filed its motion for preliminary injunctive relief in open court, and it supported that motion with the testimony of numerous knowledgeable employees who detail the types of irreparable harm—both tangible and intangible—that P&G will suffer from Kraft's continued infringement.

**C.    Objection: Paragraph 8 (3:23-4:5)**

Paragraph 5 of the Stern reply declaration provides an argument regarding the alleged meaning of the file history of the P&G patent:

> 8.    In filing the Preliminary Injunction in this case and in filing its opposition to this Motion to Stay, P&G has never submitted to this Court the file history for the '418. Attached hereto as Exhibit E is a true and correct copy of just the last office action excerpt of this file history. As an example only, this excerpt reveals that, in trying to convince the PTO to issue the '418 patent, P&G sought to distinguish certain prior art relied on and cited by the PTO. In seeking to distinguish this prior art, P&G made the claim to the PTO that the claims of the '418 patent, unlike the specific prior art cited, incorporate something referred to as "region of deflection." In its explanation to the PTO, P&G sought to define the specific characteristics of a "region of deflection." Nowhere in its preliminary injunction papers or in its opposition to this Motion to Stay has P&G made any reference to this file history segment (or any other portion of the file history).

The argument is irrelevant to the issues before the Court on Kraft's motion. To the extent the argument is somehow relevant, it should have been made in Kraft's opening brief so that P&G could respond to it. In submitting this and other arguments in a declaration, rather than its brief, Kraft also circumvents Local Rule 7-4(b) limiting reply briefs to 15 pages.

**D.    Objection: Paragraph 9 (4:6-14)**

In paragraph 9, Mr. Stern states his alleged belief that all of the asserted claims of the P&G patent are invalid based on unidentified "work product":

> 9.    In the short time my firm has been involved in this case, we have gathered various forms of prior art (both printed publication and actual inventions) that I believe render the asserted claims of the '418 patent invalid, or, at a minimum, reflect a good faith belief that the asserted claims of the

'418 patent are invalid.  We have also prepared various charts (all of which are work product) that reflect how prior art packaging art maps onto the asserted claims of the '418 patent, and establish that the claims of the '418 patent are, at a minimum, obvious under the *KSR. v. Teleflex* standard, and therefore invalid under Section 103 of the Patent Act.  As an example only, I attach hereto as Exhibit F a true and correct copy of one of these charts in draft form (applied to a representative asserted claim).

Counsel's views regarding the merits of his client's arguments on each of the patent claims is not relevant.  To the extent the sole claim chart attached to Mr. Stern's declaration as "an example" of his views can be understood at all, the chart should have been submitted with Kraft's opening brief to give P&G's witnesses an opportunity to respond in connection with P&G's opposition.

### E.     Objection: Paragraph 10 (4:15-23)

Paragraph 10 of the Stern reply declaration also violates Local Rule 7-5(b) by failing to "contain only facts," and failing to "avoid conclusions and argument":

> P&G argues in Opposition to the Motion to Stay that some or most of the document requests, interrogatories or requests for admissions that we served on P&G last week as part of our Motion to Stay seek irrelevant information or are otherwise overbroad.  Attached hereto as Exhibit G is a true and correct copy of a chart that I have assembled (portions were assembled at my instruction) that identifies in general how each of the discovery requests we have provided to P&G is relevant to the claim asserted or defenses thereto in this case.")

Stern Decl. ¶ 10.

Exhibit G, which is incorporated into Mr. Stern's declaration, consists of additional arguments of counsel, including the following improper suggestion:

> P&G's preliminary injunction motion is suspiciously devoid of any studies, reports, analysis or surveys that relate to any testimony offered by P&G declarants.  This request seeks documents that are relevant to determining whether P&G has in fact fabricated testimony to this Court, or has documents that in fact contradict P&G's presented testimony.

Stern Decl., Ex. G, p. 34.  If counsel chooses to make such baseless arguments, the Local Rules require that he at least do so in his memorandum of points and authorities, not in his declarations.

-4-     P&G's Objections to Reply Declarations of
Stern, Leboutillier,
Case No.: C07-04413 PJH

DM_US:20719938_1

## II. SPECIFIC OBJECTIONS TO LEBOUTILLIER REPLY DECLARATION

### A. Objection: Paragraph 5 (3:2-21)

Mr. Leboutillier states for the first time in his reply declaration that he objects to the testimony of P&G's declarants as being "*as yet* unfounded and speculative":

> 7. I have reviewed the declarations of Jason Gemeiner, Greg Huntington, Sue Mills, Rudy Schmeller, Edward Bello, Todd Roe and Scott Goodfellow, which I understand P&G has submitted to this Court in an effort to prove that Kraft's new plastic container is causing P&G to suffer economic harm or irreparable injury in various ways. In my opinion, all of the assertions in those declarations that Kraft is causing economic harm to P&G, much less irreparable harm, are as yet unfounded and speculative. In reviewing the statements made by the various P&G representatives, I did not see any reference to any studies or analyses which actually prove or support the conjecture by these P&G employees that, in fact, sales of Kraft coffee in its plastic containers has caused or will cause any actual injury to P&G. By the same token, I did not see any evidence in these declarations that Kraft's sale of *Maxwell House* brand coffee in plastic containers has prompted or will prompt retailers to stop carrying P&G's *Folgers* brand coffee, or that any distributors have reduced or eliminated or would reduce or eliminate orders of *Folgers* brand product, or that consumers have stopped or will stop buying (or reduced or will reduce their purchase of) P&G's *Folgers* brand coffee. I also saw no reference in these declarations to any report or evidence that suggested that the sale of *Maxwell House* brand coffee in plastic containers would hurt the *Folgers*' brand in any way (especially any material way), that the *Folgers* brand has suffered or will suffer any loss in brand loyalty or that P&G's goodwill has been or will be injured. I know of no such facts or injury to P&G's economic or business relationships, brand value, loyalty or good will caused by any Kraft's sale of *Maxwell House* brand coffee in plastic containers.

P&G filed the Gemeiner, Huntington, Mills, Schmeller, and Bello declarations before Kraft filed its motion to stay or continue the preliminary injunction motion, and Kraft briefly commented on those declarations in its memorandum supporting Kraft's motion. Mr. Leboutillier and Kraft could have made their objections to these declarations as allegedly being speculative in support of Kraft's opening papers, when Mr. Leboutillier first submitted a declaration. Because the objections were made for the first time in connection with Kraft's reply, they should be stricken. *See Hong v. Right Mgmt. Consultants, Inc.*, 2006 U.S. Dist. LEXIS 15252 (N.D. Cal. 2006) (objections that were due with opposition brief but filed two weeks later were untimely and stricken); *Student Fin. Corp. v. Royal Indem. Co.*, 2004 U.S. Dist. LEXIS 4952 (D. Del. 2004) ("The practice of reserving

arguments for reply briefs 'amounts to impermissible 'sandbagging.''" *Wesleyan Pension Fund, Inc. v. First Albany Corp.*, 964 F. Supp. 1255, 1275 (S.D. Ind. 1997) ("Arguments raised for the first time in a reply brief are waived.")

In addition to being late, Mr. Leboutillier's position that the testimony of P&G's witnesses is "***as yet unfounded and speculative***" is irrelevant under Fed. R. Evid. 402. Nothing requires P&G to wait for irreparable harm to occur before seeking a preliminary injunction to prevent that harm. Similarly, the law does not require a party that will be prejudiced by a stay or delay in litigation to show that recent infringing activity has already caused measurable loss of market share, consumer goodwill or loyalty, and influence among retailers.

Mr. Leboutillier's statement that he "saw no reference in these declarations to any report or evidence that suggested that the sale of *Maxwell House* brand coffee in plastic containers would hurt the *Folgers'* brand in any way (especially any material way)" also is an irrelevant argument. P&G's witnesses provided evidence by testifying under oath regarding how they built up market share, consumer goodwill, brand equity, and other advantages over Kraft using P&G's innovative packaging, and by explaining why Kraft's use of that same innovative packaging to catch up with P&G is going to hurt P&G in the marketplace, among consumers, and among retailers.

**B.     Objection: Paragraph 8 (3:22-25)**

Mr. Leboutillier states in paragraph 8:

> 8.      As explained in more detail below, it is my opinion, based on all the data of which I am aware, that P&G has not suffered any economic harm from Kraft's sale of *Maxwell House* brand coffee in plastic containers, and is not being threatened with loss of its market share position, or any other form of injury ***specifically as a result of Kraft's plastic container***. (Emphasis added.)

Mr. Leboutillier's opinion that P&G is not being threatened with loss of market share "specifically as a result of Kraft's plastic container"—an apparent reference to Kraft's belief that its new 100% Arabica blend is also going to be a contributing factor to P&G's losses—is irrelevant. P&G is not required to show prejudice from continued sales of Kraft's plastic container, not that the container is the sole cause of harm to P&G.

C.     **Objection: Paragraph 9 (3:26-4:4)**

Mr. Leboutillier states in paragraph 9:

> 9.     Kraft's best information indicates that, contrary to P&G's asserted experience with *Folgers* brand coffee, Kraft's launch of a new plastic container for 3 lb. equivalent *Maxwell House* brand coffee will not in and of itself result in an increase in sales. Instead, Kraft's sales of *Maxwell House* brand coffee are expected to rise primarily from the introduction of its 100% Arabica blend. This is why Kraft's new marketing campaign touts the advantages of *Maxwell House* brand's 100% Arabica coffee blend, whereas P&G's marketing for *Folgers* brand coffee touts the advantages of its AromaSeal® container.

Mr. Leboutillier apparently is referring to an analysis by Kraft allegedly showing that its new plastic container will not "***in and of itself***" cause increased sales at P&G's expense. Such an analysis is irrelevant. The issue before the Court is whether the new plastic packaging—if Kraft continues to use it—will cause prejudice to P&G, not whether it is the *only* reason that Kraft will gain market share and brand loyalty from P&G. To the contrary, that some consumers will develop a taste for "100% Arabica blend" after being persuaded to try Maxwell House because of its new packaging is further evidence of irreparable harm.

Mr. Leboutillier's account of the analysis performed by Kraft as well as Kraft's marketing is also no substitute for the actual analysis and marketing. Fed. R. Evid. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.") For example, there is no way to tell from Mr. Leboutillier's statement how much Kraft's analysis shows it will gain in market share because of the container that it believed justified an investment of 5 years, $5 million in research and development, and "many tens of million dollars in transition costs." Leboutillier Reply Decl. ¶¶4-5. Similarly, there is no way to tell whether the marketing to which Mr. Leboutillier refers actually hides the fact that Kraft is now selling coffee in an improved plastic container with a handle, snap-on lid, flexible seal, and other advantages of P&G's container.

Mr. Leboutillier's assertion that sales will "primarily" increase because of Kraft's new coffee blend, and not because of Kraft's plastic packaging, is also conclusory and an improper lay

opinion under Fed. R. Evid. 701. To the extent that Mr. Leboutillier is relying on expertise of others who have provided analysis, his opinion is hearsay under Fed. R. Evid. 802.

**D.    Objection: Paragraph 10 (4:5-9)**

Mr. Leboutillier states in paragraph 10:

> 10.    I also note that several P&G declarations have asserted that if P&G were to lose market share to Kraft, it would not be able to reclaim it. (*See, e.g.*, Gemeiner Decl. ¶ 16, Roe Decl. ¶ 9 and Schmeller Decl. ¶ 3.) This speculation is entirely at odds with the same declarants' testimony that, because of Hurricane Katrina, P&G lost market share, but then *within six months*, recovered this market share. (*See, e.g.*, Gemenier Decl. ¶ 11.)

P&G objects to the late timing of Mr. Leboutillier's criticism of the Gemeiner, Roe, and Schmeller declarations. Under the Local Rules, Kraft should have asked Mr. Leboutillier to make these comments in his first declaration so that P&G's witnesses would have a fair opportunity to respond.

P&G also objects to Mr. Leboutillier's opinion that the events surrounding Hurricane Katrina and the events at issue in this lawsuit are analogous. The opinion lacks foundation and is inadmissible under Federal Rules of Evidence 701 and 702. For example, Mr. Leboutillier has not shown that the length of time P&G was impacted by Hurricane Katrina is comparable to the impact from Kraft's competing with P&G, that P&G lost any market share to Kraft during Hurricane Katrina; or that consumer motivations for coming back to Folgers product during the Katrina rebuilding effort are comparable to any comparable motivation to come back to Folgers after consumers have tried and become accustomed to another brand of coffee.

**E.    Objection: Paragraph 11 (4:10-22)**

Mr. Leboutillier states in paragraph 11:

> 11.    Equally important, P&G seems to suggest that a loss of market share is an injury that cannot be assessed in, or compensated for, in money damages. But when we calculate P&G's or Kraft's market share position, we are really looking at the total dollar "spend" in the U.S. ground coffee market, and allocating a percentage of the revenue based on revenues attributable to each particular competitor in that market. So, by way of example only, if the total customer "spend" in a market is $1 billion, a competitor in that market who has a 30% market share is receiving $300 million of the $1 billion of market revenue. If that competitor loses 10% (or 1/3) of its 30% share, that 10% loss has a value of

$100 million. If in fact P&G were somehow able to prove with certainty that Kraft's sale of *Maxwell House* brand coffee in plastic containers was wrongful and that that those sales were the cause of a certain specific percentage of P&G's market share, P&G does not explain why any such loss cannot be recovered in the form of a damages recovery. (Again, I know of no evidence which even suggests that any such loss in market share is provable or is plausible.)

Mr. Leboutillier's opinion that P&G may be able to obtain money damages if it could somehow prove "with certainty" that P&G's plastic containers resulted in "a certain specific percentage of P&G's market share" is an improper legal argument. *Mannick v. Kaiser Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 U.S. Dist. LEXIS 38430, at *48 (N.D. Cal. June 9, 2006) ("Testimony as to ultimate issues is not permitted when it consists of legal conclusions or opinions.")

Mr. Leboutillier's opinion is also irrelevant because P&G's losses are not mere losses in market share, but include lost opportunity to increase market share as well as loss of goodwill, consumer loyalty, brand equity, market penetration, and reduced leadership position among retailers

**F.     Objection: Paragraph 12 (4:24-27)**

Mr. Leboutillier states in paragraph 12:

> 12.     Folgers currently holds an approximately 12 point lead in market share as compared to *Maxwell House*. P&G has cited no survey, study or analysis which suggests that *Folgers'* "captaincy" is being threatened by Kraft's sale of *Maxwell House* brand coffee in plastic containers.

Mr. Leboutillier's opinion that P&G needs a "survey, study or [similar] analysis" to show that captaincy is threatened constitutes an impermissible lay opinion under Federal Rule of Evidence 701 and, alternatively, an impermissible legal argument under Local Rule 7-5(b). No rule of this Court or of the Federal Circuit required P&G to commission a survey before offering the testimonies of P&G's witnesses familiar with P&G's captaincy position and the reasons that P&G enjoys captaincy among some retailers.

1  The Court also should not consider this criticism of the Schmeller and Bello declarations
2  because Mr. Leboutillier did not provide it when he should have—in support of Kraft's motion. By
3  waiting until the reply to make his assertions, Mr. Leboutillier deprived P&G's witnesses of the
4  opportunity to respond, including by explaining that P&G's lead is not so great as to provide
5  captaincy among all retailers—or even at Wal-Mart.

**G.   Objection: Paragraphs 13-16 (5-1-11)**

Mr. Leboutillier states in these paragraphs:

> 13. According to the declaration of P&G's Senior Account Executive for *Folgers*, P&G did not increase the price of its coffee when it introduced its AromaSeal canisters. (*See* Rudy Schmeller Decl. ¶ 8.)
> 14. Similarly, when Kraft introduced its new plastic packaging, Kraft did not change the price it had charged for *Maxwell House* brand coffee that was offered in its new canisters.
> 15. Accordingly, the introduction of Kraft's new packaging is not expected to have any effect on the price that consumers are willing to pay for coffee, whether sold in metal or in plastic containers.
> 16. I am aware of no studies or information demonstrating that the current and historical pricing situation will be any different when both coffees are sold in plastic containers.

Mr. Leboutillier's statements are irrelevant because they do not address the issue raised by the Schmeller declaration in paragraph 8, namely the *effective* higher price consumers were willing to pay for Folgers as reflected by P&G's ability to "significantly reduce the amount of funds used to encourage retailers to support [its] brand in the market." Schmeller Decl. ¶ 8. Fed. R. Evid. 402.

**H.   Objection: Paragraphs 20-21 (6:6-19)**

Mr. Leboutillier states in these paragraphs:

> 20. Kraft is unaware of any practical third-party coffee production and packaging alternatives to Massimo Zenetti Beverage USA ("Massimo"). The known alternatives do not have the capacity or capability to package the volume that Kraft requires. Even Massimo does not have the capacity to support the kind of production that Kraft would require in the face of the injunction sought by P&G. There are no third party alternatives that are Kraft-qualified; *i.e.*, that have demonstrated that they can adequately produce and package Kraft's coffee products.
> 21. Moreover, Kraft had considered using Massimo to produce and package Kraft coffee, but Massimo proved unable to meet Kraft's quality

requirements. A coffee producer and packager is required to develop a coffee blend that matches the specifications of Kraft's proprietary blends. The only way Massimo could be expected to meet Kraft's quality requirements would be for Kraft to disclose to Massimo Kraft's trade secret coffee formulas. Considering that Massimo is a major producer for P&G, one of Kraft's major competitors, this is not a realistic option. In other words, the only practical third party alternative, Massimo, is not an option for Kraft.

Mr. Leboutillier's assertion that no other single third-party has "the capacity or capability to support the kind of production that Kraft would require in the face of the injunction sought by P&G" is irrelevant. Mr. Leboutillier does not explain why Kraft could not use more than one third party provider to meet its needs. Mr. Leboutillier also states that no third-party manufacturers "have demonstrated that they can adequately produce and package Kraft's coffee products," but he does not state that Kraft has investigated all third-party manufacturers and knows that no others can provide the production that Kraft needs.

Mr. Leboutillier's opinion is also conclusory and lacking in foundation with respect to the assertion that "[t]he only way Massimo could expected to meet Kraft's quality requirements would be for Kraft to disclose to Massimo Kraft's trade secret quality requirements." Mr. Leboutillier does not explain why Kraft cannot maintain trade secrets through other means, including by providing Massimo with pre-blended ("co-roasted") coffee beans without disclosing the blend to Massimo.

I.      **Objection: Paragraph 26 (7:14-17)**

In paragraph 26, Mr. Leboutillier opines on the harm to Kraft from an injunction as follows:

> 26.    Contrary to Mr. Goodfellow's speculation, my estimate that it would take Kraft no less than 20 weeks (if Kraft were to pay a very substantial premium to expedite supplies), and up to 25 weeks, to convert all of its coffee production back to metal cans is accurate, and Mr. Goodfellow's speculation to the contrary is incorrect.

These assertions are inadmissible lay opinions because they assume, without adequate foundation, that Kraft could not rely on a third party to supplement its production of metal cans, and on the unexplained statement that a "significant" proportion of Kraft's metal-can manufacturing capability has been removed. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627

1  F.2d 919, 928 (9th Cir. 1980) (agreeing with district court's decision to strike portions of affidavit
2  "on the grounds that the statements were speculative, conclusory, and unqualified opinion
3  testimony"); *see e.g., Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (striking declaration not
4  based on personal knowledge and amounting to unsupported conclusory allegations).

5       The electronic filer hereby attests that the individual whose name appears below has signed
6  this document.  See General Order 45. Section X.

                               Respectfully submitted,

9  DATED: October 2, 2007                 HOWREY LLP

                               By /s/  William C. Rooklidge
                                   William C. Rooklidge
                              Attorneys for THE PROCTER AND GAMBLE
                              COMPANY